OPINION
{¶ 1} George Skatzes was found guilty by a jury in the Montgomery County Court of Common Pleas of three counts of aggravated murder and three counts of kidnapping. The jury recommended the death penalty on two of the counts of aggravated murder, and the trial court agreed with this recommendation. The trial court sentenced Skatzes as follows: two death sentences, to be merged for the purpose of execution; a sentence of life imprisonment on the third count of aggravated murder, with no opportunity for parole for thirty years; and fifteen to twenty-five years on each of the three counts of kidnapping, to run consecutively with the other sentences imposed and with the sentence that Skatzes was serving at the time these offenses were committed. Skatzes appeals from his convictions.
 {¶ 2} The offenses in question arose from an eleven day prison riot in the L-block at the Southern Ohio Correctional Facility at Lucasville ("Lucasville") in April 1993. The L-block at Lucasville consisted of a large central corridor with four cell blocks extending from each side and a gymnasium at one end. Each of the eight cell blocks contained 80 cells, 40 on the lower level and 40 on the upper level accessed by a catwalk. Each cell block also contained restrooms, showers, and unit offices at the end near the central corridor and a locked stairwell at the rear. A recreation yard was accessible through a door in the gymnasium. The eight cell blocks were labeled L-1 through L-8, and the cells within each cell block were numbered 1 through 80. Thus, L-6-60 indicated cell 60 in cell block 6.
 {¶ 3} The state's evidence established the following. The riot was planned by the prison's primary gangs: the Aryan Brotherhood, a white supremacist group, the Muslims, who were mostly black, and the Black Gangster Disciples, who focused on making money rather than on any philosophical viewpoint. It was unusual for these groups to work together. The Muslims were upset on religious grounds by mandatory tuberculosis testing scheduled to begin on Monday, April 12, 1993, and the Aryan Brotherhood was upset by racial integration in inmate housing.
 {¶ 4} On April 11, 1993, Easter Sunday, the riot began in L-block at approximately 3:00 p.m. as inmates from one or two cell blocks were returning from the recreation yard. The prison was short-staffed that day because of the holiday. The inmates overpowered the corrections officers in the gymnasium and in the central corridor, beat them, and took their keys. Within a relatively short period of time, the various cell blocks and individual cells throughout L-block were unlocked, and the inmates were released into the common areas. The corrections officers who had been staffing the cell blocks fled to the locked restrooms and stairwells for safety pursuant to prison policy, but inmates broke through metal doors and cinder block walls using weight bars and furniture and took them hostage. The corrections officers were beaten, some seriously, then were gathered in designated areas and changed into inmate clothing. Meanwhile, the gangs positioned inmate guards at the door to the recreation yard to prohibit inmates from leaving L-block. Over four hundred inmates remained inside L-block for the duration of the riot.
 {¶ 5} The initial hours of the riot were characterized by chaos, random destruction of prison property, and violence against inmates who were believed to be "snitches" or against whom others had personal vendettas. However, the leaders of the three gangs worked together and organization began to emerge. The most seriously injured corrections officers were released onto the recreation yard, and the bodies of several murdered inmates, including Earl Elder, were deposited there as well. Gang members armed themselves with a wide variety of makeshift weapons, established internal rules, designated security officers, and began telephone negotiations with authorities. Each gang occupied a designated area, and each held some of the hostages. Authorities cut off power and water to L-block.
 {¶ 6} Skatzes and Jason Robb were the leaders of the Aryan Brotherhood during the riot. Skatzes was one of the primary negotiators with the authorities during the early days of the riot and identified himself to the authorities. Along with the other inmate negotiators, Skatzes presented a list of demands compiled by gang members and other inmates. The demands related to prison conditions generally, such as the tuberculosis testing and the racial integration, and to conditions as they existed during the course of the riot, such as the need for food drops and the inmates' desire that water and power be restored to L-block. Officials began audio taping these telephone negotiations on April 13. They also installed microphones in tunnels that ran underneath L-block, which were able to record some of the inmates' conversations, including some of the meetings of the gang leaders ("the tunnel tapes").
 {¶ 7} As days passed, there was some unhappiness and restlessness among the gang leaders about the lack of progress in the negotiations. These feelings were exacerbated by an April 14 television broadcast by Tess Unwin, a spokesperson for the Department of Rehabilitation and Corrections, which seemed to disparage the inmates' threat to kill a hostage. During telephone negotiations on the morning of April 15, Skatzes repeated the gangs' demand that water and power be restored to L-block, and he specified that, if the state did not comply by 10:30 a.m., "it's a guaranteed murder." The state did not comply, and at 11:10 a.m., the body of Corrections Officer Robert Vallandingham was placed on the recreation yard by four inmates.
 {¶ 8} Later that day, the gang leaders agreed to release a hostage in exchange for making a radio broadcast regarding their demands. Skatzes made the radio broadcast on behalf of the inmates that night, and Corrections Officer Darrold Clark was released. Because many inmates and gang members were disappointed with Skatzes' presentation of their demands in the radio broadcast, his role in the negotiations diminished after this point.
 {¶ 9} After several more days of negotiation and after consulting with an attorney, the gang leaders agreed to a surrender on April 21, 1993. The surrender occurred over several hours as small groups of inmates were processed by the authorities. The gang leaders were the last inmates to surrender, and the remaining hostages were released. Some murders and attempted murders occurred during the surrender, including the murder of inmate David Sommers, whose body was found when the authorities reentered L-block. As part of their agreement with the authorities, over one hundred gang members were transferred out of Lucasville immediately upon their surrender.
 {¶ 10} When the authorities entered L-block to conduct their investigation, they found vast destruction of prison property. For example, almost all of the windows, toilets, and sinks had been smashed, pipes had been exposed, and fires had been set. Because of the vast destruction, the number of inmates involved, and the elapsed time, the authorities were unable to uncover physical evidence linking crimes to particular inmates. Thus, they built cases based largely upon the testimony of other inmates. In all, fifty inmates were charged with felonies, and many more were disciplined administratively following the riot.
 {¶ 11} Skatzes was indicted for the aggravated murders of Elder, Vallandingham, and Sommers and for kidnapping Elder, Vallandingham, and Clark.[1] The evidence in support of each of these counts will be discussed infra. Each count of aggravated murder included four specifications of aggravating circumstances: that Skatzes was a prisoner at the time of the offense, that the offense was part of a course of conduct by Skatzes involving the purposeful killing of or attempt to kill two or more persons, that the offense was committed while committing kidnapping, and that he had previously been convicted of an offense involving the purposeful killing of another. Each count of kidnapping contained a specification that Skatzes had previously been convicted of an offense that was substantially equivalent to an aggravated felony of the first degree, namely aggravated murder.
 {¶ 12} The case was transferred from Scioto County to Montgomery County, and Skatzes was tried to a jury in October, November, and December 1995. Skatzes elected to have the existence of his prior conviction determined by the trial court, rather than the jury, as permitted by R.C. 2929.022(A). The jury found Skatzes guilty of each count of aggravated murder and found that each of the three specifications submitted to it existed. Additionally, the trial court found that the fourth specification existed, i.e., that Skatzes had previously been convicted of an offense involving the purposeful killing of another. The jury also found Skatzes guilty of each count of kidnapping.
 {¶ 13} Additional evidence was presented at the sentencing phase of the trial. Regarding the murders of Elder and Sommers, the jury concluded that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt and sentenced Skatzes to death. The trial court agreed with this recommendation. With respect to Vallandingham's murder, the jury found that the aggravating circumstances did not outweigh the mitigating factors beyond a reasonable doubt and imposed a sentence of life imprisonment with parole eligibility after serving thirty full years. Skatzes was sentenced as described supra.
 {¶ 14} Skatzes filed a notice of appeal on April 15, 1996. The appeal has been protracted because of irregularities in the record which will be discussed infra. Skatzes raises sixty-two assignments of error in his original brief and nine additional assignments of error in his supplemental briefs. The American Civil Liberties Union of Ohio Foundation has also filed a brief of amicus curiae raising four assignments of error.
 {¶ 15} In his twenty-first through twenty-fourth assignments of error, Skatzes asserts that the state's evidence was insufficient to support his convictions and that the trial court erred in denying his Crim.R. 29(A) motions for acquittal. Because our discussion of these assignments will provide additional information about the facts of this case, we will begin with them. We will briefly address our standard of review for these claims before discussing the assignments of error individually.
 {¶ 16} Crim.R. 29(A) states that the trial court shall enter a judgment of acquittal on one or more offenses charged in the indictment if the evidence is insufficient to sustain a conviction of such offense or offenses. "`[S]ufficiency' is a term of art meaning that legal standard which is applied to determine whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law." State v. Thompkins, 78 Ohio St.3d 380,386, 1997-Ohio-52, citing Black's Law Dictionary (6th Ed. 1990) 1433. When reviewing the sufficiency of evidence, the relevant inquiry is whether any rational finder of fact, viewing the evidence in a light most favorable to the state, could have found the essential elements of the crime proven beyond a reasonable doubt. State v. Dennis,79 Ohio St.3d 421, 430, 1997-Ohio-372, citing Jackson v. Virginia
(1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789. A guilty verdict will not be disturbed on appeal unless "reasonable minds could not reach the conclusion reached by the trier-of-fact." Id.
 {¶ 17} With this standard in mind, we turn to Skatzes' twenty-first, twenty-second, twenty-third, and twenty-fourth assignments of error.
 {¶ 18} "21. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S OHIO CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL ON THE ELDER KILLING AND KIDNAPPING."
 {¶ 19} Skatzes claims that the evidence failed to establish that he was "intentionally involved" in the kidnapping or murder of inmate Earl Elder.
 {¶ 20} The state's evidence established that, at the outset of the riot, Corrections Officer Jeffrey Ratcliff and inmate Elder, who was out of his cell, had fled to the locked rear stairwell of L-2 for safety. Once the inmates had been released from their cells, a group of them bludgeoned the cinder block walls and the door of the stairwell with a weight bar and were eventually able to extract Officer Ratcliff and Elder. Both men were beaten when they emerged. There was some disagreement among the inmate witnesses about whether Skatzes had participated in removing Elder from the stairwell and in beating him. Inmate Miles Hogan testified, however, that Skatzes had been talking to someone through the small window in the L-2 stairway door while others, including the other leaders of the Aryan Brotherhood and the Muslims, had been "punch[ing] holes in the wall" with the weight bar. Hogan testified that the inmates had acted "like a pack of wild dogs" toward the men who had been inside the stairwell and that he was sure Skatzes had been in this group. Aryan Brotherhood lieutenant Rodger Snodgrass and another inmate, Tim Williams, testified that Elder had been locked in L-6-60 after he had been beaten because he was a snitch.
 {¶ 21} Snodgrass further testified that, on the first night of the riot, Skatzes had approached him and had said that they needed to go to L-6. They were joined by a Muslim named Lucky Roper. Skatzes walked Snodgrass to L-6-60 and told Snodgrass to "take care of your business, son." Snodgrass interpreted this statement to mean that he was to kill the man in the cell. Snodgrass was unaware of the man's identity at that point. The cell door was unlocked for Snodgrass, and he could tell that the man inside was already "kind of messed up" from being "assaulted * * * [or] stabbed * * * beforehand * * * [and] was kind of groggy." Snodgrass told Elder to make his peace with God and then stabbed him with a shank resembling an ice pick. Snodgrass stabbed Elder several times in the neck, chest, and side, first while Elder was standing and then while he was on the floor. Elder was still moaning when Snodgrass left the cell. Skatzes and Roper had been by the cell door during the attack and, when it was over, Skatzes had put his arm around Snodgrass and had said "you did a good job, brother, I am proud of you." Snodgrass explained that he had acted on Skatzes' orders because he believed that he would have been killed if he had disobeyed an order from the Aryan Brotherhood. Aryan bylaws were introduced in support of this claim. Roper later told Snodgrass that Elder was not dead and, when Snodgrass conferred with Skatzes about this report, Skatzes told Snodgrass that he would "take care of it."
 {¶ 22} Inmate Williams corroborated much of Snodgrass's testimony. Williams had been invited into L-6 for safety by one of his Muslim friends and was watching late night television in the back of the block on the first night of the riot. He testified that Skatzes, Roper, and Snodgrass had entered L-6 and had walked down the cell block to cell L-6-60. Williams had not previously been aware of the man in that cell, who was "unrecognizable" because his "face was puffy, black and bruised and distorted." According to Williams, the men unlocked the cell, Snodgrass asked the man inside whether he had made peace with his God, and then Snodgrass repeatedly stabbed him. Williams testified that, when Snodgrass had finished stabbing the man, he and Skatzes had walked up the cell block together and Skatzes had placed his arm around Snodgrass's shoulder in a congratulatory gesture "[t]he way that a father would put his arm around his son if he did a good job at something." Skatzes had appeared to be happy with Snodgrass, not angry or upset. Roper went into the cell and inflicted additional wounds after Skatzes and Snodgrass had left. Williams later saw the body being carried out of L-6.
 {¶ 23} Viewing this evidence in a light most favorable to the state, reasonable minds could have concluded that Skatzes had been "intentionally involved" in Elder's kidnapping and murder. The trial court did not err in denying Skatzes' Crim.R. 29(A) motion for acquittal on the charges relating to Elder.
 {¶ 24} The twenty-first assignment of error is overruled.
 {¶ 25} "22. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S OHIO CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL ON THE VALLANDINGHAM KILLING AND KIDNAPPING."
 {¶ 26} Skatzes claims that the state offered no evidence to prove that he had kidnapped or killed Corrections Officer Robert Vallandingham and that his motion for acquittal should have been granted.
 {¶ 27} Numerous witnesses testified that Skatzes had been a high ranking member of the Aryan Brotherhood at Lucasville and had been part of the prisoners' negotiation team. Several inmates testified that they had heard Skatzes talk about killing a guard in order to be taken seriously if demands for the restoration of power were not met. Further, Black Gangster Disciple leader Anthony Lavelle testified that Skatzes had been present at a meeting of gang leaders during which the killing of a guard had been discussed. Snodgrass also testified that Skatzes had been one of the voting members of the Aryan Brotherhood delegation at gang meetings and that Skatzes had not opposed killing a guard. Lavelle stated that both he and Skatzes had agreed with the plan to kill a guard if demands were not met and that, in fact, Skatzes had been designated as the Aryan Brotherhood participant in the killing.
 {¶ 28} Sergeant Howard Hudson of the State Highway Patrol testified that, on the morning of April 15, while negotiating on behalf of the inmates, Skatzes had issued an ultimatum that a guard would be killed if the state did not accede to the inmates' demand that power and water be restored to L-block. Vallandingham's body was brought out onto the recreation yard later that morning, and coroners determined that he had died in the hours immediately preceding the removal of his body. Moreover, inmate Kenneth Hazlett testified that he had seen Skatzes and other gang leaders going into L-6 on the morning of Vallandingham's murder and that they had come back out forty-five minutes to one hour later carrying a body. Inmates David Lomache and Robert Brookover testified that Skatzes had been one of the gang members who had escorted Vallandingham's body through the halls of L-block. Viewing this testimony in a light most favorable to the prosecution, a rational trier of fact could have concluded beyond a reasonable doubt that Skatzes was an active participant in the murder of Vallandingham, and was thus guilty of aggravated murder.
 {¶ 29} There was also sufficient evidence from which a jury could have concluded that Skatzes was an active participant in the kidnapping of Vallandingham and was thus guilty of kidnapping. There was testimony from several witnesses that, due to his leadership role in the riot, Skatzes had exercised control over the movement and treatment of the hostage corrections officers. In particular, inmate Hazlett recalled that Skatzes had moved Vallandingham between cell blocks in the early days of the riot. The fact that Skatzes may not have participated in extracting Vallandingham from the locked bathroom to which he had fled at the outset of the riot does not absolve Skatzes of responsibility for restraining Vallandingham of his liberty during the course of the riot by virtue of his leadership role in the Aryan Brotherhood. Again, a rational trier of fact could have concluded that Skatzes had kidnapped Vallandingham.
 {¶ 30} The trial court did not err in overruling Skatzes' motion for a judgment of acquittal on the counts related to Vallandingham.
The twenty-second assignment of error is overruled.
 {¶ 31} "23. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S OHIO CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL ON THE SOMMER'S [SIC] KILLING."
 {¶ 32} Skatzes claims that there was insufficient evidence that he murdered inmate David Sommers to send the matter to the jury.
 {¶ 33} Various inmates testified that, during the riot, Sommers had controlled the phones in L-2, where the bulk of the negotiations had taken place, and that he had also made bombs. Although L-2 was occupied by the Aryan Brotherhood during the riot, Sommers was not a member of the Aryan Brotherhood, and there was some concern among the Aryans that both Sommers and Brookover were "snitches" who could not be trusted to keep quiet. Brookover testified that, on the day of the surrender, he had been given a lightening bolt tattoo against his will by the Aryan Brotherhood and had been told that he was going to have to kill someone. The apparent purpose of this task was to keep Brookover quiet about what had happened during the riot. Brookover testified that, while the surrender had been underway, inmates Dewey Bocook, Skatzes, and Snodgrass had led him from L-2 into L-7, and then Robb had led Sommers into L-7. Brookover tackled Sommers, stabbed him, and choked him with an extension cord while Skatzes kicked Sommers and repeatedly hit him in the head with a baseball bat as "hard as [he] could hit." Brookover claimed that he had done these things because he had "wanted to live more than anything in the world" and had believed that he would be killed if he did not participate. Brookover stated that the group had surrendered about twenty minutes later after burning some of their clothes.
 {¶ 34} Snodgrass corroborated much of Brookover's testimony. He stated that it had been the unspoken understanding among the Aryan Brothers that, if Brookover had not participated in a killing to show that he was not a snitch or a coward, he would have been killed. He testified that an armed group, including Brookover, had "dressed out" in an extra set of clothes that could be disposed of if they got bloody and had gone from L-2 to L-7 while the surrender was underway. Skatzes had been part of this group and had been armed with a baseball bat, but Snodgrass was unsure whether Skatzes had "dressed out." Snodgrass understood that they were going to kill some inmates who had plotted against the Aryan leadership during the riot, but, when the Muslims refused to release these men, Bocook demanded Sommers instead. According to Snodgrass, Robb led Sommers into L-7, and Skatzes administered "hard swings, straight down swings" with a baseball bat to Sommers' head. Snodgrass saw Brookover strangling Sommers with a cord and others in the group stabbing Sommers and also hitting him with a baseball bat.
 {¶ 35} The coroner testified that Sommers' skull had been "shattered" and that the head wounds had been the fatal blows.
 {¶ 36} From this evidence, a rational trier of fact could have concluded beyond a reasonable doubt that Skatzes had murdered Sommers. The trial court did not err in overruling his motion for acquittal.
The twenty-third assignment of error is overruled.
 {¶ 37} "24. THE TRIAL COURT ERRED WHEN IT DENIED DEFENDANT'S OHIO CRIM.R. 29 MOTION FOR JUDGMENT OF ACQUITTAL ON THE CLARK KIDNAPPING."
 {¶ 38} Skatzes claims that the state's evidence was insufficient to support his conviction for Clark's kidnapping.
 {¶ 39} There is no question that Clark and the other corrections officers were held against their will by the leaders of the riot, and there was overwhelming evidence that Skatzes was one of the Aryan leaders during the riot. Moreover, as discussed supra, several witnesses testified that Skatzes had exercised control over the movement of the hostage corrections officers and how they were treated. For example, Clark himself stated that Skatzes had checked up on the hostages and that, when Clark had asked Skatzes to get him moved out of the Muslim block, Skatzes had moved him to the Aryan block. This evidence was sufficient to sustain Skatzes' conviction for Clark's kidnapping, and the trial court did not err in overruling Skatzes' motion for a judgment of acquittal.
 {¶ 40} The twenty-fourth assignment of error is overruled.
 {¶ 41} We will address Skatzes' remaining assignments of error in the order in which they are presented.
 {¶ 42} "1. THE INDICTMENT WAS INSUFFICIENT TO CHARGE KIDNAPPING, AGGRAVATED MURDER DURING THE COURSE OF A KIDNAPPING, OR THE DEATH SPECIFICATION THAT THE MURDER OCCURRED DURING THE COURSE OF A KIDNAPPING."
 {¶ 43} Skatzes argues that the indictments were defective because they did not fully inform him of the facts and elements of the charges he faced.
 {¶ 44} The offense of kidnapping is set forth at R.C. 2905.01(A) as follows:
 {¶ 45} "No person, by force, threat, or deception, * * * shall remove another from the place where the other person is found or restrain the liberty of the other person, for any of the following purposes:
 {¶ 46} "(1) To hold for ransom, or as a shield or hostage;
 {¶ 47} "(2) To facilitate the commission of any felony or flight thereafter;
 {¶ 48} "(3) To terrorize, or to inflict serious physical harm on the victim or another;
 {¶ 49} "(4) To engage in sexual activity * * * with the victim against the victim's will;
 {¶ 50} "(5) To hinder, impede, or obstruct a function of government, or to force any action or concession on the part of governmental authority."
 {¶ 51} Skatzes claims that the purpose for which the alleged kidnappings were committed was not sufficiently identified in the indictment because the indictment listed four of the five purposes set forth in the statute, R.C. 2905.01(A)(1-3) and (5), "in the disjunctive." Skatzes further argues that, regarding the offense set forth at R.C.2905.01(A)(2), the indictment was defective because it did not identify the underlying felony that he was alleged to have committed.
 {¶ 52} As a preliminary matter, we note that Skatzes did not object to the form of the indictment in the trial court. Crim.R. 12(B)(2) requires that objections to the indictment be raised before trial and, thus, Skatzes has waived all but plain error. Crim.R. 12(G); State v.Frazier, 73 Ohio St.3d 323, 332, 1995-Ohio-235; State v. Loines (1984),20 Ohio App.3d 69, 71. Plain error exists when the outcome would clearly have been different if the error had not occurred and should only be recognized with utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice. State v. Hill,92 Ohio St.3d 191, 203, 2001-Ohio-141; State v. Stallings,89 Ohio St.3d 280, 285, 2000-Ohio-164, citing State v. Long (1978),53 Ohio St.2d 91, paragraph three of the syllabus; State v. Jells
(1990), 53 Ohio St.3d 22, 24, certiorari denied (1991), 498 U.S. 1111,111 S.Ct. 1020. Thus, we review the indictment for plain error.
 {¶ 53} "Courts cannot grant new trials based upon imperfection or inaccuracy in an indictment if the charge is sufficient to fairly and reasonably inform the defendant of the essential elements of the crime."State v. Landrum (1990), 53 Ohio St.3d 107, 119, certiorari denied (1991), 498 U.S. 1127, 111 S.Ct. 1092; Crim.R. 33(E)(1). Crim.R. 7(B) provides that an indictment shall contain a statement of the offense in the words of the applicable statute or in other words sufficient to give the defendant notice of all the elements of the offense with which he is charged.
 {¶ 54} The indictments on kidnapping in Skatzes' case tracked the language of R.C. 2905.01(A) and thus properly charged the offense. SeeState v. Murphy (1992), 65 Ohio St.3d 554, 583; Landrum,53 Ohio St.3d at 119; State v. Grimsley (1998), 131 Ohio App.3d 44, 46-47; Crim.R. 7(B). We are unpersuaded by Skatzes' argument that the indictment was vague in that it specified multiple purposes for the kidnappings "in the disjunctive," leaving him uncertain about which purposes the state intended to allege. In our view, it was apparent that the state intended to show that Skatzes had engaged in kidnapping for all of the stated purposes, rather than for just one of them, notwithstanding its use of the word "or" in listing the elements. The alleged purposes were not mutually exclusive.
 {¶ 55} Skatzes' argument that the indictment was defective because it did not specify the underlying felony regarding R.C. 2905.01(A)(2) is also without merit. The supreme court has held that an indictment is sufficient if it tracks the wording of the applicable statutes, especially when a bill of particulars may be used to obtain additional information. Murphy, 65 Ohio St.3d at 583. See, also, Frazier,73 Ohio St.3d at 332; State v. Reed (May 31, 1991), Lake App. No. 89-L-14-130.State v. Childs, 88 Ohio St.3d 194, 2000-Ohio-298, on which Skatzes relies in his brief, involved the failure to allege an overt act committed in furtherance of an alleged conspiracy. Although the supreme court held that this failure was a fatal defect in the indictment in that case, Skatzes' case is clearly distinguishable from Childs, and we are unaware of any case in which the supreme court has held that the failure to identify an underlying felony is a fatal defect in an indictment. Moreover, we note that Skatzes did avail himself of the opportunity to acquire additional information through a bill of particulars, and the bill of particulars identified aggravated riot as the felony underlying the R.C. 2905.01(A)(2) kidnapping charge. Thus, Skatzes was not unaware of the nature of the charges against him.
 {¶ 56} The first assignment of error is overruled.
 {¶ 57} "2. EVEN IF AN INDICTMENT FOR KIDNAPPING UNDER [R.C.]2905.01(A)(2), AGGRAVATED MURDER DURING A KIDNAPPING UNDER [R.C.]2903.01(B), OR A DEATH SPECIFICATION OF KIDNAPPING UNDER [R.C.]2929.04(A)(7) CAN UNDER SOME CIRCUMSTANCES BE SUFFICIENT WITHOUT IDENTIFYING THE ELEMENT OF PURPOSE OR THE FELONY AT ISSUE UNDER SUBPARAGRAPH (2) OF THE KIDNAPPING STATUTE, IT WAS NOT SUFFICIENT IN THIS CASE WHERE THE FELONY WAS AGGRAVATED RIOT."
 {¶ 58} Some of the counts of kidnapping with which Skatzes was charged alleged a purpose of facilitating the commission of another felony. See R.C. 2905.01(A)(2). Skatzes claims that he "did not learn that the felony underlying the kidnapping charges was aggravated riot until the closing argument." He also contends that, because of the complexity of the aggravated riot statute, R.C. 2917.02, and the state's failure to specify aggravated riot as the underlying felony in the indictment, neither he nor the grand jurors "contemplated this complicated intermingling of statutes and charges."
 {¶ 59} As we discussed under the first assignment of error, Skatzes did not object to the alleged defects in the indictment prior to trial and, as such, has waived all but plain error. See Crim.R. 12(B)(2) and (G); Frazier, 73 Ohio St.3d at 332. We also discussed the fact that underlying felonies are not required to be set forth in the indictment. See Murphy, 65 Ohio St.3d at 583; Frazier, 73 Ohio St.3d at 331-332;Reed, Lake App. No. 89-L-14-130. More importantly, the record wholly undercuts Skatzes' assertion that he did not realize that the underlying felony was aggravated riot until closing arguments. The bill of particulars revealed that aggravated riot was the underlying felony, and the state made reference to this fact in its opening statement. Because we find no plain error, and because Skatzes' assertions about discovering the nature of the underlying felony at closing argument are refuted by the record, we reject his argument that he had no knowledge of the underlying felony of aggravated riot. Further, insofar as there were other purposes set forth in the indictment for which Skatzes was charged with kidnapping, we cannot say that his conviction of kidnapping was dependent upon his having committed an underlying felony of aggravated riot.
 {¶ 60} Likewise, we are unpersuaded by Skatzes' assertion that the indictment does not indicate any understanding on the part of the grand jurors of the "complicated intermingling of statutes and charges" involved in this case. We do not find the aggravated riot statute or the interplay between the aggravated murder, kidnapping, and aggravated riot statutes to be particularly complicated, and we will not presume that the grand jurors did not understand the nature of the offenses presented or of the statutory scheme.
 {¶ 61} The second assignment of error is overruled.
 {¶ 62} "3. THE JURY WAS NEVER ADEQUATELY INSTRUCTED ON THE ELEMENTS OF KIDNAPPING AS AN INDEPENDENT CRIME, AN ASPECT OF AGGRAVATED MURDER UNDER OHIO REV. CODE § 2903.01(B), OR AS A DEATH SPECIFICATION."
 {¶ 63} Skatzes contends that the trial court failed to adequately instruct the jury on the offenses of kidnapping and aggravated riot. The aggravated riot instruction was related to the kidnapping charge because Skatzes was charged with kidnapping Vallandingham for various purposes, one of which was removing Vallandingham by force, threat or deception for the purpose of "facilitating the commission of any felony, to wit: aggravated riot * * *." Skatzes was not charged with the offense of aggravated riot itself.
 {¶ 64} With respect to kidnapping, Skatzes claims that the trial court's instructions failed to require the jury to agree upon his purpose in committing the kidnapping. With respect to aggravated riot, Skatzes claims that the instructions did not convey the need for the jury to unanimously find that Skatzes had engaged in disorderly conduct. He also asserts that the instructions did not require the jury to agree upon whether the riot was committed pursuant to R.C. 2917.02(A)(1) or R.C.2917.02(A)(3). Skatzes' argument ignores the fact that the jury was later instructed at least twice that, before it could find the defendant guilty of an offense for which alternate ways of committing the offense had been provided, it must be unanimous in its verdict on any one alternative. We will infer that Skatzes found this instruction to be inadequate. We note that he did not object to the instructions at issue.
 {¶ 65} "[A] party may not assign as error the giving or the failure to give any instructions unless [he] objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A); Stallings,89 Ohio St.3d at 292. By failing to object, a defendant waives all but plain error. Stallings, 89 Ohio St.3d at 292; State v. Underwood (1983),3 Ohio St.3d 12, 13. Plain error has been defined as "error prejudicial to a defendant * * * which involves a matter of great public interest having substantial adverse impact on the integrity of and the public's confidence in judicial proceedings." (Internal quotation marks omitted.)State v. Endicott (1994), 99 Ohio App.3d 688, 694 As discussed supra, "the plain error rule should be applied with utmost caution and should be invoked only to prevent a clear miscarriage of justice." Underwood,3 Ohio St.3d at 14.
 {¶ 66} In essence, Skatzes argues that his right to a unanimous verdict encompassed a right to a unanimous theory of culpable conduct supporting that verdict. The United States Supreme Court has rejected this argument. In Schad v. Arizona (1991), 501 U.S. 624, 629-630,111 S.Ct. 2491, 2495, the defendant was convicted of first-degree murder after the prosecution advanced theories of premeditated murder and felony murder. No instruction was given to the jurors requiring them to unanimously find the defendant guilty of first-degree murder based on one of these proposed theories. Id. at 630-631, 111 S.Ct. at 2496. The Supreme Court found that different mental states of moral and practical equivalence, as in the case of premeditated and felony murder, may serve as alternative means to satisfy the mens rea element for the single offense of murder without infringing upon the constitutional rights of the defendant. Id. at 643, 111 S.Ct. at 2503. The Court stated:
 {¶ 67} "We have never suggested that in returning general verdicts in [cases proposing multiple theories] the jurors should be required to agree upon a single means of commission, any more than the indictments were required to specify one alone. In these cases, as in litigation generally, `different jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.'" (Citations omitted.) Id. at 631-632, 111 S.Ct. at 2497.
 {¶ 68} At least one Ohio court has found that, like the offenses in Schad, the five purposes listed in Ohio's kidnapping statute "reflect notions of equivalent blameworthiness or culpability" that justify treating them as alternative means to satisfy the mental element of a single offense. State v. Avery (1998), 126 Ohio App.3d 36, 48, citingSchad, 501 U.S. at 643-644, 111 S.Ct. at 2503-2504. The court observed that, "[g]iven the long history of the definition of kidnapping and the widespread use of the definition, it is unlikely that the [defendant] could demonstrate that he could not determine the inherent elements of the crime, or that the state has defined as a single crime multiple offenses that are inherently separate." Id. at 48. The court concluded that the purpose upon which the jury had based a kidnapping conviction did not affect the integrity of the jury's unanimous verdict because the jury's options "did not fall beyond the constitutional bounds of fundamental fairness and rationality." Id., citing Schad,501 U.S. at 645, 111 S.Ct. at 2504. See, also, State v. Evans (Aug. 18, 1993), Hamilton App. Nos. C-910443, C-910515, (concluding that the trial court did not err when it failed to instruct the jury on the need for unanimity on the alternate means of committing theft).
 {¶ 69} For the reasons discussed in Schad and Avery, we share the view that the jurors were not required to unanimously agree upon any one purpose for Vallandingham's kidnapping. Thus, the trial court did not err in failing to give such an instruction.
 {¶ 70} The trial court's instructions on aggravated riot and disorderly conduct were as follows:
 {¶ 71} "Aggravated riot is a felony and is defined as follows: No person being an inmate of a detention facility shall participate with four or more others in a course of disorderly conduct with the purpose to commit or facilitate the commission of a felony and/or when the offender, or any participant to the knowledge of the offender, has on or about his person or under his control, uses, or intends to use a deadly weapon.
 {¶ 72} "Disorderly conduct is defined as follows: No person shall recklessly cause inconvenience, annoyance, or alarm to another by engaging in fighting, in threatening harm to persons or property, or in violent or turbulent behavior."
 {¶ 73} Skatzes does not elaborate on his argument that the jury did not understand the unanimity with which it had to conclude that disorderly conduct and aggravated riot had been committed. For the reasons discussed supra we are unpersuaded that unanimity was required on either of the two definitions of aggravated riot on which the jury was charged. Moreover, it appears to us that the jury was properly instructed that disorderly conduct was an element of the offense of aggravated riot. It was not plain error for the trial court to instruct the jury as it did on these issues.
 {¶ 74} The third assignment of error is overruled.
 {¶ 75} "4. THE JURY WAS NEVER ADEQUATELY INSTRUCTED ON CONSPIRACY AND COMPLICITY."
 {¶ 76} Skatzes claims that the trial court's instruction to the jury on complicity was flawed in two ways.
 {¶ 77} Skatzes contends that the charge was unclear as to the culpable mental state required in that the court stated: "Before you can find the defendant guilty, you must find beyond a reasonable doubt that * * *, acting with the required culpable mental state for the particular offense, [he] * * * conspired with another to commit the offenses." The offenses at issue were aggravated murder and kidnapping. This language tracked the language of the complicity statute, R.C. 2923.03(A), and we are confident that the jurors would have understood this instruction to mean that they should apply the culpable mental state for the offense that they found to be the object of the conspiracy.
 {¶ 78} Skatzes also argues that the trial court defined conspiracy improperly in stating: "You may not find * * * that the defendant conspired with others to commit an offense unless you find beyond a reasonable doubt that a substantial overt act in furtherance of such conspiracy is proved to have been done by him or by a person with whom he conspires, and that such an act wasn't performed subsequent to the defendant's entrance into the conspiracy." (Emphasis added). The court reporter has certified that this was the oral instruction given by the court. If so, the court appears to have stated the opposite of what it intended because an overt act was required subsequent to the defendant's entrance into the conspiracy. R.C. 2923.01(B). We cannot know with absolute certainty whether the trial judge misspoke or whether there was an error in the transcription of this passage. Skatzes did not object to the instruction given from the bench. We will assume, for the sake of argument, that the trial court delivered an incorrect instruction on this matter from the bench. Nonetheless, we are confident that Skatzes was not prejudiced by this misstatement. The jury was provided with written copies of the instructions, and, pursuant to our order of April 25, 2002, these written instructions are part of the record in this case. The written instructions correctly stated the law, and the trial court encouraged the jury to rely upon the written instructions. Moreover, as it was read to the jury, the conspiracy instruction was illogical; it would make no sense to find Skatzes culpable only if overt actions hadpreceded his involvement in the conspiracy. As such, we do not believe that the jury would have relied upon the incorrect oral instruction without further clarification from the court.
 {¶ 79} Because we find no plain error, the fourth assignment of error is overruled.
 {¶ 80} "5. THE STATE'S SHIFTING THEORY OF THE CASE AND EVIDENCE MADE IT IMPOSSIBLE TO DEFEND AND DENIED GEORGE SKATZES NOTICE OF THE CHARGES AGAINST HIM."
 {¶ 81} Under this assignment of error, Skatzes reiterates his claims that "the indictment failed to contain sufficient information to inform him of what acts the State thought sufficient to prove" the charges against him. He claims that the state's theory of the case was "being made up as the case went along" and that he was prejudiced thereby. As we discussed under the first two assignments, we are satisfied that the indictment adequately informed Skatzes of the charges against him. Moreover, our review of the record does not support Skatzes' claim that the state was making its case up as it went along; the state appears to us to have been quite focused on the charges it intended to prove from the outset. Skatzes' assertion that some of the charges against him did not become clear until the jury instructions were given lacks credibility.
 {¶ 82} The fifth assignment of error is overruled.
 {¶ 83} In the sixth, seventh, and eighth assignments of error, Skatzes challenges the admission of statements allegedly made by his co-conspirators. We note, however, that Skatzes did not raise these issues at trial, and thus he has waived all but plain error. See Statev. Lindsey, 87 Ohio St.3d 479, 482, 2000-Ohio-465; State v. Lundgren,73 Ohio St.3d 474, 480, 1995-Ohio-227.
 {¶ 84} "6. THE TRIAL COURT ERRONEOUSLY ALLOWED INMATE SNITCHES TO TESTIFY TO CONSPIRACY STATEMENTS PURSUANT TO EVIDENCE RULE 801(D)(2)(e) WHEN NO PRIMA FACIE SHOWING OF A CONSPIRACY WAS MADE."
 {¶ 85} Skatzes contends that the state did not make a prima facie showing of a conspiracy by independent proof so as to allow the introduction of statements made by his co-conspirators pursuant to Evid.R. 801(D)(2)(e). He also seems to contend that the state was required to expressly state that it was offering testimony pursuant to Evid.R. 801(D)(2)(e) and that the court was required to expressly determine whether a prima facie case had been made before the statements could be admitted.
 {¶ 86} Evid.R. 801(D)(2)(e) provides, in pertinent part, that a statement is not hearsay if it is offered against the defendant by a co-conspirator and the statement was made by the co-conspirator during the course and in furtherance of the conspiracy, upon independent proof of the conspiracy. In other words, in order for the out-of-court declaration of a co-conspirator to be admissible, the state must prove: 1) the existence of the conspiracy; 2) that the declaration was made during the course of the conspiracy; 3) that the declaration was made in furtherance of the conspiracy; 4) the declarant's participation in the conspiracy; and 5) the defendant's participation in the conspiracy.State v. Adkins, 136 Ohio App.3d 765, 773, 2000-Ohio-1656, citing Statev. Daniels (1993), 92 Ohio App.3d 473, 482. The proponent of the statement of the co-conspirator must make a prima facie showing of the existence of a conspiracy by independent proof before the statement is admitted. State v. Smith, 87 Ohio St.3d 424, 434, 2000-Ohio-450; Statev. Carter, 72 Ohio St.3d 545, 1995-Ohio-104, paragraph three of the syllabus. However, nothing in Evid.R. 801(D)(2)(e) requires that explicit findings be made on the record regarding the existence of a conspiracy. State v. Robb, 88 Ohio St.3d 59, 70, 2000-Ohio-275.
 {¶ 87} Skatzes' argument that there was no prima facie evidence of a conspiracy is incredible. At the beginning of the state's case, Steven Macko, who had been imprisoned at Lucasville for eleven years prior to the riot, testified about the three gangs operating in L-block, the relative strengths of the gangs, their cooperation during the riot, and the identities of the gang leaders. Furthermore, Sgt. Hudson testified that it had been apparent from the negotiations that the three gangs were working together to compile their demands and to obtain concessions from the authorities while using the hostage corrections officers as bargaining chips. Clark, one of the hostages, testified about the cooperation among the gangs inside the prison regarding the handling of the hostages. Each of these witnesses identified Skatzes as a leader of the Aryan Brotherhood and as a central figure in the riot and the negotiations. Thus, there was ample evidence of a conspiracy to permit the introduction of evidence pursuant to Evid.R. 801(D)(2)(e). SeeRobb, 88 Ohio St.3d at 70 (holding that similar testimony by Macko and Sgt. Hudson in that case had established a conspiracy by gang members).
 {¶ 88} Skatzes has cited no authority in support of his suggestion that the state was required to make a formal motion to introduce evidence pursuant to Evid.R. 801(D)(2)(e), and we are aware of none. Moreover, the supreme court has held that a trial court is not required to make explicit findings regarding the existence of a conspiracy. Id. As such, Skatzes' procedural arguments are also without merit.
 {¶ 89} The sixth assignment of error is overruled.
 {¶ 90} "7. THE TRIAL COURT ERRONEOUSLY ALLOWED INMATE SNITCHES TO TESTIFY AS CO-CONSPIRATORS PURSUANT TO EVID.R. 801(D)(2)(e) WHEN NO CONSPIRACY WAS CHARGED."
 {¶ 91} Skatzes asserts that co-conspirator statements may be introduced pursuant to Evid.R. 801(D)(2)(e) only if the alleged conspiracy has been charged in the indictment of the party against whom the statement is offered. Because he was not charged with conspiracy, he reasons, the statements should not have been allowed.
 {¶ 92} The plain language of Evid.R. 801(D)(2)(e) does not require that a defendant be charged with the alleged conspiracy before the introduction of his co-conspirators' statements. Moreover, the supreme court has held that the state may prove a conspiracy in order to introduce out-of-court statements by conspirators in accordance with Evid.R. 801(D)(2)(e) even though the substantive offense of conspiracy has not been charged. Robb, 88 Ohio St.3d at 68. See, also, Lindsey,87 Ohio St.3d at 480-482; State v. Milo (1982), 6 Ohio App.3d 19, certiorari denied (1983) 461 U.S. 957, 103 S.Ct. 2429.
 {¶ 93} We also point out that Skatzes' suggestion that the alleged conspiracy must be proven beyond a reasonable doubt is groundless and is refuted by even those cases upon which he seems to rely. As pointed out in Carbo v. United States (C.A.9, 1963), 314 F.2d 718, 736, and quoted in Skatzes' brief, such a requirement would obviate the purpose of Evid.R. 801(D)(2)(e) because, "if by independent evidence the defendant's position as a co-conspirator is to be established * * * beyond a reasonable doubt, there is no occasion ever to resort to the declarations at all."
 {¶ 94} Finally, we note that, insofar as all of the co-conspirator statements specifically objected to in Skatzes' brief related to the actions of other inmates, Skatzes has failed to show that he was prejudiced.
 {¶ 95} The seventh assignment of error is overruled.
 {¶ 96} "8. IN ORDER FOR CO-CONSPIRATOR STATEMENTS TO BE ADMITTED PURSUANT TO EVIDENCE RULE 801(D)(2)(e) THE CONSPIRACY MUST BE A CRIME."
 {¶ 97} Under this assignment, Skatzes contends that Evid.R. 801(D)(2)(e) did not permit the introduction of statements of co-conspirators because the conspiracy that they were alleged to have committed-conspiracy to commit aggravated riot-is not recognized as a crime under Ohio law. Skatzes correctly observes that, pursuant to R.C.2923.01, conspiracy to commit aggravated riot is not recognized as a crime in Ohio. Based on this observation, he concludes that the alleged co-conspirators' statements were not statements against interest, whereby they obtained their only "indicia of reliability," and therefore were not admissible against him. The state, on the other hand, contends that the word "conspiracy," as used in Evid.R. 801(D)(2)(e), does not have the same meaning as the crime of conspiracy as defined in R.C. 2923.01. Unfortunately, neither party has cited any authority in support of its position.
 {¶ 98} Both the Supreme Court of Ohio and the Tenth Appellate District permitted the admission of co-conspirators' statements pursuant to Evid.R. 801(D)(2)(e) in the case against Jason Robb, one of Skatzes' co-conspirators. Robb, 88 Ohio St.3d at 68; State v. Robb (Apr. 30, 1998), Franklin App. No. 95APA08-1003. Obviously, the nature of the conspiracy in that case was identical to the conspiracy here. Furthermore, the co-conspirators' statements were admissible pursuant to Evid.R. 801(D)(2)(e) because the state presented ample prima facie evidence of a conspiracy to commit kidnapping and murder in addition to its evidence of conspiracy to commit aggravated riot. Conspiracy to commit kidnapping and murder are clearly recognized under Ohio law, R.C.2923.01, and the prima facie evidence of these conspiracies justified the admission of co-conspirator statements pursuant to Evid.R. 801(D)(2)(e) independent of any evidence of aggravated riot. Thus, the prosecutor's error, if any, in referring to an underlying conspiracy to commit aggravated riot was harmless.
 {¶ 99} The eighth assignment of error is overruled.
 {¶ 100} "9. THE PROBATIVE VALUE OF CO-CONSPIRATOR STATEMENTS OFFERED AGAINST DEFENDANT UNDER OHIO EVID.R. 801(D)(2)(e) WAS SUBSTANTIALLY OUTWEIGHED BY THE RISKS OF PREJUDICE AND CONFUSION."
 {¶ 101} Skatzes contends that, even if co-conspirator statements were properly admitted against him pursuant to Evid.R. 801(D)(2)(e), "the statements used in this case should have been excluded because the risk of prejudice and confusion far outweighed any remote probative value they may have had."
 {¶ 102} The admission or exclusion of relevant evidence rests within the sound discretion of the trial court. Robb,88 Ohio St.3d at 68, citing State v. Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus; State v. Edmonds (2000), 139 Ohio App.3d 298, 300. These decisions will not be disturbed on appeal absent an abuse of discretion.Edmonds, 139 Ohio App.3d at 300, citing State v. Graham (1979),58 Ohio St.2d 350, 352. The term "abuse of discretion" connotes more than an error of law or judgment; it implies that the court's attitude was unreasonable, arbitrary, or unconscionable. State v. Weaver (1988),38 Ohio St.3d 160, 161, citing Blakemore v. Blakemore (1983),5 Ohio St.3d 217, 219.
 {¶ 103} Skatzes argues that the state, defense counsel, and the court "engaged in a full scale abandonment of responsibility" regarding the prejudicial effect of the inmate snitches' testimony against him. The testimony of other inmates was relevant, however, in that it helped to prove a conspiracy, namely that prison gang leaders, including Skatzes, had conspired over eleven days to seize and control L-block, to settle old scores, to take hostages and even to murder one, all in an attempt to force concessions from prison authorities. See Robb,88 Ohio St.3d at 68. The probative value was not "remote," as Skatzes contends. This testimony was undoubtedly prejudicial, but we are unpersuaded that it was unfairly prejudicial. "Evid.R. 403 speaks in terms of unfair prejudice. Logically, all evidence presented by a prosecutor is prejudicial, but not all evidence unfairly prejudices a defendant. It is only the latter that Evid.R. 403 prohibits." State v. Wright (1990),48 Ohio St.3d 5, 8. Although much of the testimony of the other inmates was unfavorable to Skatzes, it was not unfairly prejudicial, and the trial court did not err in admitting it pursuant to Evid.R. 403(A) because it was relevant to the crimes with which Skatzes was charged.
 {¶ 104} The ninth assignment of error is overruled.
 {¶ 105} "10. EVIDENCE OF OTHER ACTS WAS ERRONEOUSLY ADMITTED AT TRIAL."
 {¶ 106} Skatzes claims that the state offered evidence of others acts that he had committed in violation of Evid.R. 404(B) and R.C. 2945.59
and that the "huge volume of other acts evidence in effect became a non-statutory aggravating factor" in his case.
 {¶ 107} Most of the evidence cited by Skatzes involved acts he committed during the course of the riot for which he was not charged, such as the destruction of property, disciplining inmates by violent means, and his involvement in the Aryan Brotherhood. The state contends that this evidence was properly offered to show Skatzes' leadership role in the Aryan Brotherhood and in the riot. We agree. For example, Skatzes' physical confrontation with an inmate who was stealing food from the hostage corrections officers showed his leadership role and demonstrated that the gangs had set up a code of conduct by which members were bound during the riot. This and other evidence related to Skatzes' involvement in the Aryan Brotherhood during the riot was offered not as a comment on Skatzes' character but as evidence of Skatzes' leadership role, which bore directly upon the power he wielded during the riot and upon the crimes with which he was charged. This is precisely the type of evidence permitted by R.C. 2945.59.
 {¶ 108} Some of the other evidence cited by Skatzes involved events outside the scope of the riot, and the admission of this evidence was more problematic. For example, the state offered testimony that Skatzes had participated in a hunger strike and in clogging toilets at the Mansfield Correctional Institution after the riot as part of an Aryan Brotherhood protest. The state claims that this evidence was admissible because it also showed Skatzes' membership and leadership in the Aryan Brotherhood. Insofar as abundant evidence of Skatzes' involvement with the Aryan Brotherhood existed from the riot itself, we agree with Skatzes that evidence of his participation in Aryan Brotherhood activities at Mansfield after the riot could have been excluded pursuant to Evid.R. 404(B). We note, however, that these events were close in time to the riot and that the trial court had broad discretion in this regard. We also note that Skatzes did not object to the testimony in question. Moreover, in light of the ample evidence of Skatzes' involvement in violent acts during the riot, we do not believe that evidence that he had clogged a toilet or had engaged in a hunger strike would have prejudiced him in the eyes of the jury.
 {¶ 109} The tenth assignment of error is overruled.
 {¶ 110} "11. THE TRIAL COURT ERRED IN ADMITTING BAD ACTS OF OTHERS ATTRIBUTED TO THE ACCUSED THROUGH A CONSPIRACY THEORY BASED ON AN UNCHARGED CRIME AND UNCHARGED CONSPIRACY IN VIOLATION OF OHIO EVID.R. 403 404."
 {¶ 111} Under this assignment of error, Skatzes objects to the admission of testimony "about the bad acts of others that did not involve George Skatzes * * * [including] accounts of the early violence in the takeover, beatings of guards and inmates, threats, references to weapons, and other bad acts." Skatzes claims that this evidence should have been excluded pursuant to Evid.R. 403 and 404(B).
 {¶ 112} The crimes of which Skatzes was accused occurred within the context of an eleven day riot involving hundreds of inmates and, in particular, scores of gang members who worked in concert to achieve concessions from authorities. The state was entitled to present evidence about the context of the alleged crimes to make the actions of the participants more understandable to the jurors. Skatzes did not commit the crimes in a vacuum, and the state was not required to proceed as if he had. Thus, the trial court had wide latitude to permit the presentation of evidence about how the riot started and unfolded, the rules and procedures established by the gangs during the course of the riot, how infractions were dealt with, and the ways in which the relationships between the gangs and gang members affected how events unfolded. All of this information was relevant to the biases of the various witnesses and to the reasons that they behaved the way they did. Although Skatzes claims that this evidence "inflame[d] the passions and sympathies of the jurors," he has made no specific argument in this respect, and we are unpersuaded that the testimony had this effect. Because the prison culture and gang loyalty demonstrated by much of this testimony would not have been within the knowledge or experience of the average juror, the trial court could have reasonably concluded that its probative value outweighed the danger of unfair prejudice or confusion of issues and that this evidence was admissible pursuant to Evid.R. 403.
 {¶ 113} Moreover, Evid.R. 404(B) was inapplicable to the evidence about which Skatzes complains under this assignment of error because the "other acts" at issue were not acts committed by Skatzes. Evid.R. 404(B) prohibits evidence of other acts offered "to prove the character of a person in order to show that he acted in conformity therewith." Skatzes' argument implies that the acts of one person could be offered to prove the character of another person. We find this argument to be illogical, and we are confident that the other acts to which Evid.R. 404(B) refers must be the acts of the person whose character is at issue. Insofar as Skatzes' character was at issue, we fail to see how evidence of the bad acts of others would have been prohibited by Evid.R. 404(B).
 {¶ 114} The eleventh assignment of error is overruled.
 {¶ 115} "12. THE TRIAL COURT ERRED WHEN IT OVERRULED DEFENDANT'S OBJECTION TO RO[D]GER SNODGRASS TESTIFYING ABOUT AN UNVERIFIED AGREEMENT CONCERNING THE TREATMENT OF WHITE INMATES DURING THE TAKEOVER."
 {¶ 116} Skatzes claims that the trial court erred in allowing Snodgrass to testify that the Aryan Brotherhood had reached an agreement with the Muslims regarding the treatment of white inmates during the riot because Snodgrass did not identify with sufficient certainty from whom he had heard about the alleged agreement.
 {¶ 117} Snodgrass testified that he had murdered Earl Elder under Skatzes' orders and that a Muslim named Lucky Roper had appeared to confer with Skatzes prior to the murder and had watched the murder along with Skatzes. When the state asked Snodgrass why he and Skatzes had been involved in this murder with a Muslim, Snodgrass replied that, according to Robb, the Aryan Brotherhood had made a pact with the Muslims. Snodgrass stated that Skatzes had explained the pact to him as follows: "[N]o more white guys were going to be killed in that riot, without sanctions from the AB, * * * that if they [white guys] were to be killed, they were goin' to be killed by their own kind or at least given that opportunity." Snodgrass then wavered, however, about whether the information attributed to Skatzes about the terms of the pact had, in fact, come from Skatzes. He allowed for the possibility that Robb or another person in the Aryan Brotherhood leadership had supplied him with this information. Skatzes claims that this testimony was inadmissible pursuant to Evid.R. 404(B) and Evid.R. 802 and that it was "no more than gossip" and speculation. These arguments are without merit. Evid.R. 404(B) had no bearing on the trial court's decision because the testimony did not evince any prior crime, wrong, or act. Moreover, Snodgrass did not speculate that a pact had been reached by the Muslim and Aryan Brotherhood leadership; according to his testimony, Snodgrass had been told of such a pact but could not remember with certainty who had told him about it.
 {¶ 118} More importantly, however, the testimony was admissible pursuant to Evid.R. 801(D)(2). Evid.R. 801(D)(2)(a) permits the use of a party's own statement against him and, accordingly, allowed the testimony at issue if the statement was made by Skatzes. If the statement was not made by Skatzes but was made instead by Robb or another Aryan Brotherhood leader, the possibility of which Snodgrass conceded, then it was admissible pursuant to Evid.R. 801(D)(2)(e), which permits a statement made by a co-conspirator of a party during the course and in furtherance of the conspiracy.
 {¶ 119} The twelfth assignment of error is overruled.
 {¶ 120} "13. THE JURY WAS NEVER ADEQUATELY INSTRUCTED ON THE USE OF OTHER ACTS EVIDENCE."
 {¶ 121} Skatzes asserts that the trial court's instructions on other acts evidence left the jurors "unable to tell which evidence was other acts and thus how to use it in their deliberations." Skatzes also points out that the testimony of "inmate snitches" regarding other acts was "highly suspect."
 {¶ 122} Skatzes appears to suggest that the trial court should have enumerated for the jury the other acts about which evidence was presented and the evidence in support of those acts. Skatzes has cited no authority requiring a trial court to instruct a jury at such length, and we are aware of none. It was the jury's responsibility to review the evidence. Moreover, based on the instructions given, we are confident that the jurors understood the concept of other acts evidence, i.e., acts other than those for which Skatzes was indicted, and what legitimate purposes it served.
 {¶ 123} We also reject Skatzes' claim that, because of extensive testimony from "inmate snitches" in this case, the jurors should not have been allowed to draw the usual inferences from the acts of accomplices about motive, purpose, or knowledge. The jury was fully instructed that accomplices "may have special motives in testifying" and that their testimony should be carefully examined, used with great caution, and viewed with grave suspicion. Nothing further was required.
 {¶ 124} The thirteenth assignment of error is overruled.
 {¶ 125} "14. THE STATE IMPROPERLY VOUCHED FOR THE CREDIBILITY OF ITS WITNESSES AND EVIDENCE."
 {¶ 126} Skatzes claims that the state improperly vouched for the credibility of its witnesses and its evidence in four respects. We will address each of these arguments in turn. We point out, however, that most of the comments addressed in Skatzes' argument were not objected to at trial, and thus Skatzes has waived all but plain error. See Lundgren,73 Ohio St.3d at 484, citing State v. Williams (1977), 51 Ohio St.2d 112, death penalty vacated on other grounds (1978), 438 U.S. 911,98 S.Ct. 3137.
 {¶ 127} First, Skatzes contends that, in its opening statement, the state interfered with his right to a fair trial by discussing the challenges in gathering evidence in this case, including the length of the riot, the number of inmates involved, and the lack of integrity of the crime scenes, and by mentioning that the state had been unable to identify the perpetrator or perpetrators with respect to many offenses. In explaining these facts, the prosecutor referred to investigative procedures and to agreements that were struck with some inmates to piece together what had happened during the riot. Skatzes claims that these comments "created the impression that not only was the state vouching for the credibility of its witnesses but also for George Skatzes' guilt." We are unpersuaded by this argument. We do not think that the inference Skatzes suggests was implicit in the prosecutor's comments. The state was entitled to present evidence regarding its methods of investigation following the riot and to comment upon that evidence in its opening statement. Moreover, it is common practice for prosecutors to elicit or disclose information about plea agreements "to blunt or foreclose unfavorable cross-examination revealing that [witnesses] agreed to testify in exchange for favorable treatment by the prosecutor." Statev. Cornwell, 86 Ohio St.3d 560, 571, 1999-Ohio-125. Such disclosure is not prejudicial to the defendant, and may even be beneficial to him. Id.
 {¶ 128} Second, Skatzes argues that the state unfairly vouched for the credibility of its inmate witnesses through the testimony of Sgt. Hudson, who had assisted in the investigation of the riot. Sgt. Hudson testified that a computer database had been used to cross-reference the information provided by different inmates and the information provided by a particular inmate on different occasions. He also testified about the need to make deals with some of the inmates in exchange for their testimony and about the special protection that was afforded to cooperating inmates. An objection was sustained regarding a comment by Sgt. Hudson that the deals with the inmates were necessary to "get the truth." In our view, considering that there were over four hundred potential suspects and witnesses to the crimes that occurred during the course of the riot, the state was certainly entitled to present evidence regarding how the investigation was conducted and how the evidence was collected and organized. Sgt. Hudson's testimony on this issue did not improperly vouch for the conclusions reached by investigators. Moreover, nothing that Sgt. Hudson said could be reasonably interpreted to "impl[y] that all of the information fed into the computer system support[ed Skatzes'] prosecution," as the defense suggests.
 {¶ 129} Third, Skatzes claims that the state improperly "stamp[ed] * * * the imprimatur of the prosecutor's office" on the testimony of inmate David Lomache by making it clear to the jury that Lomache had worked with the prosecutor in deciphering one of the tunnel tapes. This argument is without merit. The prosecutor revealed that he had worked with Lomache to decipher the tape, and Lomache testified that the prosecutor had not coached him about what he might hear on the tape. This evidence of cooperation did not amount to vouching for the witness's credibility.
 {¶ 130} Fourth, Skatzes contends that the prosecutor vouched for the credibility of inmate witnesses Brookover and Lavelle "by indicating that their plea bargains were guarantees of truthfulness." Brookover and Lavelle each testified on direct examination that their plea agreements required them to testify truthfully and that, if they did not do so, the agreements could be withdrawn. The supreme court addressed this argument in Cornwell, 85 Ohio St.3d at 570-571, and concluded that such questions by a prosecutor are not improper and do not prejudicially affect a defendant's substantial rights. The court further observed that "a `truthful testimony' clause in the plea agreement can be a two-edged sword. Defense counsel can effectively argue to the jury that such a clause gives the witness incentive not to tell the truth but to please the prosecutor." Id. at 570.
 {¶ 131} Skatzes' arguments that the state vouched for the credibility of its witnesses are without merit.
 {¶ 132} The fourteenth assignment of error is overruled.
 {¶ 133} "15. THE CRIME SCENE PHOTOS WERE INADMISSIBLE UNDER OHIO EVID.R. 403."
 {¶ 134} Skatzes contends that the 275 crime scene photographs that were admitted into evidence had no probative value and were prejudicial and inflammatory. Thus, he claims that these photographs should have been excluded pursuant to Evid.R. 403.
 {¶ 135} Evid.R. 403(A) provides that relevant evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, of confusion of the issues, or of misleading the jury. The admission of photographs is left to the sound discretion of the trial court. Robb, 88 Ohio St.3d at 71.
 {¶ 136} The photographs at issue were introduced during the testimony of Sgt. Hudson, who was a member of the negotiating team during the riot and was one of the investigators following the riot. The photographs depicted the condition of L-block when investigators first accessed it after the riot. The pictures were probative of the inmates' activities during the riot: security measures that they had taken, such as blockades at entrances and bed sheets tied flat beneath vents to prevent authorities from dropping tear gas, remnants of fires, the positioning of mattresses throughout the hallways and gymnasium, and the like. The pictures also showed the holes that had been battered through concrete block walls and metal doors to get guards and inmates out of the locked stairwells and bathrooms at the beginning of the riot and the instruments used to create these holes. A few pictures depicted the bodies that were found in L-block when the authorities reentered; others showed blood-soaked areas where acts of violence had obviously occurred at some point during the riot. Some photographs showed graffiti and banners crafted by the inmates evincing gang activity and their demands during the riot; others showed a huge array of homemade weapons. Additionally, almost all of the pictures in some way revealed the vast random destruction of the block, which included pipes torn from the walls, shattered consoles, toilets, and sinks, drywall knocked from the ceilings, broken windows, metal bars removed from inside windows, and huge amounts of garbage.
 {¶ 137} Skatzes did not object to the admission of these photographs at trial; in fact, his attorney expressly stated that he did not have any objection. Thus, we review the trial court's decision for plain error. Lundgren, 73 Ohio St.3d at 484; Underwood,3 Ohio St.3d at 13.
 {¶ 138} The photographs were used to present background information regarding what had happened in L-block during the riot. They established the existence of gang activity and the presence of weapons, and they provided information about normal prison operations and the manner in which the corrections officers had been captured. In addition, with the use of these photographs, Sgt. Hudson testified regarding where hostages had been held, where the various gangs had stayed during the riot, and where negotiations had taken place. The condition of L-block was also probative of the extent to which the inmates had controlled the area and the challenges negotiators had faced in dealing with them, such as inmates' fears that prison officials would release tear gas into the unit. As Skatzes admits, none of the pictures tied him to the offenses he was alleged to have committed. In our view, the photographs were probative and were not "highly inflammatory," especially in light of the fact that they did not directly implicate Skatzes in any crime. It was not plain error for the trial court to admit these photographs. See State v. Wickline (1990), 50 Ohio St.3d 114,119-120.
 {¶ 139} The fifteenth assignment of error is overruled.
 {¶ 140} "16. THE TRIAL COURT ERRED WHEN IT DENIED GEORGE SKATZES' MOTION TO SEVER THE CHARGES AND TRIALS AGAINST HIM."
 {¶ 141} Skatzes contends that the trial court erred in overruling his motion to sever the counts in the indictment and to try the offenses separately. He claims that the evidence as to each offense was weak and that his convictions resulted from "prejudicial spillover from one crime to the next."
 {¶ 142} Crim.R. 8(A) provides:
 {¶ 143} "Two or more offenses may be charged in the same indictment * * * if the offenses charged * * * are of the same or similar character, or are based on the same act or transaction, or are based on two or more acts or transactions connected together or constituting parts of a common scheme or plan, or are part of a course of criminal conduct."
 {¶ 144} Crim.R. 14 provides for relief from joinder where either party is prejudiced thereby. State v. Lott (1990), 51 Ohio St.3d 160,163.
 {¶ 145} "[J]oinder and the avoidance of multiple trials [are] favored for many reasons, among which are conserving time and expense, diminishing the inconvenience to witnesses and minimizing the possibility of incongruous results in successive trials before different juries."State v. Torres (1981), 66 Ohio St.2d 340, 343, citing State v. Thomas
(1980), 61 Ohio St.2d 223, 225. The defendant claiming error in the trial court's refusal to sever multiple charges has the burden of affirmatively showing that his rights were prejudiced. Id. For an appellate court to reverse a trial court's ruling denying severance, the defendant must demonstrate that the trial court abused its discretion. Id.; Lott, 51 Ohio St.3d at 163.
 {¶ 146} When a defendant argues that the combination of separate offenses prejudiced him by its cumulative effect on the jury, the prosecutor can negate such claims by showing that either: 1) the evidence of each of the joined offenses would have been admissible at separate trials; or 2) the evidence of each crime joined at trial is simple and direct such that it can be readily separated. Torres,66 Ohio St.2d at 344; Lott, 51 Ohio St.3d at 163. See, also, State v. Mills (1992),62 Ohio St.3d 357, 362. If evidence of each of the joined offenses would have been admissible at separate trials, severance is not required because prejudice due to the cumulation of evidence or the inference of criminal disposition is largely absent. State v. Benner (1988),40 Ohio St.3d 301, 306, certiorari denied (1990), 494 U.S. 1090,110 S.Ct. 1834, citing State v. Hamblin (1988), 37 Ohio St.3d 153, 159.
 {¶ 147} The offenses for which Skatzes was indicted were part of a common scheme or plan or were part of a course of criminal conduct. As such, they were properly joined pursuant to Crim.R. 8(A), and Skatzes bore the burden of showing that he was prejudiced by the joinder. Skatzes asserts that he was prejudiced because the evidence relating to the various crimes with which he was charged would not have been admissible if the charges had been tried separately. He does not, however, cite any authority or present any argument in support of this assertion. In our view, the trial court could have reasonably concluded that the evidence of other acts that occurred during the course of the riot would have been admissible to prove motive or plan if the offenses had been tried separately. See Evid.R. 404(B). As such, the trial court could have reasonably concluded that Skatzes was not prejudiced by the joinder.
 {¶ 148} The trial court could also have reasonably concluded that the evidence was sufficiently straightforward that the jury was capable of separating it as to each offense. Although the evidence in the case was voluminous, Skatzes makes no specific argument in support of his claim that it was so "complex" as to prevent the jury from understanding the evidence relevant to each charge, and we are unpersuaded that the jury was unable to separate the evidence regarding each offense.
 {¶ 149} Finally, amicus urges that the evidence against Skatzes was so weak that the jury could only have found him guilty by viewing the evidence cumulatively and that, if the charges had been tried separately, "the Court might well have been obligated to grant * * * [a] motion pursuant to Crim.R. 29(A) to dismiss" in each case. In support of this position, amicus urges that the testimony of Skatzes' "prisoner `complicitors,'" upon which the convictions were partially based, was unreliable. In response to this argument, we simply point out that whether the testimony of other prisoners was reliable or credible goes to the weight of the evidence, not its sufficiency. See Thompkins,78 Ohio St.3d at 386-387. Thus, the reliability of the testimony was an issue for the jury and would not have been grounds for granting a motion made pursuant to Crim.R. 29(A).
 {¶ 150} The sixteenth assignment of error is overruled.
 {¶ 151} "17. THE TRIAL COURT ERRED WHEN IT FAILED TO REQUIRE FAIR AND EVENHANDED VOIR DIRE PROCEDURES."
 {¶ 152} Skatzes claims that the state was given much wider latitude than the defense in conducting voir dire. The record and the examples cited by Skatzes do not support this contention. The trial court prohibited the defense from questioning potential jurors regarding specific mitigating factors about which no evidence had yet been offered, such as how they would view evidence that an inmate had protected other inmates from harm during the riot. The supreme court has held that a trial court acts within its discretion in refusing to allow such specific questioning about mitigation evidence. See State v. Wilson,74 Ohio St.3d 381, 386-387, 1996-Ohio-103; Lundgren,73 Ohio St.3d at 481. The state's questions concerned the jurors' understanding of the concept of mitigation and were based on hypotheticals unrelated to the facts of this case. The trial court did not abuse its discretion in treating these lines of questioning differently.
 {¶ 153} Further, Skatzes contends that the trial court erred in not excusing prospective juror Cynthia Hicks after she questioned whether any mitigation evidence could be compelling enough to cause her to impose a life sentence, rather than a death sentence, upon someone who had committed three murders. Viewing the voir dire of Hicks as a whole, it is clear that she was willing to consider any evidence that the court instructed her to consider in mitigation but that she believed it "would have to be awful strong evidence" to convince her to impose a sentence of life upon someone who, according to the defense's hypothetical, had committed three deliberate murders. The trial court did not err in refusing to excuse Hicks for cause.
 {¶ 154} The seventeenth assignment of error is overruled.
 {¶ 155} "18. THE TRIAL COURT ERRED WHEN IT OVERRULED THE OBJECTION TO RO[D]GER SNODGRASS TESTIFYING ABOUT DAVID SNOW ON THE BASIS OF HEARSAY STATEMENTS ABOUT INMATE BROOKOVER."
 {¶ 156} Snodgrass testified that, after he had been transferred to the Mansfield Correctional Institute at the end of the riot, he had received a letter from David Snow, an Aryan Brotherhood member in the general population, in which Snow had stated that Brookover was "a maggot * * * [and] a snitch" who had "brought down the A.B. somehow in a murder case in Arizona." Snodgrass apparently celled next to Brookover at that time, and many inmates believed that Brookover was working with the authorities. Skatzes argues that Snow's letter to Snodgrass was irrelevant and that his objection to this testimony should have been sustained. While we agree that the testimony was irrelevant, we fail to see how Skatzes could have been prejudiced by it. As such, the trial court's error was harmless.
 {¶ 157} The eighteenth assignment of error is overruled.
 {¶ 158} "19. THE TRIAL COURT ERRED WHEN IT OVERRULED THE OBJECTION TO THE TESTIMONY OF KENNETH HAZLETT THAT AN INMATE TOLD HIM THAT THE INMATE HAD BEEN FORCED TO CARRY SEVERAL BODIES."
 {¶ 159} Skatzes objects to testimony by inmate Kenneth Hazlett that another inmate, Bobby Bass, had told Hazlett that he had been forced to carry bodies during the riot, including the body of Vallandingham. The state contends that this testimony was admissible pursuant to Evid.R. 801(D)(2)(e) or that, in the alternative, it was harmless error.
 {¶ 160} Evid.R. 801(D)(2)(e) provides that statements of co-conspirators are not hearsay under certain circumstances. The state asserts that Bass was a "forced" co-conspirator and that his statement was therefore admissible under this rule. While Bass may have been forced to carry bodies, we do not accept the state's argument that he was thereby a co-conspirator. We do agree with the state's position, however, that any error in the admission of this statement was harmless. Bass's statement did not implicate Skatzes, and there was no dispute that bodies had been moved around within L-block and placed out on the recreation yard. We are unpersuaded that Skatzes was prejudiced by this testimony.
 {¶ 161} The nineteenth assignment of error is overruled.
 {¶ 162} "20. GEORGE SKATZES WAS DENIED AN IMPARTIAL JUDGE."
 {¶ 163} Skatzes contends that numerous factors in the trial judge's handling of the case demonstrated that he was partial, including: 1) his failure to treat the case independently; 2) his disparate rulings on the parties' objections; 3) his failure to reprimand the prosecutor for comments made to Skatzes; 4) his failure to order a competency evaluation; and 5) his failure to control and preserve the record of the proceedings. We will briefly discuss each of these issues; however, we note that most of these issues are touched upon in other assignments of error as well.
 {¶ 164} First, Skatzes asserts that "[t]he court made evidentiary rulings not on the basis of the law or even the judge's own good instincts, but rather on the basis of what was done in the Robb case." In doing so, Skatzes claims that the judge assumed the role of the prosecutor. The fact of the matter is that there were many similarities between Jason Robb's case and Skatzes' case: both men were alleged to have been leaders of the Aryan Brotherhood at Lucasville during the riot, many of the same witnesses were called at each trial, and some of the same attorneys and the same judge were involved. Because of the similarities between the two cases, some of the legal and evidentiary issues overlapped. When similar issues arose, the prosecutors and the judge sometimes acknowledged this fact by referring to the judge's rulings in the Robb case. In our view, these references do not evince any bias. See, also, our discussion of the thirtieth assignment of error, infra.
 {¶ 165} Second, Skatzes contends that the court did not act evenhandedly in ruling on the parties' objections. Our review of the record does not reveal any disparate treatment in this regard. Even if it is true, as Skatzes implies, that more defense objections were overruled than state objections, the numbers themselves would not demonstrate prejudice. The trial court must base its decisions upon the perceived merit of the objections raised without regard to whether the parties are receiving equivalent shares of favorable rulings.
 {¶ 166} Third, Skatzes claims that the trial judge showed bias in failing to reprimand the prosecutor for an exchange in which the prosecutor indicated that, if the defense intended to comb through the disciplinary records of each of the state's inmate witnesses, the state would do the same with the defense witnesses, including Skatzes. The state encouraged the judge to rule that either both parties must be allowed to engage in this type of cross-examination or that neither party should be allowed to question inmate witnesses about their prison disciplinary records. There was nothing improper about this exchange, and thus there was no reason to reprimand the prosecutor.
 {¶ 167} Fourth, Skatzes faults the court for not ordering a competency evaluation, sua sponte, based on his own characterization of himself as "paranoid," his inability to remember events during the riot, and his contradiction of the testimony of other defense witnesses that he had been unarmed during the riot. None of these issues was directly relevant to Skatzes' ability to understand the nature and objective of the proceedings against him and to assist in his defense. See R.C.2945.37(A); State v. Carter, 89 Ohio St.3d 593, 603, 2000-Ohio-172. These factors were insufficient to warrant ordering a competency evaluation, and the trial court did not show bias in failing to do so. See, also, our discussion of the fortieth assignment of error, infra.
 {¶ 168} Fifth, Skatzes contends that the record problems in this case show partiality on the part of the trial judge. We will discuss these record problems in greater detail under the sixtieth assignment of error. With respect to a showing of bias, we simply note that offering exhibits into the record was not the responsibility of the trial judge and that the judge does not appear to have played any role in the disappearance of exhibits from the record.
 {¶ 169} The twentieth assignment of error is overruled.
 {¶ 170} "25.THE PROSECUTION'S REFERENCES TO MR. SKATZES' PRIOR CONVICTION DURING GUILT AND MITIGATION CROSS-EXAMINATION AND CLOSING ARGUMENT WERE PREJUDICIAL TO THE DEFENDANT."
 {¶ 171} Skatzes claims that the prosecutor improperly commented upon his prior murder conviction in the guilt and sentencing phases of his trial.
 {¶ 172} Each of the aggravated murder counts upon which Skatzes was indicted included a specification pursuant to R.C. 2929.04(A)(5) that he had previously been convicted of an offense involving the purposeful killing of or attempt to kill another. This was an aggravating circumstance that was required to be proven beyond a reasonable doubt at the guilt phase of the trial. See R.C. 2929.03(B); State v. Davis
(1988), 38 Ohio St.3d 361, 364, certiorari denied (1992), 506 U.S. 858,113 S.Ct. 172. The legislature, however, has provided a mechanism whereby this potentially prejudicial information can be precluded from consideration by the jury. R.C. 2929.022(A) provides: "If an indictment or count in an indictment charging a defendant with aggravated murder contains a specification of the aggravating circumstance of a prior conviction listed in [R.C. 2929.04(A)(5)], the defendant may elect to have the panel of three judges, if he waives trial by jury, or the trial judge, if he is tried by a jury, determine the existence of that aggravating circumstance at the sentencing hearing * * *." In other words, "when an R.C. 2929.022(A) election is made, evidence concerning a prior purposeful killing, not otherwise admissible, may not be introduced at the guilt phase to prove an aggravating circumstance." Davis,38 Ohio St.3d at 364-365. The statute does not, however, "provide a defendant with a blanket statutory right to preclude * * * the introduction of all evidence pertaining to prior purposeful killings which is otherwise admissible." Id.
 {¶ 173} Skatzes points out that the prosecutor made one reference to his prior conviction during cross-examination while exploring Skatzes' feelings about "snitches" and one reference to it during closing argument in the sentencing phase of the trial. He claims that these references were "highly inflammatory and prejudicial." We are unpersuaded that the prosecutor's comments were improper.
 {¶ 174} During the guilt phase of the trial, the prosecutor questioned Skatzes about his definition of a "snitch" and his feelings about snitches. The prosecutor also inquired as to whether Skatzes' "partner," meaning his partner in crime, had testified against him with respect to his prior "homicide conviction." Skatzes admitted that his partner had been "the only witness against [him]." The state's theory in this case was that Sommers and Elder had been killed because they were snitches. As such, Skatzes' feelings about snitches and, specifically, the fact that he had previously been convicted of an offense based on the testimony of someone with whom he had committed a crime was relevant to his motive. Evidence of other crimes is admissible to show proof of motive pursuant to Evid.R. 404(B), and R.C. 2929.022(A) does not preclude the introduction of evidence for that purpose. See Davis,38 Ohio St.3d at 364.
 {¶ 175} During his closing argument in the sentencing phase of the trial, the prosecutor referred to the fact that Skatzes had previously been convicted of aggravated murder as an aggravating circumstance in the case and instructed the jury to determine how much weight to assign to that factor. Skatzes claims that this comment resulted in unfair prejudice and appears to believe that the prosecutor should not have been permitted to comment on his prior conviction in any way. We disagree.
 {¶ 176} The prosecutor's comments were brief and, in our opinion, were not particularly inflammatory. Thus, for us to find that this was error, we would have to agree with Skatzes' position that, where a defendant has elected to have the prior purposeful killing specification determined by the court rather than by the jury pursuant to R.C.2929.022(A), the evidence of the prior conviction and the court'sdetermination regarding the specification must be kept from the jury at both the guilt and sentencing phases of the trial. The law does not support this interpretation.
 {¶ 177} R.C. 2929.022(B) states, "If the panel of judges or the trial judge determines that the specification of the aggravating circumstance of a prior conviction listed in [R.C. 2929.04(A)(5)] is proven beyond a reasonable doubt * * *, the panel of judges or the trial judge and trial jury shall impose sentence on the offender pursuant to [R.C. 2929.03(D) and R.C. 2929.04]." Where a capital case is tried to a jury, R.C. 2929.03(D) and R.C. 2929.04 clearly require the jury to weigh all of the aggravating circumstances and mitigating factors in determining the proper sentence. Nothing in either of these sections suggests that the jury should be shielded from one of the aggravating circumstances that has been proven beyond a reasonable doubt. Indeed, in some cases, this might be the only aggravating circumstance. To suggest that the jury should not be told of one of the aggravating circumstances at the sentencing phase of a capital trial is to suggest that the jury should not participate in the sentencing decision at all where the defendant has made an election pursuant to R.C. 2929.022(A) because, in such a situation, the jury could not meaningfully weigh the aggravating circumstances against the mitigating factors. We are wholly unpersuaded that the legislature intended such a result. Furthermore, the supreme court has discussed R.C. 2929.022(A) in terms of precluding the admission of evidence of a prior conviction at the guilt phase of a capital trial, and not as an absolute ban on such evidence. See State v. Cowans,87 Ohio St.3d 68, 78, 1999-Ohio-250; Davis, 38 Ohio St.3d at 364. Thus, the prosecutor was entitled to comment on Skatzes' prior conviction during the sentencing proceedings.
 {¶ 178} The twenty-fifth assignment of error is overruled.
 {¶ 179} "26. THE TRIAL COURT ERRED WHEN IT GRANTED THE GOVERNMENT'S MOTION TO LIMIT THE DEFENDANT'S ATTEMPT TO IMPEACH ROBERT BROOKOVER ON THE BASIS OF SPECIFIC BAD ACTS."
 {¶ 180} Skatzes claims that he should have been allowed to cross-examine Brookover more extensively about the truthfulness of his testimony that he had committed only two murders. Skatzes relies on Evid.R. 608(B) in support of his argument.
 {¶ 181} "The Ohio Rules of Evidence clearly delineate the methods by which a party may impeach a witness. Credibility may be attacked by evidence that the witness has been convicted of a crime (Evid.R. 609), or by evidence of the witness's character for untruthfulness (Evid.R. 608)."State v. Rodriguez (1986), 31 Ohio App.3d 174, 176. Other than the Evid.R. 609 exception for certain criminal convictions, a witness's credibility may not be impeached by extrinsic proof of special instances of his conduct; such conduct may be inquired into only by the intrinsic means of cross-examination within the guidelines set forth in Evid.R. 608(B). State v. Kamel (1984), 12 Ohio St.3d 306, paragraph two of the syllabus; State v. Jurek (1989), 55 Ohio App.3d 70, 73-74. Criminal activities not resulting in conviction cannot ordinarily form the basis for an attack upon a witness's credibility. See Rodriguez,31 Ohio App.3d at 176; Kamel, 12 Ohio St.3d at 310-311.
 {¶ 182} Brookover stated on cross-examination that he had killed two people in his life: one in Arizona and one at Lucasville. The defense questioned Brookover at some length about the murder of another individual in Greene County. Brookover had allegedly been a prime suspect in that case until the investigation was halted because authorities learned that he was serving a life sentence in Arizona. The trial court sustained an objection to this questioning, concluding that it was "far afield" and not relevant.
 {¶ 183} Skatzes claims that he was entitled to pursue this line of questioning because he did not seek to introduce extrinsic evidence of the alleged crime; he sought only to question Brookover about it. In our view, however, the trial court acted within its discretion in sustaining the state's objection. See Evid.R. 608(B). Defense counsel asked Brookover whether he had committed any additional murders, and Brookover stated that he had not. Because the defense clearly was not permitted to introduce extrinsic evidence that Brookover had been involved in an additional murder, it is unclear what legitimate purpose would have been served by allowing the defense to repeat the question in numerous forms, as it apparently sought to do. Moreover, regarding questions about prior criminal convictions offered for impeachment under Evid.R. 609, the supreme court has held that the trial court has broad discretion to limit any questioning of a witness beyond the name of the crime, the time and place of the conviction, and the punishment imposed. Robb,88 Ohio St.3d at 71, citing State v. Amburgey (1987), 33 Ohio St.3d 115, syllabus. If the trial court may limit the evidence regarding prior convictions in this way, it surely must be permitted to similarly narrow the scope of questions about previous crimes of which the witness has not been convicted.
 {¶ 184} In his supplemental brief, Skatzes also argues that he has been prejudiced by the fact that documents relating to the time Brookover served in an Arizona prison have been lost, and thus this court cannot review the trial court's decision that Skatzes was not entitled to use those documents at trial. The information in question was sealed at a December 8, 1994 hearing in the trial court but is not part of the record on appeal. Skatzes claims that, if he had been allowed to use the Arizona documents at trial, he would have been able to show that Brookover's testimony about Skatzes was not truthful by showing that his testimony about his own past conduct had been "less than honest." As stated supra, however, Evid.R. 608 would have precluded the introduction of general information bearing on Brookover's character. This seems to be the type of information contemplated in Skatzes' argument, which sought to show "Brookover's past involvement in murderous and violent conduct." Moreover, the record demonstrates that Brookover's prior convictions, as well as his criminal activities in Arizona prisons, such as drug usage and drug trafficking, were the subject of extensive cross-examination.
 {¶ 185} We note that, in his argument to the trial court at the December 8, 1994 hearing, Skatzes discussed other potential uses of Brookover's records at trial, particularly the possibility that the records could show Brookover's bias against members of the Aryan Brotherhood due to his conflicts with them in Arizona prisons. Skatzes did not address this argument in his brief or in his supplemental brief. At trial, however, Brookover testified at length about his fear of the Aryan Brotherhood and the fact that he had been viewed as a snitch in the Arizona prisons. Indeed, Brookover testified that his transfer to Ohio had been based upon concern for his safety if he remained in the Arizona prison system. Thus, we are confident that Skatzes was not precluded from attempting to show Brookover's bias.
 {¶ 186} The twenty-sixth assignment of error is overruled.
 {¶ 187} "27. THE TRIAL COURT ERRED IN PERMITTING TESTIMONY FROM SGT. HUDSON ABOUT THE STOCKHOLM SYNDROME."
 {¶ 188} Skatzes claims that the trial court erroneously permitted Sgt. Hudson of the State Highway Patrol to testify as an expert regarding Stockholm Syndrome.
 {¶ 189} Sgt. Hudson was a member of the State Highway Patrol's negotiation team and had received training in hostage negotiations from the highway patrol and the Federal Bureau of Investigation prior to the riot. Upon questioning by the prosecutor, he stated that he was familiar with Stockholm Syndrome and that the negotiators had taken it into account during their negotiations with the inmates. Sgt. Hudson defined Stockholm Syndrome as follows:
 {¶ 190} "Stockholm Syndrome occurs many times in hostage negotiations, where the hostage taker and the hostage himself or herself form a very strong bond with each other. * * * It's been found that, first of all, when people are in any type of crisis situation together, they get closer, there's a bond that is formed. In the hostage situation, the hostage taker is seen by the hostage as somebody who has life or death power over them. When they are allowed to live through the situation, they obviously are very thankful for this, but they see this as being due to the hostage taker making that decision to let them live and, of course, they are very grateful and this strengthens the bond.
 {¶ 191} "Also, during a hostage situation, it is very common that the hostage[s] themselves become very upset with the authorities on the outside who[m] the hostage taker is dealing with. Obviously, as I mentioned, they are in a life or death situation, minute by minute. * * * This is obviously the most important thing that they are dealing with, and they can't understand or they don't understand in many instances why the authorities won't do whatever the hostage taker is asking in order to let them live.
 {¶ 192} "* * * [T]hey see the power of the decision-making authority as being in that hostage taker's hands and are often turned against authorities during this time and take the side of the hostage taker throughout this incident."
 {¶ 193} Sgt. Hudson further testified that the negotiators took Stockholm Syndrome into account at several points during the negotiations when the hostage corrections officers made statements on the phone or in the prison yard to the effect that the state should give in to the inmates' demands. Sgt. Hudson did not testify that any person had, in fact, suffered from the syndrome.
 {¶ 194} Evid.R. 702 provides that a witness may testify as an expert if his testimony relates to matters beyond the knowledge or experience of lay persons and he is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony. Skatzes argues that the state did not attempt to qualify Sgt. Hudson as an expert on Stockholm Syndrome, but he sets forth no specific argument as to how Sgt. Hudson's testimony failed to satisfy the requirements of Evid.R. 702. It is clear from the record that Sgt. Hudson had specialized knowledge and training on hostage negotiations and on Stockholm Syndrome in particular and that a lay person would not possess knowledge of these matters.
 {¶ 195} Moreover, Sgt. Hudson's testimony was not hearsay because it did not convey a statement made by another nor was it offered to prove that the hostage corrections officers suffered from Stockholm Syndrome. Rather, it was offered to explain the state's actions in its negotiations with the inmates. Testimony offered to explain the investigative activities of witnesses, and not to prove the truth of the matters asserted, is admissible. Thomas, 61 Ohio St.2d at 232; State v.Williams (1996), 115 Ohio App.3d 24, 44; State v. Parson (1990),67 Ohio App.3d 201, 207.
 {¶ 196} Skatzes' twenty-seventh assignment of error is overruled.
 {¶ 197} Because the twenty-eighth and twenty-ninth assignments of error are related, we will address them together.
 {¶ 198} "28. THE TRIAL COURT ERRED WHEN IT OVERRULED THE DEFENSE OBJECTION TO ANTHONY LAVELLE INTERPRETING THE CONTENTS OF TUNNEL TAPE 61."
 {¶ 199} "29. THE TRIAL COURT ERRED WHEN IT OVERRULED DEFENDANT'S OBJECTION TO ANTHONY LAVELLE'S SPECULATION ABOUT THE DEFENDANT'S STATE OF MIND."
 {¶ 200} Skatzes claims that the trial court should not have permitted Anthony Lavelle to testify about the conversations recorded on tunnel tapes 61 and 67 because he was speculating about what the participants meant and because his "testimony should have been limited to what he personally knew." Skatzes does not challenge the admissibility of the tapes themselves. Tunnel tape 61 recorded an April 15 meeting where a vote was taken amongst the gang leaders to kill a guard. Tunnel tape 67 contained a conversation about negotiations and Skatzes' commitment to the inmates' demands.
 {¶ 201} Skatzes' argument about Lavelle's alleged lack of personal knowledge about the contents of the tapes ignores the fact that Lavelle was present at the recorded conversations. Thus, Lavelle possessed firsthand knowledge of what had been said and was competent to testify regarding inaudible portions of the tape or the meaning he attributed to statements made by other participants. Skatzes had the opportunity to cross-examine Lavelle about these interpretations. Lavelle's opinions about the tapes were also admissible pursuant to Evid.R. 701.
 {¶ 202} Moreover, the supreme court reviewed the propriety of the state's use of tunnel tape 61 in the case of Skatzes' co-conspirator, Jason Robb, and it observed, "* * * Lavelle, who was present at the meeting, authenticated the tape and interpreted its contents, and other evidence also established the tapes' authenticity. Defendant had full opportunity to cross-examine Lavelle as to what was said or meant on the tapes. The trial court did not abuse its discretion in admitting taped conversations of gang-leader meetings despite the background noises, and disjointed and multiple conversations. * * *" Robb,88 Ohio St.3d at 72. Although Robb's argument challenged the admissibility of the tape itself and Skatzes' argument challenges Lavelle's testimony about the tape, it is our view that the supreme court tacitly approved the use of tunnel tape 61 and Lavelle's testimony about it in Robb.
 {¶ 203} With respect to tunnel tape 67, Skatzes also argues that Lavelle testified about his own state of mind, which was "not relevant to anything that the government had to prove." The statement at issue did not actually relate to Lavelle's state of mind as much as it revealed how Lavelle had interpreted statements made by Skatzes. This interpretation was relevant, and it was admissible pursuant to Evid.R. 701. Moreover, Skatzes has made no argument as to how this comment about Lavelle's "state of mind," if it can be characterized as such, prejudiced him in any way.
 {¶ 204} The twenty-eighth and twenty-ninth assignments of error are overruled.
 {¶ 205} "30. PROSECUTOR MISCONDUCT DENIED GEORGE SKATZES A FAIR TRIAL."
 {¶ 206} Skatzes claims that he was prejudiced by the prosecutor's statements at trial regarding: 1) similarities between Skatzes' case and the Robb case; 2) Easter and prayer in the context of the riot; 3) his prior conviction; 4) uncharged killings and other bad acts during the course of the riot; 5) Skatzes' unsworn statement during the sentencing phase; 6) irrelevant and prejudicial evidence; 7) vouching for the credibility of state's witnesses; and 8) mimicking Skatzes' manner of speech.
 {¶ 207} In order for prosecutorial misconduct to warrant reversal, it must appear from the record that the prosecutor's remarks were improper, and that, if improper, the remarks prejudiced the defendant's substantial rights. State v. Smith (1984), 14 Ohio St.3d 13,14, citing United States v. Dorr (C.A.5, 1981), 636 F.2d 117. Prosecutorial misconduct can form the basis for reversal of a conviction only in rare instances where the prosecutor's pattern of misconduct deprived the defendant of a fair trial. State v. Keenan (1993),66 Ohio St.3d 402, 405. The touchstone of due process analysis in cases of alleged prosecutorial misconduct "is the fairness of the trial, not the culpability of the prosecutor." Landrum, 53 Ohio St.3d at 112, citing Smith v. Phillips (1982), 455 U.S. 209, 219, 102 S.Ct. 940, 947.
 {¶ 208} The propriety of evidence regarding uncharged crimes and other bad acts, the state's alleged vouching for the credibility of its witnesses, and the state's comments about Skatzes' prior conviction are discussed under other assignments of error. Naturally, because we found no error pertaining to these issues, we must also conclude that the prosecutor did not engage in misconduct.
 {¶ 209} Skatzes claims that the prosecutor engaged in misconduct by referring to the Robb case in some of its arguments and thereby failing to treat his case independently. Skatzes contends that the prosecutor used the Robb case "as a talisman to encourage favorable judicial rulings." The reality of the matter was, however, that the same parties had raised some of the same issues before the same judge in Robb's case because of the many similarities between the two cases. The prosecutor was not required to pretend that the previous discussions and the judge's previous rulings on some nearly identical issues had never occurred. Moreover, we fail to see how Skatzes was prejudiced by these references. Also, the prosecutor's discussion in closing argument of the fact that many people were involved in crimes during the riot, some of whom reached plea agreements with the state and some of whom did not, did not demonstrate that the state's "goal was to tack any hide to the wall rather than seek a just result," as Skatzes claims.
 {¶ 210} Skatzes also contends that the prosecutor's references to the fact that the riot started on Easter Sunday were "designed to create bias in those who would be offended by the conduct occurring on a religious holiday." This argument is speculative at best. The prosecutor discussed the holiday in his presentation of the case because it helped many witnesses to pinpoint the time frame of the riot and it explained why the prison had been understaffed when the riot began. These comments were not unfair to Skatzes. Further, the prosecutor's comment in closing argument that Skatzes' "prayer that the truth would come out" had been answered was not inappropriate religious commentary.
 {¶ 211} The prosecutor elicited testimony that one of the inmate witnesses had come forward because Skatzes' actions in taking over the prison had caused the inmate's mother great concern for his safety. This testimony may have been of little relevance, but we are confident that it made little, if any, impact on the jury so as to prejudice Skatzes. The prosecutor's comment during closing argument that Skatzes was a "cold-blooded killer" was within the wide latitude afforded to a prosecutor in summation. See State v. Stephens (1970), 24 Ohio St.2d 76,82. Moreover, the prosecutor's use of the phrase "I reckon" a couple of times in closing argument, mimicking Skatzes' testimony, was not prejudicial.
 {¶ 212} Finally, Skatzes contends that the prosecutor improperly commented upon his unsworn statement in the penalty phase of the trial. R.C. 2929.03(D)(1) grants the defendant in a capital case the right to make an unsworn statement at the penalty phase of his trial. The supreme court has held that, "[t]o permit the prosecutor to extensively comment on the fact that the defendant's statement is unsworn affectsFifth Amendment rights and negates the defendant's statutory prerogative."State v. DePew (1988), 38 Ohio St.3d 275, 285, certiorari denied (1989),489 U.S. 1042, 109 S.Ct. 1099. The prosecutor is permitted to comment that the defendant's statement was not made under oath or affirmation, but such comment must be limited to reminding the jury that, in contrast to the testimony of all other witnesses, the defendant's statement was not made under oath. Id., at paragraph two of the syllabus. Skatzes claims, without elaboration, that the state engaged in the practice "condemned" in DePew.
 {¶ 213} Our review of the record reveals that the prosecutor did remind the jurors that Skatzes' statement during the penalty phase had been unsworn, that he had not been subject to cross-examination, and that the testimony of other witnesses during the mitigation phase of the trial had sounded "completely different" after cross-examination than it had after direct examination. The prosecutor also commented that Skatzes was "a master manipulator" and that he had manipulated the jurors with his unsworn statement. The prosecutor's comments herein did exceed the proper scope of comment set forth in DePew. However, we find that the remarks were not prejudicial to Skatzes in light of the significant weight of the aggravating circumstances relative to the factors offered in mitigation, as discussed infra.
 {¶ 214} In sum, prosecutorial misconduct did not deprive Skatzes of a fair trial.
 {¶ 215} The thirtieth assignment of error is overruled.
 {¶ 216} "31. THE TRIAL COURT ERRED WHEN IT PERMITTED TESTIMONY ABOUT AN UNCHARGED PLOT TO KILL SEVERAL INMATES AT THE END OF THE TAKEOVER IN VIOLATION OF OHIO EVID.R. 404(B)."
 {¶ 217} Skatzes argues that, pursuant to Evid.R. 404(B), the trial court should have excluded Snodgrass's testimony about a plot to kill several inmates at the end of the riot.
 {¶ 218} The following testimony was at issue. Snodgrass testified that, toward the end of the riot, he and other members of the Aryan Brotherhood had become aware that some inmates had been "going around trying to solicit, to get guys together * * * to kill George Skatzes, take over the block that the Aryan Brotherhood had, take over the hostage negotiations, and try to bring an end to the riot, and get the demands that they wanted met, basically in a coup" because of dissatisfaction with how things had been being handled. The Aryans consulted with the Muslims about the situation, and those involved in planning the coup were locked in a cell in the Muslim block. The Aryans wanted the individuals transferred to the Aryan Brotherhood block so that they "could take them out." As the surrender began, several members of the Aryan Brotherhood, including Snodgrass and Skatzes, "dressed out," meaning that they donned an extra layer of clothing that could be disposed of if they got bloody, in anticipation of the Muslims turning over those who had discussed a coup. The group waited in L-7 while Robb attempted to secure the release to the Aryan Brotherhood of those who had discussed the coup. Robb was unsuccessful, however, and reported to the group that the Muslims would not release the men because they had converted to Islam. The group then requested that Sommers be brought in because he was believed to be a snitch. Sommers was brought to L-7 a short time later and was beaten and stabbed to death.
 {¶ 219} Skatzes argues that Snodgrass's testimony about the plan to kill those who had plotted against the Aryan Brotherhood leaders was impermissible other acts evidence. In our view, this testimony was not improper other acts evidence because it provided the context in which Sommers was killed. Skatzes, Snodgrass, and others were lying in wait and literally dressed to kill in L-7 when they discovered that their intended targets were not available and focused their attention on Sommers instead. The trial court could have reasonably concluded that the plot to kill other inmates was not separate from the murder of Sommers, but part of the same series of events. Thus, Evid.R. 404(B) did not require that this evidence be excluded.
 {¶ 220} The thirty-first assignment of error is overruled.
 {¶ 221} "32. THE TRIAL COURT ERRED WHEN IT ADMITTED EXHIBITS 289 AND 290."
 {¶ 222} Exhibits 289 and 290 were poster-sized chronologies prepared by the state of the eleven days of the riot and the first day after the riot had ended which included such information as when bodies were placed on the recreation yard, when demands were made, when food was supplied, and when water and electricity were turned off. The chronologies also included notations about the telephone negotiations with the inmates and the tunnel tapes. Skatzes did not object to the introduction of these exhibits to assist in the presentation of evidence at trial, but he did object to the admission of the exhibits "as evidence for the jury to contemplate." He also disputed some of the "facts" set forth in the chronology, such as the identity of voices on the tunnel tapes.
 {¶ 223} After considering the parties' arguments, the trial judge overruled Skatzes' objection to the exhibits, stating, "in a normal case, in a normal brief case, where the jury has an opportunity to remember the facts, it would not be suitable in my opinion to use such a board * * *. However, I think that discretion of the Court would allow the Court, in a very long, very complicated case, * * * to allow the jury to use that for the purposes for which it is intended, which is merely a reminder of what the actual testimony and evidence was on that particular subject. Under those conditions, I think it would be allowable. I will so allow it."
 {¶ 224} The admission of exhibits such as these into evidence is within the broad discretion of the trial court. State v. Barker (1978),53 Ohio St.2d 135, 146. See, also, State v. Reiner, 89 Ohio St.3d 342,356, 2000-Ohio-190; State v. Williams, 74 Ohio St.3d 569, 576,1996-Ohio-91. Absent an abuse of discretion, the admission of such exhibits is not reversible error. Yeager v. Riverside Methodist Hosp. (1985), 24 Ohio App.3d 54, 56. An abuse of discretion requires more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable. State v. Clark,71 Ohio St.3d 466, 470, 1994-Ohio-43.
 {¶ 225} It appears from the record that the trial court carefully considered the parties' arguments and made a reasonable determination that the helpfulness of the exhibits outweighed any prejudice to Skatzes. Moreover, we think it was clear to the jury that some of the information contained on the posters, such as the alleged identities of the inmate negotiators, had been a source of some confusion during the riot and was open to debate. The court did not abuse its discretion in admitting the posters.
 {¶ 226} The thirty-second assignment of error is overruled.
 {¶ 227} "33. THE TRIAL COURT ERRED WHEN IT ADMITTED EXHIBIT 334, A DOCUMENT PURPORTING TO BE THE BYLAWS OF THE ARYAN BROTHERHOOD."
 {¶ 228} Skatzes contends that the trial court erred in admitting Exhibit 334, the document purported to be the bylaws of the Aryan Brotherhood, because the state had not laid a proper foundation for the document and it was hearsay. Skatzes also claims that the government shifted the burden of proof to Skatzes to show that he had no knowledge of the bylaws, whereas the state should have had the burden to show that Skatzes did have knowledge of the document at the time of the riot.
 {¶ 229} Snodgrass testified that he had become a captain in the Aryan Brotherhood after the Lucasville riot and had obtained Exhibit 334 from Dewey Bocook, another ranking member of the Aryan Brotherhood. He further testified that all of the Aryan Brothers had to be aware of the bylaws and to agree to abide by them as "part of taking an oath to the Brotherhood." The bylaws provided, in pertinent part:
 {¶ 230} "10. Whatever the committee says, is, in fact, the law.
 {¶ 231} "11. Brothers will always be there for other Brothers. If a Brother is proven to have left a Brother in the middle of a conflict or potentially violent conflict, he will be deemed a traitor and dealt with accordingly.
 {¶ 232} "12. When there is a `Call to Arms,' all Brothers must answer the call promptly and accordingly. Failure to do so is a traitorous act!"
 {¶ 233} Snodgrass testified that these bylaws were in effect at the time of the riot. He also testified that being "deemed a traitor" and being "dealt with accordingly" meant that "you would be killed."
 {¶ 234} Snodgrass properly identified the bylaws pursuant to Evid.R. 901(B)(1) because his testimony was sufficient to support a finding that the document was what he claimed it to be. Although Skatzes complains that Snodgrass did not testify that he had been present when the bylaws were passed, nothing in the language of the rule suggests that he had to be present when the bylaws were passed in order to identify or authenticate them. Moreover, Snodgrass did testify that all Aryan Brotherhood members had to learn about and accept the bylaws as part of becoming a member. This testimony supported the inference that Skatzes had known about the bylaws at the time of the riot. It did not unfairly "shift the burden" to Skatzes, as he claims.
 {¶ 235} Skatzes also argues that the bylaws were inadmissible hearsay. The state responds that the bylaws were admissible pursuant to Evid.R. 801(D)(2)(e), an exception to the hearsay rule that allows into evidence a statement by a co-conspirator of a party during the course and in furtherance of the conspiracy. We see a more fundamental problem with Skatzes' argument, however. We are unpersuaded that the document qualified as hearsay at all because it represented the views of an organization, not a "person" as set forth in Evid.R. 801(B). Although Snodgrass testified that Bocook and Tramp Johnson had possessed the document before he had obtained it, his testimony did not indicate that either of these men was a "declarant" in the sense that he had established the rules set forth therein.
 {¶ 236} The thirty-third assignment of error is overruled.
 {¶ 237} "34. THE TRIAL COURT ERRED BY GIVING AN UNCONSTITUTIONAL REASONABLE DOUBT INSTRUCTION."
 {¶ 238} Skatzes claims that Ohio's statutory definition of reasonable doubt, set forth at R.C. 2901.05(D), sets a lower standard for conviction than that which is required by the Due Process Clause of theFourteenth Amendment to the United States Constitution. He asserts that the statutory definition is akin to a clear and convincing standard and has been widely criticized by the Supreme Court, federal circuit courts, and some Ohio courts.
 {¶ 239} The Supreme Court of Ohio has addressed this argument and has concluded that the statutory definition of reasonable doubt is constitutionally sufficient. State v. Nabozny (1978), 54 Ohio St.2d 195,202-203, vacated on other grounds (1978) 439 U.S. 811, 99 S.Ct. 70. It reasoned:
 {¶ 240} "The General Assembly has attempted, in R.C. 2901.05 and the definition of `reasonable doubt' therein, to provide not only a degree of consistency as to the meaning of the term throughout the courts of this state, but also to have a definition comprehensible to all the members of the jury and not merely those trained in the subtle nuance of legalese. Considering the inherent difficulty in defining this abstract concept of reasonable doubt, the similarity of the definition under consideration with that in Holland [v. United States (1954), 348 U.S. 121,75 S.Ct. 127], and the beneficial aspects of the legislative mandated definition, we find that the General Assembly has pronounced a rational definition of `reasonable doubt' which, when taken as a whole, correctly conveyed the concept of `reasonable doubt' to the jury." Id.
 {¶ 241} It is well settled that "an appellate court is conclusively bound by the decisions of the Supreme Court of Ohio." Statev. Crago (1994), 93 Ohio App.3d 621, 640, quoting Thompson v. Moore
(1943), 72 Ohio App. 539, 541. See, also, Thacker v. Board of Trusteesof Ohio State Univ. (1971), 31 Ohio App.2d 17, 21, affirmed (1973),35 Ohio St.2d 49. As such, we find this argument to be without merit.
 {¶ 242} The thirty-fourth assignment of error is overruled.
 {¶ 243} "35. THE TRIAL COURT FAILED TO GIVE ADEQUATE JURY INSTRUCTIONS AT THE GUILT/INNOCENCE PHASE OF TRIAL."
 {¶ 244} Skatzes alleges numerous unrelated problems with the jury instructions at the guilt phase of his trial and contends that each of the alleged errors warrants reversal of his conviction. He also argues that the cumulative effect of the errors warrants reversal. None of the alleged errors in the trial court's instructions were raised at trial.
 {¶ 245} "[A] party may not assign as error the giving or the failure to give any instructions unless [he] objects before the jury retires to consider its verdict, stating specifically the matter objected to and the grounds of the objection." Crim.R. 30(A); Stallings,89 Ohio St.3d at 292. By failing to object, a defendant waives all but plain error. Stallings, 89 Ohio St.3d at 292; Underwood, 3 Ohio St.3d at 13. Plain error has been defined as "obvious error prejudicial to a defendant * * * which involves a matter of great public interest having substantial adverse impact on the integrity of and the public's confidence in judicial proceedings." (Internal quotation marks omitted.) Endicott,99 Ohio App.3d at 694. "[T]he plain error rule should be applied with utmost caution and should be invoked only to prevent a clear miscarriage of justice." Underwood, 3 Ohio St.3d at 14.
 {¶ 246} Under this assignment of error, Skatzes reiterates an argument advanced under the third assignment of error that the jury was required to unanimously agree upon the purpose for which he had committed the Vallandingham kidnapping and that the trial court had erred in failing to so instruct the jury. We rely on our earlier discussion in rejecting this argument. To the extent that Skatzes contends that the instructions regarding the Clark and Elder kidnappings suffered from the same infirmity, we likewise reject these arguments.
 {¶ 247} Skatzes also claims that the trial court erred in failing to identify the felony underlying the Clark and Elder kidnappings. (The court had identified aggravated riot as the underlying felony in the Vallandingham kidnapping.) In our view, the trial court was not required to identify the underlying felony. See 4 Ohio Jury Instructions (2001) 148, Section 505.01(A)(2) (applicable to offenses committed before July 1, 1996). In fact, with respect to Vallandingham and Elder, the evidence would have supported the conclusion that the kidnappings had facilitated the felony of murder as well as aggravated riot. As such, the trial court's instruction regarding Vallandingham's kidnapping was more narrow than it need have been. The court did not err in failing to identify an underlying felony with respect to the kidnappings of Clark and Elder.
 {¶ 248} Skatzes claims that the jury instructions regarding complicity contained a "misleading" definition of what it means to solicit another to commit an offense "because it diminish[ed] the character of the request required." The trial court defined "solicit" as that term is defined in the Ohio Jury Instructions: "to seek, to ask, to influence, to invite, to tempt, to lead on, to bring pressure to bear." 4 Ohio Jury Instructions (2001) 573, Section 523.03(6) (applicable to offenses committed before July 1, 1996). It is unclear to us in what respect Skatzes finds this definition to be "vague" and "unreliable." In our opinion, the definition was not misleading, vague, or unreliable, and it certainly did not rise to the level of plain error.
 {¶ 249} Skatzes also challenges the trial court's definition of acting "purposefully." The court's definition complied with 4 Ohio Jury Instructions (2001) 57-58, Section 409.01(4), which provides in pertinent part that, "To do an act purposely is to do it intentionally and not accidentally." Skatzes argues that he was prejudiced by this juxtaposition of "intentionally" and "accidentally" because it "left the jurors to presume that anything more than accident fit the definition of purposely." We disagree. The preceding line of the instructions was that "[a] person acts purposely when it is his specific intention to cause a certain result," and the instructions subsequently equated purpose and intent. It would be speculative for us to presume that the jury misinterpreted these instructions in the manner that Skatzes suggests, and, in any event, these instructions do not amount to plain error.
 {¶ 250} Skatzes also faults the trial court for its instruction on aggravated riot. This argument relates to Skatzes' conviction for kidnapping Vallandingham. One of several bases upon which Skatzes was indicted for kidnapping was that the kidnapping had facilitated the commission of another felony, specifically aggravated riot. See R.C.2905.01(A)(2). Although the trial court identified aggravated riot as the underlying felony in its instructions to the jury on kidnapping, Skatzes speculates that the jurors may have based their decisions on different underlying felonies or that the jurors may not have known what constituted a felony. This argument is entirely speculative and thus without merit.
 {¶ 251} Next, Skatzes objects to the jury instructions regarding prior calculation and design during the guilt phase of the trial. The following instruction was given to the jury:
 {¶ 252} "A person acts with prior calculation and design when, by engaging in a distinct process of reasoning, he forms the purpose to kill and plans the method he intends to use to cause death. The circumstances surrounding a homicide must show a scheme designed to carry out the calculated decision or cause the death.
 {¶ 253} "No definite period of time must elapse and no particular amount of consideration must be given, but acting upon the spur of the moment or after momentary consideration of the purpose to cause a death is not sufficient."
 {¶ 254} Skatzes objects to the fact that the following language from 4 Ohio Jury Instructions (2001), 116-117, Section 503.01(3) was not included in the instruction:
 {¶ 255} "`Prior calculation and design' means that the purpose to cause the death was reached by a definite process of reasoning in advance of the homicide, which process of reasoning must have included a mental plan involving studied consideration of the method and the means with which to cause the death.
 {¶ 256} "To be prior calculation, there must have been sufficient time and opportunity for the planning of an act of homicide, and the circumstances surrounding the homicide must show a scheme designed to carry out the calculated decision to cause the death."
 {¶ 257} The trial court's instruction encompassed the "definite process of reasoning" portion of Section 503.01(3) to which Skatzes claims he was entitled. The second paragraph of the instruction to which Skatzes claims he was entitled adds little to the preceding paragraph, and we fail to see how Skatzes could have been prejudiced by the trial court's failure to give that instruction. The state's theory of the case was that Skatzes and the other gang leaders had contemplated killing a corrections officer and had threatened to do so from the outset of the riot. Vallandingham was killed five days into the riot. If the jury believed the state's version of events, there could have been little doubt that Skatzes and the other gang leaders had had sufficient time and opportunity to satisfy the prior calculation element of the killing. Skatzes' defense was that he had not voted to kill Vallandingham and that he had not known about the murder until after it had happened. If the jury had believed this version of events, the issue of how much time had elapsed between making the decision and acting upon it would not have been relevant. Thus, we are unpersuaded that Skatzes was prejudiced by the trial court's failure to give this instruction.
 {¶ 258} Skatzes challenges the trial court's definition of "cause" on the ground that the second sentence is inapplicable to an aggravated murder case. The court instructed: "Cause is an act which is [sic] in the natural and continuous sequence directly produces the death and without which it would not have occurred. Cause occurs when the death is the natural and foreseeable result of the act." Skatzes cites no authority for his claim that this instruction was inapplicable to aggravated murder, and we are aware of none. This instruction was not plain error.
 {¶ 259}
 {¶ 260} Next, Skatzes contends that the instruction regarding the felony murder specification to the Vallandingham murder was flawed because the victim of the underlying felony of kidnapping was not identified. The trial court was not required to identify the victim of the kidnapping, but, read in context, we think it was clear that the victim of the kidnapping was also Vallandingham. The trial court did not err in giving this instruction.
 {¶ 261} Skatzes contends that the trial court's definition of a principal offender as "one who has hands-on involvement in a homicide" did not adequately define the degree of participation required for principal offender status. This instruction related to the aggravated murder of David Sommers. Skatzes claims that, under this definition, one who provided a weapon, escorted the victim, or carried a body could have been found to be a principal offender.
 {¶ 262} The term "principal offender" as used in R.C. 2929.04(A)(7) is not defined in the Revised Code or in Ohio Jury Instructions. The supreme court has held that the term "principal offender" means "the actual killer," State v. Penix (1987), 32 Ohio St.3d 369, 371, or "one who personally performs every act constituting the offense" of aggravated murder, State v. Getsy, 84 Ohio St.3d 180, 197, 1998-Ohio-533, certiorari denied (1999), 527 U.S. 1042, 119 S.Ct. 2407. See, also, Stallings,89 Ohio St.3d at 292 (approving instruction that "principal offender means the one who directly caused the death"). We agree with Skatzes that the trial court's "hands-on involvement" instruction did not require the same level of involvement as these other definitions and that this language should have been stronger. This instruction was not plain error, however, because it was not outcome determinative. The state presented evidence that Skatzes had beaten Sommers with a baseball bat and that Sommers had died of injuries inflicted by such a weapon. Skatzes claimed that he had not been present at Sommers' murder and that he had not learned of the killing until after he had been transferred to Mansfield. There was no evidence to suggest that Skatzes, if he was present at the time of the murder, was anything but the actual killer, such as an escort or a mere provider of a weapon. Based on the evidence presented, the jury could only have concluded that Skatzes had had hands-on involvement in Sommers' murder if it had believed the state's version of events, i.e., that Skatzes had been an active participant in the murder. As such, the error in the instruction was harmless, and we find no plain error. SeeState v. Chinn, 85 Ohio St.3d 548, 559-560, 1999-Ohio-288, certiorari denied (2000), 528 U.S. 1120, 120 S.Ct. 944 (finding that trial court's failure to define "principal offender" was not plain error under the facts presented).
 {¶ 263} Skatzes argues that the trial court's instructions to the jury regarding the verdict forms did not adequately convey to the jury that it "must be unanimous `as to any alternative'" presented in the instructions. We disagree. Throughout its instructions to the jury, the trial court referred to the unanimity required for its many different decisions. Then, after discussing at some length three of the forty-two verdict forms that it found to be representative of the whole, the trial court stated: "Some of the offenses provide alternate ways of committing the offense. Before you can find the defendant guilty of an offense providing alternatives, you must be unanimous in your verdict as to any alternative." The court later repeated this instruction using slightly different language. In our view, the jury was adequately instructed on this topic. See, also, our discussion of the third assignment of error, supra.
 {¶ 264} Because we have found that there was no plain error in the specific instructions to which Skatzes objects, we likewise find that there was no cumulative error.
 {¶ 265} The thirty-fifth assignment of error is overruled.
 {¶ 266} "36. THE TRIAL COURT FAILED TO ACCURATELY INSTRUCT THE JURY IN RESPONSE TO ITS QUESTION ABOUT THE ROLE ONE MUST PLAY TO BE CONSIDERED A PRINCIPAL OFFENDER UNDER OHIO REV. CODE § 2929.04(A)(7)."
 {¶ 267} Skatzes contends that the trial court erred in instructing the jury that, for purposes of the death specification under R.C.2929.04(A)(7), Skatzes was required to have been "a principal offender" in Sommers' murder rather than "the principal offender." This issue arose in response to a question from the jury about a discrepancy between the jury instructions and the verdict forms.
 {¶ 268} The supreme court has held that "principal offender" does not mean "the sole offender." State v. Stojetz, 84 Ohio St.3d 452, 458,1999-Ohio-464, certiorari denied (1999), 528 U.S. 999, 120 S.Ct. 455;State v. Keene, 81 Ohio St.3d 646, 655, 1998-Ohio-342, certiorari denied (1998), 525 U.S. 936, 119 S.Ct. 350. "As there can be more than one actual killer, there can be more than one principal offender." Stojetz,84 Ohio St.3d at 458-459. Thus, the trial court's instruction that the jury was to determine whether Skatzes had been "a principal offender" was accurate.
 {¶ 269} The thirty-sixth assignment of error is overruled.
 {¶ 270} "37. THE TRIAL COURT FAILED TO GIVE ADEQUATE JURY INSTRUCTIONS AT THE MITIGATION PHASE OF TRIAL."
 {¶ 271} Under this assignment of error, Skatzes challenges the jury instructions given during the penalty phase of his trial on nine different bases.
 {¶ 272} First, Skatzes contends that the trial court's instruction "seriously undermined the jury's sense of responsibility for determining the appropriate sentence" by referring to the jury's sentencing verdict as a "recommendation." The supreme court addressed this argument inRobb, 88 Ohio St.3d at 84, wherein it concluded that the trial court's use of the word "recommendation" had "accurately stated the law and did not constitute error" especially where, as here, the jury was further instructed that the use of the term "recommendation" should not "diminish [its] sense of responsibility in this matter."
 {¶ 273} Second, Skatzes argues that the trial court "failed to instruct the jurors to count specifications arising from the same conduct or course of conduct only once." He also argues that "duplicative death specifications [should have been] merged for sentencing." Skatzes' argument in this respect is unclear, but, based on the pages he cites in the transcript, we interpret his argument to be that the trial court should have merged the specifications related to Skatzes' prior conviction for aggravated murder and his commission of the present offenses while he was a prisoner in a detention facility because "the prior purposeful killing * * * [was] the very reason Mr. Skatzes was in prison." In reviewing death penalty cases, however, the supreme court has not merged these specifications in the manner that Skatzes suggests, and he cites no authority for doing so. See State v. Carter,64 Ohio St.3d 218, 228, 1992-Ohio-127, certiorari denied (1993),507 U.S. 938, 113 S.Ct. 1330; State v. Bradley (1989), 42 Ohio St.3d 136,149, certiorari denied (1990) 497 U.S. 1011, 110 S.Ct. 3258.
 {¶ 274} Third, Skatzes contends that the trial court "put a gratuitous thumb on the scale of justice" by allowing the jury to make sentencing recommendations on two counts of aggravated murder for each victim instead of merging the counts before they were submitted to the jury. The cases cited by Skatzes do not support this position. The general rule is that a defendant may be charged with multiple counts based on the same conduct but may be convicted of only one and that the trial court effects the merger at sentencing. R.C. 2941.25(A); State v.Osborne (1976), 49 Ohio St.2d 135, 144, vacated on other grounds (1978)438 U.S. 911, 98 S.Ct. 3136. A "conviction" includes both the guilt determination and the penalty imposition. See, generally, State v.Henderson (1979), 58 Ohio St.2d 171, 177-179. Skatzes' right not to be convicted of more than one offense based upon the same conduct was not violated because, in imposing sentence, the trial court merged the counts in question. Skatzes has cited no authority for the proposition that the jury should not have been allowed to make a sentencing recommendation on each of the aggravated murder offenses.
 {¶ 275} Fourth, Skatzes complains that the trial court combined or "double counted" the aggravating circumstances in part of its instructions. For example, Skatzes was found guilty of two counts of aggravated murder regarding Vallandingham, and the trial court discussed the four identical specifications with respect to each count together. We reject Skatzes' claim that the manner in which the trial court instructed the jury led the jurors "to weigh eight specifications for each aggravated murder victim." Viewed in context, the record does not support such a conclusion, especially in light of the trial court's express instruction that "[t]he penalty for each individual count must be assessed separately. Only the aggravating circumstances relating to a given count may be considered in assessing the penalty for that count."
 {¶ 276} Fifth, Skatzes argues that the trial court erred in failing to tell the jurors that they did not have to unanimously agree on a mitigating factor in order for it to be considered. There is nothing in the record to suggest that the jurors would have acted under such a misapprehension, and such an instruction was not required. The trial court properly instructed the jurors that they had to unanimously find that the aggravating circumstances outweighed the mitigating factors beyond a reasonable doubt in order to impose the death penalty.
 {¶ 277} Sixth, Skatzes objects to the trial court's definition of "principal offender." We addressed this issue under the thirty-fifth assignment of error.
 {¶ 278} Seventh, Skatzes contends that the trial court erred in instructing the jury not to be influenced by "sympathy or prejudice" because "[s]ympathy flowing directly from the mitigation is properly considered." The jury was fully instructed about the proper consideration to be given to mitigation evidence. The court's instruction that the jury should reach a decision "without bias, sympathy, or prejudice so that the State of Ohio and the defendant [would] feel their case was fairly and impartially tried" was not error.
 {¶ 279} Eighth, Skatzes claims that the trial court should have enumerated all of the mitigating factors about which he had presented evidence rather than enumerating some of the mitigating factors set forth in R.C. 2929.04(B), followed by a general instruction that the jury could consider any other factors that were relevant to whether Skatzes should be sentenced to death. While the trial court might have tailored the instructions more to the evidence, such an approach was not required.Landrum, 53 Ohio St.3d at 122.
 {¶ 280} Finally, Skatzes objects to the definition of "reasonable doubt" used by the trial court. We addressed this argument under the thirty-fourth assignment of error, and it requires no further discussion here.
 {¶ 281} The thirty-seventh assignment of error is overruled.
 {¶ 282} Skatzes raises numerous assignments of error in which he claims that he was denied the effective assistance of counsel at trial. We will evaluate these contentions in light of the two prong analysis set forth in Strickland v. Washington (1984), 466 U.S. 668, 104 S.Ct. 2052
and adopted by the Supreme Court of Ohio in Bradley, 42 Ohio St.3d 136.
 {¶ 283} Trial counsel is entitled to a strong presumption that his conduct falls within the wide range of reasonable assistance.Strickland, 466 U.S. at 688, 104 S.Ct. at 2064-2065. To reverse a conviction based on ineffective assistance of counsel, it must be demonstrated that trial counsel's conduct fell below an objective standard of reasonableness and that his errors were serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. Id. at 687, 104 S.Ct. at 2064. Deficient performance means that claimed errors were so serious that the defense attorney was not functioning as the "counsel" that theSixth Amendment guarantees. State v. Cook (1992), 65 Ohio St.3d 516, 524, certiorari denied (1994), 510 U.S. 1040, 114 S.Ct. 681. Hindsight is not permitted to distort the assessment of what was reasonable in light of counsel's perspective at the time, and a debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Id. at 524-525.
 {¶ 284} We now turn to Skatzes' arguments in assignments of error thirty-eight, thirty nine, and forty-two through fifty-three, all of which are based on the alleged ineffectiveness of Skatzes' trial counsel.
 {¶ 285} "38. DEFENDANT'S TRIAL COUNSEL[']S CONDUCT FELL BELOW THE ACCEPTABLE STANDARD WHEN THEY AGREED THAT SGT. HUDSON COULD TESTIFY AS A SUMMARY WITNESS."
 {¶ 286} It is undisputed that the prosecution and the defense reached an agreement prior to trial that Sgt. Hudson would testify as a "summary witness" regarding the negotiations during the riot and the subsequent investigation. Skatzes claims that he was prejudiced by this agreement because Sgt. Hudson's testimony may have touched on matters about which he had no firsthand knowledge. Skatzes claims that defense counsel waived his "right to confront" Sgt. Hudson "and received little in return."
 {¶ 287} We disagree with Skatzes' assessment that his attorneys acted ineffectively in allowing Sgt. Hudson to testify as a summary witness. It appears that the primary purpose of the agreement regarding this testimony was to present the jury with the background of the case as expeditiously as possible. The defense could have reasonably concluded that Skatzes had nothing to gain by having this evidence presented by several witnesses rather than by one. Moreover, defense counsel had ample opportunity to cross-examine Sgt. Hudson.
 {¶ 288} Our review of the record also suggests that Sgt. Hudson did, in fact, have firsthand information regarding most of the matters about which he testified and that much of his testimony was corroborated by pictures, audiotapes of the negotiations, and videotapes of the events that occurred on the recreation yard. Further, Sgt. Hudson's testimony did not directly implicate Skatzes in any of the crimes for which he was indicted. Rather, it established only that he had been one of the primary negotiators, a fact that was not disputed. Trial counsel's conduct regarding Sgt. Hudson's testimony did not fall below an objective standard of reasonableness and, in any event, Skatzes has not demonstrated that he was prejudiced by the manner in which this testimony was presented.
 {¶ 289} The thirty-eighth assignment of error is overruled.
 {¶ 290} "39. THE TRIAL COURT VIOLATED APPELLANT'S FUNDAMENTAL RIGHT TO THE ASSISTANCE OF COUNSEL AS GUARANTEED BY THE SIXTH ANDFOURTEENTH AMENDMENTS TO THE UNITED STATES CONSTITUTION AND ARTICLE I, §§ 10 AND 16 OF THE OHIO CONSTITUTION WHEN IT FAILED TO MAKE SUFFICIENT INQUIRY INTO THE REASONS FOR APPELLANT'S REQUEST FOR SUBSTITUTE COUNSEL AND TO DETERMINE WHETHER THEY WERE ARBITRARY OR LEGITIMATE."
 {¶ 291} Skatzes claims that the trial court violated his fundamental rights when it failed to adequately inquire into his request for substitute counsel and his dissatisfaction with his attorneys. This argument is without merit because the record does not reflect that Skatzes asked for different attorneys. Rather, Skatzes expressed some frustration about his ability to communicate freely with his attorneys while in prison and about his access to the tunnel tapes, which he wanted to review in their entirety. Skatzes told the trial court that his attorneys treated him with "a high degree of respect" and denied that he was requesting that they be removed from his case. In fact, Skatzes expressed confidence that he and his attorneys could "iron it out," referring to his expectations regarding communication and access to discovery materials. The only direct reference to a request for new attorneys came from the prosecutors, who stated that it was their "understanding kind of through a grapevine that * * * Skatzes had [some dissatisfaction] with his lawyers and that there was going to be a request that new lawyers be appointed." In this context, and given Skatzes' assurances to the trial court that he was not requesting that his attorneys be removed, the trial court certainly did not err in failing to pursue this matter further.
 {¶ 292} The thirty-ninth assignment of error is overruled.
 {¶ 293} "42. DEFENDANT'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE WHEN THEY FAILED TO DEVELOP THE DEFENSE OF DURESS."
 {¶ 294} Skatzes claims that he was denied the effective assistance of counsel by his attorneys' failure to raise a defense of duress in the guilt and sentencing phases of his trial. Skatzes asserts that duress was a viable defense to conspiracy, kidnapping, and murder under the facts of this case and that evidence that he had acted under duress might have led the jury to impose a lesser sentence.
 {¶ 295} Duress consists of any conduct that overpowers a person's will and coerces his performance of an act that he otherwise would not have performed. State v. Grinnell, 112 Ohio App.3d 124, 144-145. "One of the essential features of the defense of duress is the sense of immediate, imminent death or serious bodily injury if the actor does not commit the act as instructed." Id. at 145, citing State v. Cross
(1979), 58 Ohio St.2d 482.
 {¶ 296} Trial counsel did not act ineffectively in failing to offer a defense of duress because the facts presented at trial, including Skatzes' own testimony, did not support such a defense. Skatzes claimed to have had no involvement in the deaths of Elder, Vallandingham, and Sommers. As the state points out, one must admit involvement in a crime in order to mount a defense based on duress. Skatzes admitted to holding Clark as a hostage but did not give any indication at trial that he had felt that he would be harmed or killed if he had not done so. Even as to activities bearing on the alleged conspiracy with which Skatzes was not charged, Skatzes' testimony did not support a defense of duress. For example, Skatzes testified that he had voluntarily become involved in the telephone negotiations, "speaking for the inmate body" rather than for the Aryan Brotherhood, because he could see that negotiations were not going well when conducted by another inmate and because of the "mutual respect" between him and the authorities. He claimed to have acted with similar benevolence when participating in further negotiations because he did not want to see any corrections officers killed. Throughout his testimony, Skatzes portrayed himself as one who participated out of a desire to help resolve disputed issues and to ensure the safety of the hostages and inmates; he did not claim to have been given responsibilities against his will.
 {¶ 297} Skatzes claims that his attorneys were also ineffective in failing to raise duress as a mitigating factor in the sentencing phase of the trial. R.C. 2929.04(B)(2) provides that, in determining the sentence for a capital offense, the jury may consider whether it is unlikely that the offense would have been committed but for the fact that the defendant was under duress, coercion, or strong provocation. Skatzes asserts that his attorneys should have offered this type of evidence in the form of expert testimony from a psychologist or other mental health professional about "the impact of the circumstances of the takeover" on a person of Skatzes' "fragile mental condition." In response to this argument, we reiterate that Skatzes' version of events provided scant support, if any, for the claim that he had acted under duress, and that his denial of involvement in any of the crimes actually conflicted with a claim of duress.
 {¶ 298} The forty-second assignment of error is overruled.
 {¶ 299} "43. THE DEFENDANT'S TRIAL COUNSEL[`]S CONDUCT FELL BELOW THE ACCEPTABLE STANDARD WHEN THEY FAILED TO OBJECT TO THE STATE'S REPEATED REFERENCES TO THE ARYAN BROTHERHOOD AND ITS BELIEFS."
 {¶ 300} Skatzes claims that his membership in the Aryan Brotherhood "had no relevance to [his] guilt or to the aggravating circumstances or mitigating factors" because he was white and his alleged victims were white. He contends that his attorneys were ineffective in failing to object to evidence regarding his involvement in the Aryan Brotherhood. Skatzes relies upon Dawson v. Delaware (1992), 503 U.S. 159,112 S.Ct. 1093, in support of this argument.
 {¶ 301} Skatzes' claim that his membership in the Aryan Brotherhood had no relevance to this case is wholly unfounded. The gangs operating in L-block, their leadership structures, the tensions among the gangs, and their unusual cooperation during the riot were intimately tied to the events that unfolded at Lucasville in April 1993. According to the state's theory of the case, Skatzes would not have been in a position to negotiate with authorities or to direct the actions of other inmates had it not been for his leadership role in the Aryan Brotherhood. Thus, this evidence was entirely appropriate and counsel were not ineffective in failing to object to it. Dawson v. Delaware is distinguishable because, in that case, the defendant's involvement in the Aryan Brotherhood was completely unrelated to the crime he had committed.
 {¶ 302} Amicus also urges that Skatzes was convicted in this case because the jury and judge were unduly and unfairly influenced by his association with the Aryan Brotherhood and that Skatzes "cannot constitutionally be found guilty, much less sentenced to death, based upon the abstract beliefs of any group to which he belonged." We disagree with the assertion that Skatzes was convicted based on his beliefs rather than his actions. Again, Skatzes' involvement in the Aryan Brotherhood was closely tied to his involvement in the riot, and evidence regarding this association was appropriate.
 {¶ 303} The forty-third assignment of error is overruled.
 {¶ 304} "44. DEFENDANTS' TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO OBJECT TO PROSECUTOR COMMENTS AND TESTIMONY OF SGT. HUDSON VOUCHING FOR THE STATE'S WITNESSES AND EVIDENCE."
 {¶ 305} Under his fourteenth assignment of error, Skatzes argued that the state and Sgt. Hudson had improperly vouched for the credibility of the state's inmate witnesses. We rejected this argument, supra. Because we have concluded that the statements of the prosecutors and of Sgt. Hudson were not improper, we also conclude that defense counsel were not ineffective in failing to object to these statements.
 {¶ 306} The forty-fourth assignment of error is overruled.
 {¶ 307} "45. DEFENDANT'S TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO PROTECT GEORGE SKATZES' RIGHT TO AN IMPARTIAL AND PROPERLY GUIDED JURY BY FAILING TO OBJECT TO MATTERS RAISED DURING VOIR DIRE AND IMPROPER INSTRUCTIONS AT THE GUILT AND PENALTY PHASES OF TRIAL; PROSECUTOR MISCONDUCT; AND IMPROPER CONDUCT OF COURT."
 {¶ 308} Skatzes raises six issues under this assignment of error. First, he argues that the court's questions to potential jurors about whether they could impose the death penalty should, instead, have been focused on whether the potential jurors could refuse to join the other jurors in imposing a death sentence if the facts warranted a life sentence. He also claims that the trial court's questioning of potential jurors about their abilities to sign a verdict imposing a death sentence "created the impression that the court's greatest concern was that they be able to hand down a death verdict."[2] He claims that counsel were ineffective in failing to object. We disagree.
 {¶ 309} Skatzes cites no authority in support of his position that the trial court was required to question the potential jurors about their fortitude for not imposing the death penalty in the manner that he suggests. See Stojetz, 84 Ohio St.3d at 452, syllabus (holding that there is no requirement for the trial court to "life qualify" prospective jurors in a capital murder case, sua sponte). Moreover, we think that the trial judge's opening question to the jurors about whether they could, "in a proper case, where the facts warrant it, and the law permits it, [sign] a verdict form which might recommend" the imposition of the death penalty was a fair attempt to ascertain those who were capable of sitting on the jury. Trial counsel were then given an opportunity to delve into this issue more fully. Trial counsel did not act ineffectively in failing to object to the trial court's questions.
 {¶ 310} Second, Skatzes contends that his trial attorneys acted ineffectively because they did not object to the prosecutor's explanation of the "capital legal process" to each juror during voir dire. He claims that these explanations gave "the government an unfair advantage with the jurors when it [came] time for final argument." Skatzes does not claim that the prosecutor mischaracterized the legal process, and the record reveals that the prosecutor's explanations were very balanced and accurate. In our view, there is no support for Skatzes' claim that he was somehow prejudiced by these explanations, and thus trial counsel were not ineffective in failing to object to them.
 {¶ 311} Third, Skatzes argues that trial counsel were ineffective in failing to exercise a peremptory challenge to excuse prospective juror Steven Brooks. We reject this argument because the record reveals that Brooks was excused for cause before the defense had an opportunity to exercise a peremptory challenge.
 {¶ 312} Fourth, Skatzes claims that trial counsel should have objected to a hypothetical used by the prosecution to demonstrate the concept of mitigation. In the hypothetical, each prospective juror was asked to imagine two men who had each committed multiple murders in the course of an armed robbery of a convenience store; one man had committed the crimes because he needed money to feed a drug habit, and the other man had done so because his family was being held hostage and the kidnappers had threatened that his family would be killed if he did not do it. The prosecutor then asked the prospective jurors whether they could see that one of the men in the hypothetical might have very little mitigation and the other might have a lot of mitigation. Skatzes claims that this hypothetical "falsely characterize[d] mitigation as an aspect of motive or an excuse for criminal conduct." R.C. 2929.04(B), however, compels a jury to consider the nature and circumstances of the offense in mitigation. In the prosecutor's hypothetical, the reasons for the murders would certainly be circumstances surrounding the offenses which the jury would be required to consider. Skatzes' argument that the hypothetical falsely characterized mitigation evidence is without merit.
 {¶ 313} Fifth, Skatzes contends that the prosecutor improperly instructed the jury that it must find a mitigating factor unanimously and that defense counsel were ineffective in failing to object to this instruction. In fact, the prosecutor did no such thing. Skatzes refers to a portion of the voir dire examination in which a prospective juror asked whether the jurors had to be unanimous in determining that the aggravating circumstances outweighed the mitigating factors. The prosecutor answered affirmatively. The prosecutor did not imply that each mitigating factor had to be agreed upon unanimously to be considered in mitigation, as Skatzes implies. Moreover, the jurors were fully informed that the judge would instruct them on the law to be applied to the case.
 {¶ 314} In his sixth and final argument, Skatzes points out that trial counsel made numerous efforts to assure proper jury instructions but argues that, to the extent that we find these efforts to have been inadequate, trial counsel acted ineffectively. We do not find trial counsel's efforts to have been inadequate.
 {¶ 315} The forty-fifth assignment of error is overruled.
 {¶ 316} "46. DEFENSE COUNSEL[`]S CONDUCT FELL BELOW THE ACCEPTABLE STANDARD OF PRACTICE WHEN THEY FAILED TO CHALLENGE THE ADEQUACY OF THE INDICTMENT."
 {¶ 317} Skatzes claims that his attorneys were ineffective because they did not challenge the indictment based on its failure to inform them of the charges against him.
 {¶ 318} We addressed the adequacy of the indictment under the first and second assignments of error and concluded that the information contained in the indictment was sufficient to apprise Skatzes of the charges against him. As such, counsel did not act ineffectively in failing to challenge the indictment.
 {¶ 319} The forty-sixth assignment of error is overruled.
 {¶ 320} "47. DEFENSE COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO OBJECT TO REPEATED INSTANCES OF IRRELEVANT OR SPECULATIVE TESTIMONY."
 {¶ 321} Under this assignment of error, Skatzes contends that his attorneys were ineffective in failing to object to a list of forty-nine snippets of testimony from various witnesses on the ground that the testimony was irrelevant. The evidence cited includes various portions of the testimony of Sgt. Hudson and Anthony Lavelle, references to assaults and murders with which Skatzes was not charged, testimony about the tunnel tapes and about statements made by other inmates, and some of the state's exhibits. With respect to the vast majority of this evidence, Skatzes has challenged its relevance and propriety under other assignments of error wherein we have held that the evidence was properly admitted or that the error, if any, was harmless. Moreover, none of the alleged errors was serious enough to create a reasonable probability that, but for the errors, the result of the trial would have been different. Strickland, 466 U.S. at 688, 104 S.Ct. at 2064-2065. Thus, Skatzes was not denied the effective assistance of counsel based on this list of claimed derelictions.
 {¶ 322} The forty-seventh assignment of error is overruled.
 {¶ 323} "48. DEFENSE COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO OBJECT TO THE SHOWING OF THE TELEVISION COMMENTARY DURING STATE'S EXHIBIT 5."
 {¶ 324} Skatzes argues that state's exhibit five was irrelevant and that trial counsel were ineffective in failing to object to its admission. Exhibit five was a videotape of television news coverage during the riot that depicts a statement made by Department of Rehabilitation and Corrections spokesperson Tess Unwin on April 14, 1993.
 {¶ 325} The videotape in question was clearly relevant to the state's case. The day before Vallandingham was killed, Unwin stated at a press conference that the inmates' threat that a hostage would be killed if their demands were not met in three and one-half hours was "a standard threat; it's nothing new. * * * They've been threatening things like this from the beginning." The state's evidence showed that the inmates had been aware of Unwin's statement through their televisions and radios and that gang leaders had taken the statement as a signal that their threats were not being taken seriously. Vallandingham was killed the next day. Because the videotape was relevant, trial counsel were not ineffective in failing to object to it.
 {¶ 326} The forty-eighth assignment of error is overruled.
 {¶ 327} "49. DEFENDANT'S TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO OBJECT TO TESTIMONY THAT WAS IRRELEVANT TO THE CHARGES AGAINST HIM OR SHOULD HAVE BEEN REJECTED UNDER OHIO EVID.R. 403(A), AND THUS VIOLATED THE DEFENDANT'S RIGHT TO COUNSEL AS GUARANTEED BY THE OHIO CONSTITUTION, ART. I, § 10, AND THE UNITED STATES CONSTITUTION, AMEND. VI AND XIV."
 {¶ 328} Skatzes raises four separate issues under this assignment of error and claims that each issue demonstrates that he was denied his right to the effective assistance of counsel.
 {¶ 329} First, Skatzes claims that testimony that inmate Brookover sold marijuana at Lucasville prior to the riot "had no relation to the charges" against him and was prejudicial to him. Insofar as Brookover testified on behalf of the state and Skatzes was not implicated in any drug dealing, we fail to see how Skatzes could have been prejudiced by this testimony. If anything, Brookover's drug dealing might have made him a less credible witness. Trial counsel acted reasonably in not objecting to this testimony.
 {¶ 330} Second, Skatzes claims that counsel should have objected to "the sheer number of photographs" introduced by the state, most of which were not tied to any crime committed by Skatzes. Skatzes' objection encompasses approximately 275 pictures of L-block at the end of the riot and over 400 pictures of the inmates who were in L-block at the time of the surrender.
 {¶ 331} The supreme court has held that "the mere fact that there are numerous photos will not be considered reversible error unless the defendant is prejudiced thereby. Absent gruesomeness or shock value, it is difficult to imagine how the sheer number of photographs admitted can result in prejudice requiring reversal." DePew, 38 Ohio St.3d at 281. Other than the number of photographs, Skatzes has made no specific argument as to how these photographs prejudiced him. The supreme court held in Robb that evidence relating to "the setting of the case," i.e.
the riot, was relevant and admissible. Robb, 88 Ohio St.3d at 68. Thus, the photographs of L-block depicting gang-related graffiti, areas where negotiations took place, measures taken by inmates to guard against a raid by the authorities, areas where hostages were captured and held, and random destruction were admissible. The photographs of each inmate in L-block during the riot were also relevant and admissible. These pictures were the means by which the state's witnesses identified participants in the riot, whether gang leaders, gang members, or inmate bystanders. Because many inmates were known to others only by their nicknames, these pictures helped to assure proper identification of those involved in the riot. These pictures could not have been prejudicial to Skatzes. Thus, trial counsel were not ineffective in failing to object to these photographs.
 {¶ 332} Third, Skatzes argues that the state improperly attempted to impeach Corrections Officer Jeffrey Ratcliff when he testified on Skatzes' behalf. Skatzes claims that the state explored a variety of objectionable issues, "including accounts of inmate conduct not attributable to [Skatzes], use of a statement the witness did not recall, and implications that the witness suffered from the Stockholm Syndrome." Skatzes' argument about the impropriety of this cross-examination is nebulous. Our review of the cross-examination leaves us unpersuaded that it was improper or that Skatzes was prejudiced thereby.
 {¶ 333} Fourth, Skatzes contends that his attorneys were ineffective in failing to object to victim impact evidence offered during the guilt phase of his trial. The evidence characterized by Skatzes as victim impact evidence includes references to Corrections Officer Vallandingham's reputation and to Corrections Officer Clark's disabled daughter, accounts of non-gang members' hunger, thirst, and fear, and the "endearing" description of inmate Pop Svette, who was murdered, as a cantankerous, comical old man with a walker. Skatzes claims that these references were intended to elicit sympathy and bias and that counsel were ineffective in failing to object. We disagree that this was victim impact evidence prohibited during the guilt phase of a capital trial. See Payne v. Tennessee (1991), 501 U.S. 808, 111 S.Ct. 2597. This evidence was not offered to show the victim's suffering, the family's grief, or the loss to the community caused by the crimes, as is typically the case with victim impact evidence. Rather, it was part of the context for the riot. For example, inmates liked some corrections officers better than others, and they had opinions about which one should have been killed. Family responsibilities affected how the hostage corrections officers dealt with and felt about their confinement, and Clark seemed, by all accounts, to have been on the verge of a nervous breakdown during his confinement. Indeed, this is why he was the one released in exchange for the radio broadcast. The effect of the riot on non-gang members and the personal characteristics of some of the victims were not offered for their emotional impact but as evidence of the gangs' control and of the unpopularity of some of those who were murdered. The trial court was not required to confine this type of evidence to the sentencing phase of the trial, and trial counsel did not act ineffectively in failing to object to it.
 {¶ 334} The forty-ninth assignment of error is overruled.
 {¶ 335} "50. DEFENDANT'S TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO OBJECT TO EVIDENCE OF THE BAD ACTS OF OTHERS."
 {¶ 336} Skatzes claims that evidence of the bad acts of others during the course of the riot was irrelevant and therefore inadmissible pursuant to Evid.R. 402 and that his attorneys were ineffective in repeatedly failing to object to this type of evidence.
 {¶ 337} As we have discussed several times in this opinion, much of the evidence to which Skatzes objects was properly admissible because it was relevant to the roles of the various gangs in the riot, to Skatzes' leadership role, and to the manner in which the gangs wielded their power. The supreme court observed in Robb that the trial court had acted within its discretion in admitting evidence of crimes with which the defendant had not been charged or otherwise linked because this "evidence helped prove a conspiracy, namely that prison gang leaders, including defendant, conspired over eleven days to seize and control L-complex, settle old scores, take hostages and even murder one, all in an attempt to force concessions from prison authorities." Robb,88 Ohio St.3d at 680. The supreme court also noted that several of the witnesses whose testimony was at issue, including Snodgrass and Lavelle, had provided the "independent proof of the conspiracy" required under Evid.R. 801(D)(2)(e). Id. Because this evidence was admissible, counsel were not ineffective in failing to object to it. Moreover, insofar as Skatzes was not implicated in the crimes at issue, we are unpersuaded that he suffered any prejudice as a result of this evidence.
 {¶ 338} The fiftieth assignment of error is overruled.
 {¶ 339} "51. DEFENDANT'S TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO OBJECT TO HEARSAY TESTIMONY BY VARIOUS WITNESSES."
 {¶ 340} Under this assignment of error, Skatzes cites numerous portions of testimony to which he claims his attorneys should have objected on the basis that it was hearsay. He claims that the admission of this evidence constituted plain error in each specific instance and that the cumulative effect of these failures also rose to the level of plain error.
 {¶ 341} Several of the excerpts cited by Skatzes involved the testimony of Sgt. Hudson. We have already discussed the fact that, by agreement of the parties, Sgt. Hudson testified as a summary witness regarding the course of the riot and of the state's subsequent investigation, and we concluded that trial counsel were not ineffective in agreeing to this type of testimony. Thus, we reject Skatzes' argument that counsel were ineffective in allowing Sgt. Hudson to testify about matters regarding which he lacked firsthand knowledge.
 {¶ 342} Skatzes also claims that counsel should have objected to testimony from several witnesses involving the conduct of other inmates during the course of the riot. For example, Skatzes objects to testimony about the killing or confinement of inmates with whom riot leaders had a problem, to accounts of the attack on inmate Johnny Fryman during the first hours of the riot, and to a poem about the Aryan Brotherhood found in the cell of Aryan leader Freddie Snyder. Further, Skatzes claims that the opinions of other Aryan Brotherhood members about dissatisfaction with Jason Robb's leadership during the riot and about what should be done to the suspected snitch Brookover were improper. Skatzes repeatedly claims that these actions or opinions were "never tied [to him] in anyway * * * and yet [they were] used by the State to imply that [he] was somehow involved." He also claims that some of this evidence, especially evidence relating to violence in the early hours of the riot, "helped to create a false impression of violence early in the case, which necessarily colored the way in which evidence was viewed as it was introduced throughout the proceedings."
 {¶ 343} The admissibility of relevant evidence was within the trial court's discretion. Id. Some of the evidence to which Skatzes objects was probative of how the riot unfolded and of the code of conduct within the gangs in general and during the riot in particular. Moreover, Skatzes' admission that none of the testimony at issue tied him to the incidents in question belies his claims that it was plain error to allow this testimony and that counsel were ineffective for failing to object to it. Indeed, given the lack of evidence tying Skatzes to some of the incidents in question, Skatzes' attorneys, in the exercise of their professional judgment, may have concluded that the references were harmless and that an objection would have drawn undue attention to the testimony. Further, we are wholly unpersuaded that the outcome of Skatzes' trial would have been different but for the snippets of evidence cited under this assignment. We are confident that the jury was able to distinguish between evidence that put the riot in context and evidence that pertained to crimes of which Skatzes was accused.
 {¶ 344} The fifty-first assignment of error is overruled.
 {¶ 345} "52. THE DEFENDANT'S COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO OBJECT TO THE INTRODUCTION OF IRRELEVANT, INFLAMMATORY AUDIOTAPES AND VIDEOTAPES."
 {¶ 346} Skatzes asserts that the audiotapes of the telephone negotiations with the inmates, the videotapes of events on the recreation yard during the riot, the videotape of a television broadcast by a Department of Corrections spokesperson, and the tunnel tapes should not have been admitted because they were irrelevant, inflammatory, and unreliable. He also claims that the tunnel tapes were obtained in violation of the former R.C. 2933.51 et seq., which prohibited intercepting wire or oral communications. He claims that his attorneys were ineffective in failing to object to the tapes for these reasons.
 {¶ 347} Skatzes' contention that the tapes in question were irrelevant is without merit. We are also unpersuaded that these tapes were inflammatory, and Skatzes makes no specific argument in this regard.
 {¶ 348} Skatzes does argue that the "audio tapes" had unexplained gaps in recording and were unreliable. It is unclear from his brief whether he refers to the telephone conversations or the tunnel tapes in making this claim. However, during Sgt. Hudson's testimony, he explained at some length that, at the time these tapes were made, the negotiators sought only to use the tapes in the negotiations and did not think in terms of using the tapes as evidence following the riot. He further testified that the recording of the negotiations did not always coincide with the beginning and end of the conversations with the inmates. In other words, he stated that some of the tapes included conversations amongst the negotiators when the inmates were not on the phone or included only part of a conversation with an inmate because the tape recording did not start at the very beginning of the phone call. Sgt. Hudson was able to identify these portions of the telephone negotiations and to fill in some of the missing portions from his recollection. Sgt. Hudson also attested to the fact that the recordings of the telephone negotiations were accurate reproductions of those conversations. The negotiation tapes were not inherently unreliable, and the defense was free to delve into any irregularities in the tapes on cross-examination.
 {¶ 349} Likewise, although the tunnel tapes may have been somewhat difficult to decipher, especially with respect to the identities of the speakers, Skatzes was free to highlight such shortcomings on cross-examination. Skatzes' arguments regarding this evidence go to its weight, not its admissibility. The tunnel tapes were admissible, and trial counsel did not act ineffectively in failing to object.
 {¶ 350} Skatzes also contends that the tunnel tapes were obtained in violation of the former R.C. 2933.51 et seq. and that counsel should have objected to them on that ground. The supreme court considered this argument in the case of Skatzes' co-conspirator, Jason Robb. It held:
 {¶ 351} "[W]e cannot reasonably interpret the former R.C. 2933.51et seq. as granting a statutory right to privacy in communications between rioting inmates. The General Assembly could not have envisioned creating such a right in a state prison under siege. Granting privacy rights in these circumstances makes no sense in view of the state's interest in operating a prison and, in this case, restoring order, saving the lives of hostages and nonrioting prisoners, and protecting state property. `[A] statute should not be interpreted to yield an absurd result.'" (Citations omitted.) Robb, 88 Ohio St.3d at 66.
 {¶ 352} The supreme court also observed that the former R.C.2933.52(B)(1) provided that Ohio restrictions on electronic interceptions do not apply to interceptions made in accordance with federal law, as was the case at Lucasville. Id. Thus, Skatzes was not denied the effective assistance of counsel based on his attorneys' failure to advance an argument that lacked merit.
 {¶ 353} The fifty-second assignment of error is overruled.
 {¶ 354} "53. THE DEFENDANT'S TRIAL COUNSEL WERE INEFFECTIVE WHEN THEY FAILED TO PREPARE MR. SKATZES TO TESTIFY IN [SIC] HIS OWN BEHALF."
 {¶ 355} Skatzes claims that his counsel acted ineffectively in failing to prepare him to testify at trial. In support of this argument, he cites an instance where he did not answer a question directly on direct examination, claiming that the testimony "showed a clear failure to prepare." He claims that his testimony "was not helpful to his defense" and that he "had obviously not been told or understood the simple concept of answering only the question asked * * *."
 {¶ 356} Skatzes' testimony painted a very different picture of his involvement in the riot than the state had presented in its case-in-chief. According to Skatzes, he had become involved in negotiations and other leadership roles by happenstance and for altruistic reasons. In our view, counsel did not act ineffectively in offering this version of events through Skatzes' testimony, notwithstanding the fact that, by his own admission, Skatzes had trouble keeping his answers brief. Moreover, it does not appear from the record that Skatzes' sometimes rambling answers prejudiced him by, for example, leading him to reveal activities that he ought not to have revealed. The fact that the jury did not believe Skatzes' testimony is not a basis for us to conclude, in hindsight, that the attorneys acted ineffectively in presenting it.
 {¶ 357} The fifty-third assignment of error is overruled.
 {¶ 358} "40. GEORGE SKATZES WAS INCOMPETENT TO STAND TRIAL."
 {¶ 359} Skatzes claims that he was incompetent to stand trial. He points to the following as evidence of his incompetence: 1) his admission at trial that he had had a weapon during the riot when other evidence suggested that he had not had a weapon; 2) his use of the colloquial phrase "I reckon" during his testimony, which allegedly subjected him to "ridicule" by the prosecutor; 3) his weight loss; 4) testimony by other inmates that they had referred to Skatzes as "Crazy George" and considered him to have been "paranoid" about his safety during the riot; and 5) Skatzes' statements that he had been suffering from stress and confusion at the time of the riot. The defense did not raise the issue of Skatzes' competency in the trial court.
 {¶ 360} "Fundamental principles of due process require that a criminal defendant who is legally incompetent shall not be subjected to trial." (Citations omitted.) State v. Berry, 72 Ohio St.3d 354, 359,1995-Ohio-310. A defendant is competent to stand trial if he is capable of understanding the nature and objective of the proceedings against him and of assisting in his defense. R.C. 2945.37(G); Carter,89 Ohio St.3d at 603. Absent evidence to the contrary, a defendant is presumed to be competent. R.C. 2945.37(G).
 {¶ 361} None of the issues raised by Skatzes suggests that he did not understand the nature and objective of the proceedings against him or that he was unable to assist in his defense. Skatzes' testimony that he had possessed a weapon during the riot, which was presumably truthful, had no bearing on the issues relevant to competency. See Berry,72 Ohio St.3d at 362 (finding that defendant's willingness to speak with police did not reflect poorly on his competence to stand trial). Moreover, his alleged paranoia, stress, and confusion during the riot were probably understandable under the circumstances and, in any event, do not appear to have impaired his ability to assist in his defense. See State v.Hessler, 90 Ohio St.3d 108, 125, 2000-Ohio-30 (holding that mental illness cannot necessarily be equated with the legal definition of incompetence); State v. Bock (1986), 28 Ohio St.3d 108, 110 (noting that a defendant "may be emotionally disturbed or even psychotic and still be capable of understanding the charges against him and of assisting his counsel"). Moreover, Skatzes' fellow inmates' assessments of his mental state were entitled to very little weight, if any, on the issue of his competency.
 {¶ 362} In sum, none of the issues raised by Skatzes under this assignment of error raise a genuine issue as to his ability to understand the nature of the charges against him or to participate in his defense.
 {¶ 363} The fortieth assignment of error is overruled.
 {¶ 364} "41. THE TRIAL COURT FAILED TO OBSERVE GEORGE SKATZES' RIGHT TO BE PRESENT DURING THE SENTENCING FOR THE KIDNAPPING OF EARL ELDER."
 {¶ 365} The record in this case reveals that the jury found Skatzes guilty of the kidnapping of Earl Elder, as set forth in the eighth count in the indictment, but that the trial court failed to pronounce its sentence on this particular offense during the sentencing hearing at which Skatzes was present. The trial court subsequently filed a Judgment Entry of Sentence, which provided that Skatzes was to serve "not less than 15 nor more than 25 years" on this count. Skatzes contends that the trial court's failure to pronounce this sentence in his presence violated his constitutional rights.
 {¶ 366} Crim.R. 43(A) provides that the defendant shall be present "at the arraignment and every stage of the trial, including the impaneling of the jury, the return of the verdict, and the imposition of sentence" unless he is voluntarily absent or has engaged in disruptive conduct in the courtroom. Because neither of these exceptions applied, Skatzes undoubtedly had a right to be present when his sentence was pronounced. See State v. Sutherlin (1996), 111 Ohio App.3d 287, 293;State v. Bell (1990), 70 Ohio App.3d 765, 773. This right is fundamental, and Skatzes would be entitled to resentencing, in his presence, on the kidnapping of Earl Elder. However, at oral argument, the state conceded this error and asserted that, rather than conducting further proceedings, it would prefer that this count simply be dismissed. Accordingly, Skatzes' conviction for the kidnapping of Earl Elder will be vacated.
 {¶ 367} The forty-first assignment of error is sustained.
 {¶ 368} "54. THE TRIAL COURT ERRED WHEN IT ALLOWED STEVEN MACKO TO TESTIFY THAT HAVING A LIGHTENING BOLT TATTOO MEANT THAT THE PERSON HAD KILLED A BLACK PERSON."
 {¶ 369} Steven Macko, an L-block inmate at the time of the riot who was unaffiliated with any gang, testified that the symbols of the Aryan Brotherhood were lightening bolts and the letters A and N for Aryan Nation and that these symbols were sometimes placed inside a shield. Macko testified that "most guys that was involved in the Aryan Brotherhood had lightening bolts or had a shield [tattooed] on their chest." He further testified that, based on his many years in prison, his understanding was that a member of the Aryan Brotherhood got a lightening bolt tattoo as a symbol that he had killed a black person. Skatzes claims that this testimony was highly prejudicial and of little probative value.
 {¶ 370} We are unpersuaded that Macko's testimony about the tattoos was unduly prejudicial to Skatzes. In addition to the statements set forth above, Macko testified that he did not know whether Skatzes had had a lightening bolt tattoo and that he did not believe that every member of the Aryan Brotherhood with a lightening bolt tattoo had actually killed a black man. In fact, Macko stated, "I don't believe none of them did," indicating that it was symbolism tied to "the real Aryan Brotherhood." He further testified that one particular corrections officer had had lightening bolt tattoos and had demonstrated racial preferences. In sum, Macko's testimony about the lightening bolt tattoos did not directly implicate Skatzes and thus was not unduly prejudicial.
 {¶ 371} The fifty-fourth assignment of error is overruled.
 {¶ 372} "55. THE TRIAL COURT FAILED TO CONDUCT AN APPROPRIATE SENTENCING REVIEW AS IS REFLECTED BY THE COURT'S SENTENCING OPINION."
 {¶ 373} Skatzes claims that the trial court did not conduct an adequate independent review of aggravating circumstances and mitigating factors before imposing the death sentence recommended by the jury.
 {¶ 374} Pursuant to R.C. 2929.03(F), the trial court was required to "state in a separate opinion its specific findings as to the existence of any of the mitigating factors set forth in [R.C. 2929.04(B)], the existence of any other mitigating factors, the aggravated circumstances the offender was found guilty of committing, and the reasons why the aggravated circumstances the offender was found guilty of committing were sufficient to outweigh the mitigating factors."
 {¶ 375} Following the jury's recommendation of death sentences on two of the aggravated murder counts against Skatzes, the trial court filed two entries discussing the sentences: an Opinion dated January 30, 1996, and a Judgment Entry of Sentence dated March 18, 1996. In these entries, the trial court identified the following mitigation evidence that had been offered by Skatzes: his peaceful reputation in prison, his help in settling the riot, and hostage Corrections Officer Ratcliff's testimony that Skatzes had undoubtedly saved his life by moving him away from the Muslims. The court noted that Skatzes had not introduced any evidence about his background or family and that he had made a "rambling unsworn statement" denying all guilt.
 {¶ 376} In imposing the death sentences recommended by the jury, the trial court stated that it had reviewed the evidence, especially the evidence offered in mitigation, to determine whether the jury's verdicts and recommendations were justified and were made without emotion, passion, or bias. The court then made the following observations:
 {¶ 377} "It is to be noted that the defendant could have always avoided the consequences of the riot by leaving L Block and moving out to the yard or the surrounding area away from the riot. Also, the Court wants to point out that the defendant's participation in the riot was not mitigating when he announced that if the prisoners' demands were not met, they were going to `send a body out.'
 {¶ 378} "The Court finds that the jury did carefully consider the case, along with the mitigation offered in the Second Phase, and deliberated very thoroughly before making its decision, and therefore, the Court adopts the recommendations of the jury."
 {¶ 379} It is clear from the trial court's entries that it found the mitigation evidence to be entitled to very little weight, if any. However, the trial court did not address the aggravating circumstances that Skatzes had been found guilty of committing or articulate reasons why the aggravating circumstances outweighed the mitigating factors. In these respects, the trial court's sentencing entries failed to comply with R.C. 2929.03(F). Because some of the aggravated circumstances were essentially undisputed, such as Skatzes' status as an inmate at the time of the offense and his prior aggravated murder conviction, and because the trial court thought that the mitigation evidence was entitled to so little weight, it is not difficult to imagine how it reached the conclusion that it did. Nonetheless, we recognize that the trial court's failure to comply with R.C. 2929.03(F) disrupts the review procedures enacted by the General Assembly by depriving Skatzes, this court, and subsequent reviewing courts of the trial court's perceptions. See Statev. Maurer (1984), 15 Ohio St.3d 239, 247, certiorari denied (1985),472 U.S. 1012, 105 S.Ct. 2714.
 {¶ 380} We are unconvinced, however, that Skatzes' constitutional rights have been impinged by the trial court's omission. R.C. 2929.05
requires this court and the supreme court to independently weigh all the facts and other evidence in order to determine whether the sentence of death imposed by the trial court is appropriate. "As a necessary corollary to that requirement, the courts of appeals and the Supreme Court must articulate the reasons why the aggravating circumstances outweigh the mitigating factors." Id. at 246-247. We will engage in such a review infra. As such, we cannot conclude that Skatzes was prejudiced by the failure of the trial court to enunciate its reasoning. Indeed, "the purpose of an independent review at each stage of the appellate process was designed, at least in part, to correct such omissions." Id. at 247.
 {¶ 381} The fifty-fifth assignment of error is overruled.
 {¶ 382} "56. THE STATE FAILED TO MEET ITS DISCOVERY OBLIGATIONS."
 {¶ 383} Skatzes claims that the state failed to produce the following evidence, as it was required to do: "[a]ll statements and evidence inconsistent with the State's theory of guilt" that resulted from the State Highway Patrol's 1,395 interviews in connection with the case; all of the tunnel tapes and negotiation tapes; the plea agreements of those whose statements were admitted pursuant to Evid.R. 801(D)(2)(e); all scientific evidence regarding Vallandingham's time of death; transcripts of grand jury proceedings; and unspecified videotapes.
 {¶ 384} The record refutes Skatzes' claim that he was not provided with the hundreds of tunnel tapes created during the riot. At a pretrial hearing on October 5, 1995, his attorney stated, "[W]e are in possession of all six hundred odd tunnel tapes[.]" The attorney also acknowledged receipt of copies of the negotiation tapes some ten months prior to the hearing. Thus, Skatzes' argument regarding the tunnel tapes and negotiation tapes is without merit.
 {¶ 385} The language of Crim.R. 16(B) refutes some of Skatzes' other claims. He contends that he was entitled to statements resulting from the hundreds of highway patrol interviews with inmates, hostages, and others following the riot. Crim.R. 16(B)(2) states: "[Except as otherwise provided], [t]his rule does not authorize the discovery or inspection of reports, memoranda, or other internal documents made by the prosecuting attorney or his agents in connection with the investigation or prosecution of the case, or of the statements made by witnesses or prospective witnesses to state agents." The highway patrol's 1,395 interviews following the riot constituted statements made by witnesses or prospective witnesses to state agents and were not discoverable unless they were favorable to Skatzes. See Crim.R. 16(B)(1)(f). Skatzes concludes that, because the State Highway Patrol set up a computer program to help it sort through the information it obtained from these interviews, it must have discarded information that it had deemed to be "false," which would have been exculpatory. In our view, this conclusion does not necessarily follow, and we will not presume that the state withheld exculpatory evidence. Likewise, pursuant to Crim.R. 16(B)(3) and Crim.R. 6(E), the grand jury proceedings were not subject to disclosure except by court order, and no such order existed in this case. See, also, our discussion of assignment of error fifty-eight, infra.
 {¶ 386} Skatzes has cited no basis for his claim that the state was compelled to produce the plea agreements of inmates whose statements were admitted pursuant to Evid.R. 801(D)(2)(e), and we are aware of none. The case cited by Skatzes, Giglio v. United States, is clearly distinguishable because it dealt with the government's failure to disclose an alleged promise of leniency made to its key witness in return for his testimony. Giglio v. United States (1972), 405 U.S. 150, 154,92 S.Ct. 763, 766. Co-conspirators pursuant to Evid.R. 801(D)(2)(e) are not "witnesses" as that term is normally defined or as it is used in Crim.R. 16.
 {¶ 387} Finally, Skatzes claims that he did not receive all scientific evidence regarding the time of Vallandingham's death, some of which would have shown that Vallandingham died "long before" the meeting took place at which Skatzes allegedly voted to kill a hostage. The records in dispute are those of the Scioto County Coroner, who examined Vallandingham's body when it was removed from the recreation yard, including vitreous fluids in the eye which help to determine the time of death. The state points out that there is nothing in the record to support Skatzes' claim that he did not receive these materials and that, in any event, there is no evidence to suggest that Vallandingham's death was "long before" the meeting at which gang leaders decided to kill a hostage. Given Skatzes' failure to object to this evidence at trial on the grounds that it had not been produced in discovery, we are reluctant to conclude that it had not been produced.
 {¶ 388} Moreover, the transcript reveals that Franklin County Coroner Patrick Fardal, who conducted Vallandingham's autopsy on April 16, 1993, testified about the Scioto County Coroner's preliminary findings regarding the time of Vallandingham's death. The defense raised no objection on the ground that it had been previously unaware of the Scioto County Coroner's findings. Moreover, Fardal testified that he had relied upon his own testing of vitreous fluid as well as that conducted by the Scioto County Coroner the previous day in concluding that Vallandingham had died at about 7:00 a.m., plus or minus one hour, on April 15, 1993. This testimony supported a defense theory that Vallandingham had been murdered before the meeting at which Skatzes allegedly voted to kill him. Fardal further testified that nothing in his findings was inconsistent with Vallandingham having been killed at 10:30 a.m., as was the state's theory. Skatzes had a full opportunity to cross-examine the Franklin County Coroner about these findings. Thus, even if we were to presume that the state did not produce records from the Scioto County Coroner, it does not appear that Skatzes was prejudiced by this failure.
 {¶ 389} Skatzes does not elucidate what videotapes he claims should have been turned over but were not, so we will not address this argument.
 {¶ 390} The fifty-sixth assignment of error is overruled.
 {¶ 391} "57. OHIO'S DEATH PENALTY LAW[S] * * * ARE UNCONSTITUTIONAL ON THEIR FACE AND AS APPLIED TO GEORGE SKATZES * * *."
 {¶ 392} Skatzes asserts that Ohio's death penalty scheme is unconstitutional for a number of reasons. Many of these arguments have already been addressed by the Supreme Court of Ohio in other cases, and by the United States Supreme Court as well. It is well settled that courts of appeals must accept and enforce the law as promulgated by the supreme court and may not change, modify, or ignore that law.Consolidated Rail Corp. v. Forest Cartage Co., Inc. (1990),68 Ohio App.3d 333, 341; Thacker, 31 Ohio App.2d at 21. As such, we will give cursory review to constitutional issues on which the supreme court has already spoken.
 {¶ 393} Skatzes contends that Ohio's death penalty laws are arbitrary and discriminatory because prosecutors have "uncontrolled indictment discretion." He also argues that the death penalty is imposed in a racially discriminatory manner and that it is constitutionally flawed because it does not represent the least restrictive means to reach the state's ends of deterrence and retribution.
 {¶ 394} The supreme court has rejected the argument that the death penalty is arbitrary because it is applied by prosecutors in an arbitrary and capricious manner. State v. Jenkins (1984), 15 Ohio St.3d 164,169-170, certiorari denied (1985), 472 U.S. 1032, 105 S.Ct. 3514. See, also, Gregg v. Georgia (1976), 428 U.S. 153, 199-200, 96 S.Ct. 2909,2937-2938. "`Absent facts to the contrary, it cannot be assumed that prosecutors will be motivated in their charging decision by factors other than the strength of their case and the likelihood that a jury would impose the death penalty if it convicts.'" Jenkins,15 Ohio St.3d at 169, quoting Gregg, 428 U.S. at 225, 96 S.Ct. at 2949 (White, J., concurring). To conclude otherwise would represent "an indictment of our entire criminal justice system which must be constitutionally rejected." Id. at 170.
 {¶ 395} Skatzes' argument that the death penalty is unconstitutional because "Ohio law fails to assure against race discrimination playing a role in capital sentencing" has also been rejected. The United States Supreme Court and the Supreme Court of Ohio have refused to accept statistics purporting to show a racial disparity in the imposition of the death penalty as grounds for finding the death penalty to be unconstitutional. These courts have held, instead, that a defendant "must show that racial considerations affected the sentencing process in his case" for equal protection to be implicated. (Emphasis sic.) State v. Steffen (1987), 31 Ohio St.3d 111, 124, certiorari denied (1988), 485 U.S. 916, 108 S.Ct. 1089. See, also, McClesky v. Kemp
(1987), 481 U.S. 279, 297, 107 S.Ct. 1756, 1769-70. Skatzes, who is white, has made no such showing. Skatzes' argument that the state is required to use the least restrictive means to achieve a compelling interest has also been rejected by the supreme court's recognition that "the death penalty, as a sanction or punishment, is proper in extreme cases." Jenkins, 15 Ohio St.3d at 168. See, also, Gregg,428 U.S. at 187, 96 S.Ct. at 2932.
 {¶ 396} Skatzes further argues that Ohio's death penalty laws are unconstitutional because the trial court can impose the death penalty if the aggravating circumstances are only "marginally greater" than the mitigating factors, referring to the preponderance of the evidence standard, and because the laws do not provide adequate guidelines for sentencing. He claims that these shortcomings lead to arbitrary sentencing. The supreme court has considered this argument in other cases and has concluded that Ohio's laws are "`suitably directed and limited so as to minimize the risk of wholly arbitrary and capricious action' in imposing the [death] sentence." State v. Williams (1986),23 Ohio St.3d 16, 24, citing Jenkins, 15 Ohio St.3d at 168. See, also,Zant v. Stephens (1983), 462 U.S. 862, 874, 103 S.Ct. 2733, 2741; Gregg,428 U.S. at 189, 96 S.Ct. at 2932.
 {¶ 397} Further, Skatzes contends that, by requiring proof of aggravating circumstances at the guilt phase as well as at the sentencing phase of the trial, Ohio's statutory scheme "effectively prohibits a sufficiently individualized determination in sentencing." The supreme court has held, however, that the consideration of aggravating circumstances at the guilt stage of a capital trial is not unconstitutional. Jenkins, 15 Ohio St.3d at 174.
 {¶ 398} Skatzes claims that Ohio's death penalty laws burden the right to a trial by jury because Crim.R. 11(C)(3) permits a judge to dismiss specifications "in the interests of justice" upon a guilty or no contest plea, and there is no parallel provision for those who go to trial. We reject this argument because Crim.R. 11(C)(3) was not at issue in this case. See Mills, 62 Ohio St.3d at 372; State v. Zuern (1987),32 Ohio St.3d 56, 64, certiorari denied (1988), 484 U.S. 1047,108 S.Ct. 786. Moreover, the supreme court has held that the discretion given to the judge in Crim.R. 11(C)(3) "is neither violative of [a] defendant's constitutional right to equal protection of the laws nor does it coerce the defendant to waive his constitutional right to a jury trial." Statev. Buell (1986), 22 Ohio St.3d 124, 138, certiorari denied (2001),479 U.S. 870, 107 S.Ct. 240, quoting Nabozny, 54 Ohio St.2d at 195, paragraph one of the syllabus. We further note that, notwithstanding the discretion given to the judge pursuant to Crim.R. 11(C)(3), the defendant may still be sentenced to death upon pleading guilty or no contest. Id. at 138.
 {¶ 399} According to Skatzes, the mandatory submission to the trier of fact of any presentence investigation report or mental evaluation requested by the defendant, as required by R.C. 2929.03(D)(1), is unconstitutional because it "prevents the defendant from effectively presenting his case in mitigation." This argument was rejected in Statev. Esparza (1988), 39 Ohio St.3d 8, 10, certiorari denied (1989),490 U.S. 1012, 109 S.Ct. 1657, and Buell, 22 Ohio St.3d at 138. Pursuant to R.C. 2929.03(D)(1), "the defendant decides whether to expose himself to the risk of potentially incriminating presentence investigations, including mental examinations. There is no constitutional infirmity in providing the defendant with such an option." Buell,22 Ohio St.3d at 138.
 {¶ 400} Under Ohio law, a murder may be classified as an aggravated murder if the death was caused while committing or attempting to commit, or while fleeing or attempting to flee after committing or attempting to commit, certain enumerated felonies such as kidnapping and rape. R.C. 2903.01(B). The law also provides that some of these same criteria may justify the imposition of the death penalty if the offender was the principal offender in the aggravated murder or committed the aggravated murder with prior calculation or design. R.C. 2929.04(A)(7). Skatzes argues that, because of this statutory scheme, those who commit a murder during a course of a felony enumerated in the aggravated murder statute at R.C. 2903.01(B) are "automatically eligible for the death penalty," which unfairly singles out one class of murderers for harsher punishment than others. The supreme court has rejected this argument. It has held that the provisions of R.C. 2903.01(B) and R.C. 2929.04(A)(7) are not duplicative and that this statutory scheme is not constitutionally infirm. Benner, 40 Ohio St.3d at 306-307.
 {¶ 401} R.C. 2929.03(D)(1) provides that "the nature and circumstances of the aggravating circumstances the offender was found guilty of committing" shall be considered in the imposition of the sentence of death. R.C. 2929.04(B) provides that "the nature and circumstances of the offense" shall be weighed against the aggravating circumstances in mitigation, along with other enumerated mitigating factors, if applicable. The mitigating factors specifically enumerated in R.C. 2929.04(B) include whether the offender acted under duress, coercion, or strong provocation, the youth of the offender, and the offender's lack of a significant criminal history. Skatzes claims that R.C. 2929.03(D)(1) and R.C. 2929.04(B) cannot be reconciled and result in vague capital sentencing criteria because "they incorporat[e] the nature and circumstances of an offense into the aggravating circumstances" when those factors should only be considered in mitigation. The supreme court thoroughly addressed and rejected this argument in State v. Wogenstahl,75 Ohio St.3d 344, 352-356, 1996-Ohio-219, certiorari denied (1996),519 U.S. 895, 117 S.Ct. 240, and State v. Gumm, 73 Ohio St.3d 413,416-423, 1995-Ohio-24. See, also, State v. McNeill, 83 Ohio St.3d 438,453, 1998-Ohio-293, citing Tuilaepa v. California (1994), 512 U.S. 967,973-980, 114 S.Ct. 2630, 2635-2639 and Gumm, 73 Ohio St.3d at 416-423.
 {¶ 402} Skatzes contends that Ohio law "prohibits adequate appellate review" of the proportionality and appropriateness of death sentences because insufficient data is collected about cases in which guilty pleas are entered to lesser offenses, charges are reduced at trial, or life sentences are imposed. He also argues that the appropriateness review conducted by Ohio's appellate courts is "very cursory" and does not rationally distinguish between those who are truly deserving of the death penalty and those who are not. The supreme court rejected these arguments in Steffen, 31 Ohio St.3d at 122-124, andJenkins, 15 Ohio St.3d at 176-177.
 {¶ 403} Skatzes argues that death by electrocution is cruel and unusual and "offends contemporary standards of decency." The United States Supreme Court and the Supreme Court of Ohio have held that execution by electrocution does not violate the United States or Ohio Constitutions. In re Kemmler (1890), 136 U.S. 436, 443-444,10 S.Ct. 930, 932; State v. Coleman (1989), 45 Ohio St.3d 298, 308, certiorari denied (1990), 493 U.S. 1051, 110 S.Ct. 855. Moreover, any person sentenced to death in Ohio may now elect to be executed by lethal injection instead of by electrocution. R.C. 2949.22(B)(1). Skatzes has not argued that the use of lethal injection is cruel and unusual, and neither the United States Supreme Court nor the Supreme Court of Ohio has so held. See Bryan v. Moore (1999), 528 U.S. 960, 120 S.Ct. 394, dismissed (2000), 528 U.S. 1133, 120 S.Ct. 1003; Carter,89 Ohio St.3d at 608.
 {¶ 404} Finally, in his supplemental brief, Skatzes argues that Ohio's capital sentencing provisions are unconstitutional pursuant to the United States Supreme Court's recent decision in Ring v. Arizona (2002), ___ U.S. ___, 122 S.Ct. 2428. Ring addressed Arizona's capital sentencing statutes, which provided that a "death sentence may not legally be imposed * * * unless at least one aggravating factor is found to exist beyond a reasonable doubt." Under Arizona law, after a jury verdict finding a defendant guilty of a capital crime, a sentencing judge, sitting without a jury, determined whether an aggravating circumstance necessary for the imposition of the death penalty existed. The Supreme Court held that this system of imposing a capital sentence violated the Sixth Amendment right to trial by jury.
 {¶ 405} "If a State makes an increase in a defendant's authorized punishment contingent on the finding of a fact, that fact * * * must be found by a jury beyond a reasonable doubt. A defendant may not be `expose[d] . . . to a penalty exceeding the maximum he would receive if punished according to the facts reflected in the jury verdict alone.'" (Emphasis sic.) Ring, 122 S.Ct. at 2439-2440, citing Apprendi v. NewJersey (2000), 530 U.S. 466, 483, 120 S.Ct. 2348.
 {¶ 406} Skatzes contends that Ohio's death penalty scheme runs afoul of Ring because the jury is "invited to lay the decision making responsibility on the judge's shoulders by returning a death `recommendation.'" In our view, however, Ohio's statutes clearly do not present the problem addressed in Ring. In Ohio, the jury does determine, based on all of the evidence, whether an aggravating circumstance has been proven beyond a reasonable doubt. This is precisely what Ring
required. Although the judge has the discretion not to impose the death sentence sanctioned by the jury and the jury's determination is styled as a "recommendation," the jury nonetheless fulfills its role as the finder of all facts crucial to the imposition of the death penalty. Thus, Ohio's death penalty laws are not unconstitutional pursuant to Ring.
 {¶ 407} In addition to his constitutional arguments, Skatzes contends that Ohio's death penalty scheme violates international law by which the United States and all of the states are bound pursuant to international charters, treaties, and conventions. He asserts that, "[w]here state law conflicts with international law, it is the state law that must yield." See Zschernig v. Miller (1968), 389 U.S. 429, 440,88 S.Ct. 664, 670-71; Clark v. Allen (1947), 331 U.S. 503, 508,67 S.Ct. 1431, 1434-1435. The specific agreements to which Skatzes refers are the charters of the Organization of American States and the United Nations, the International Covenant on Civil and Political Rights, the International Convention on the Elimination of All Forms of Racial Discrimination, and the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. He also refers to "customary international law" as established by the Universal Declaration of Human Rights and numerous other declarations and conventions. Skatzes contends that these treaties prohibit violations of equal protection and due process, the arbitrary deprivation of life, the imposition of the death penalty for other than the most serious offenses, racially discriminatory practices, and cruel, inhuman, or degrading treatment or punishment. Because we have already concluded that Ohio's death penalty statutes do not violate equal protection or due process, are not imposed in an arbitrary or racially discriminatory manner, and do not constitute cruel and unusual punishment, we reject Skatzes' argument that Ohio's laws are inconsistent with international law. Skatzes has not advanced any argument that these issues, as defined under international law, differ in any significant way from the constitutional arguments we have already addressed, e.g., that equal protection and arbitrariness would be evaluated differently under international law than they are under the United States or Ohio Constitutions. Because we are unpersuaded that Ohio's laws violate any of the international agreements to which the United States is a signatory, we find it to be inconsequential whether the United States Senate incorporated any conditions or reservations in its adoption of the agreements or whether it had the authority to do so. See State v. Ashworth, 85 Ohio St.3d 56, 70, 1999-Ohio-204; Stojetz,84 Ohio St.3d at 468; State v. Phillips, 74 Ohio St.3d 72, 103-104,1995-Ohio-171. See, also, State v. Keene (Sept. 20, 1996), Montgomery App. No. 14375, affirmed (1998), 81 Ohio St.3d 646.
 {¶ 408} Finally, Skatzes asserts that the state "argued conspiracy * * *, bootstrapped that into complicity * * * and used complicity to gain a conviction" on the capital offense of aggravated murder. Skatzes contends that, because conspiracy requires no specific intent to kill, this type of "bootstrapping" is unconstitutional in capital cases. We disagree. The conspiracy statute ties the culpability requirement to the underlying offense, herein aggravated murder. Moreover, we have thoroughly addressed the state's use of conspiracy and complicity theories under other assignments of error. See our discussion of assignments of error four through eight, supra.
 {¶ 409} The fifty-seventh assignment of error is overruled.
 {¶ 410} "58. THE GOVERNMENT FAILED TO RECORD THE GRAND JURY PROCEEDINGS."
 {¶ 411} Skatzes contends that the grand jury proceedings were not recorded and that the lack of a record deprived him of the opportunity to show a particularized need for access to that testimony.
 {¶ 412} "Grand jury proceedings are secret, and an accused is not entitled to inspect grand jury transcripts either before or during trial unless the ends of justice require it and there is a showing by the defense that a particularized need for disclosure exists which outweighs the need for secrecy." State v. Greer (1981), 66 Ohio St.2d 139, 148, citing State v. Lasky (1970), 21 Ohio St.2d 187, 191. The trial court must determine, within the exercise of its discretion, whether the particularized need for the production of grand jury proceedings has been shown. Id. at 148.
 {¶ 413} Skatzes filed a Motion for Disclosure of Exculpatory and Impeaching Information in which he requested, inter alia, that the state identify "each occasion on which any witness has testified before any court, grand jury or other tribunal or body" regarding Skatzes or the facts of this case. At a hearing on December 8, 1994, the defense elaborated that it was looking for inconsistencies in the testimony of any witness from one occasion to another. The state responded that no live witnesses had appeared before the grand jury, that a number of videotaped depositions had been played, and that defense counsel were being provided with summaries and transcripts of those statements. Defense counsel then indicated that the prosecutor's representation that inmates had not appeared in person to testify before the grand jury disposed of his motion, and the court indicated that the issue was moot.
 {¶ 414} Skatzes' argument that he was denied his rights to due process and a fair trial because he was not given the record of grand jury proceedings is flawed in several respects. First, although Skatzes claims that the grand jury proceedings were not recorded as required by Statev. Grewell (1989), 45 Ohio St.3d 4, 9, the record does not support this claim. The prosecutor's statement at the December 8, 1994 hearing that no inmate witnesses had testified in person did not establish that the grand jury proceedings had not been recorded, and there is no other evidence to support this claim. Second, Skatzes was required to show a particularized need for the transcript of the grand jury proceedingsbefore he was entitled to the disclosure of those records. Skatzes seems to have this argument backward, claiming that the alleged lack of a record precluded him from making such a showing. Third, defense counsel conceded at the hearing that the state's response to his motion "dispose[d] of" it. Because of this concession, the trial court did not reach the issue of whether Skatzes had shown a particularized need for the record of the grand jury proceedings. In essence, then, Skatzes obviated the alleged error of which he now complains and any argument that he was entitled to the records from the grand jury.
 {¶ 415} The fifty-eighth assignment of error is overruled.
 {¶ 416} The fifty-ninth and sixtieth assignments of error relate to Skatzes' position that the record in this case is not complete and that he therefore is being denied his right to effective appellate review. Before we address his specific arguments, we will briefly discuss the requirements for an appellate record in a capital case.
 {¶ 417} The supreme court has held that a capital defendant is entitled to a "complete, full, and unabridged transcript of all proceedings against him so that he may prosecute an effective appeal."State ex rel. Spirko v. Court of Appeals (1986), 27 Ohio St.3d 13, 18. It has never held, however, that a capital defendant is entitled to a perfect record. State v. Palmer, 80 Ohio St.3d 543, 553, 1997-Ohio-312, certiorari denied (1998), 525 U.S. 837, 119 S.Ct. 96. In fact, it has expressly stated that "[t]he requirement of a complete, full, and unabridged transcript in capital trials does not mean that the trial record must be perfect for purposes of appellate review." Id.
 {¶ 418} In Palmer, certain bench and chamber conferences had not been recorded and no transcript had been made of the jury view of the crime scene. Id. Palmer claimed that his convictions and death sentence should be vacated and a new trial ordered based upon these failures in the record. Id. The supreme court held that:
 {¶ 419} "[R]eversal of convictions and sentences on grounds of some unrecorded bench and chambers conferences, off-the-record discussions, or other unrecorded proceedings will not occur in situations where the defendant has failed to demonstrate that (1) a request was made at trial that the conferences be recorded or that objections were made to the failures to record, (2) an effort was made on appeal to comply with App.R. 9 and to reconstruct what occurred or to establish its importance, and (3) material prejudice resulted from the failure to record the proceedings at issue." (Citations omitted.) Id. at 554.
 {¶ 420} The court held that, although Palmer had attempted to comply with App.R. 9 to correct the record and to reconstruct the unrecorded conferences, he had failed to demonstrate that he had requested that the matters at issue be recorded and, most importantly, had failed to demonstrate material prejudice resulting from the unrecorded matters to which he took exception on appeal. Id. In so holding, the supreme court stated that prejudice would not be presumed from the mere existence of unrecorded proceedings in capital cases and that general averments of prejudice do not act as a substitute for an actual showing of prejudice. Id. at 554-555.
 {¶ 421} We turn to Skatzes' next two assignments with this standard in mind.
 {¶ 422} "59. THE TRIAL COURT ERRED WHEN IT FAILED TO KEEP CONTROL OF THE CHARTS USED BY THE GOVERNMENT ATTORNEYS TO TALK WITH THE JURY ABOUT THE PROCESS FOR THE TRIAL."
 {¶ 423} Skatzes contends that the trial court should have "kept control" of the charts used by the prosecutor during voir dire to explain the "capital legal process" to the jurors. The whereabouts of the charts is no longer known. Skatzes does not make any specific argument with respect to the content of the charts; he simply asserts that he was entitled to a full record of the proceedings and that effective appellate review is impossible without these exhibits.
 {¶ 424} Although Palmer involved proceedings that had not been transcribed and Skatzes complains under this assignment of error about exhibits that were presented during voir dire but not admitted into evidence, we find the issues to be analogous. Thus, we will consider whether Skatzes requested that the exhibits in question be made part of the record or objected to the trial court's refusal to make them part of the record, whether he attempted to reconstruct the content of the exhibits or to establish their importance pursuant to App.R. 9, and whether he has shown material prejudice as a result of the fact that the charts were not made a part of the record. See id. at 554.
 {¶ 425} Skatzes' attorneys did not attempt to make the charts in question part of the record in the trial court. In Palmer, the supreme court expressed confidence that, if the off-the-record conferences had involved objections and requests considered crucial by the defense, "no doubt * * * those same objections and requests would have been raised onthe record * * *." (Emphasis sic.) Id. at 556. We share this view here. Skatzes was represented by highly competent counsel, and we are confident that counsel would have objected to the charts if their contents had warranted it. As we discussed under the forty-fifth assignment of error, it appears from the record that the prosecutor's explanation of the legal process was very balanced and accurate. Skatzes' attorneys also have not attempted to recreate the content of the charts pursuant to App.R. 9(C). By failing to identify any infirmity in the charts by the means available under App.R. 9, Skatzes has failed to make the required showing of prejudice. Rather, he has made only a general averment of prejudice on the basis that "these charts were the first things that * * * each juror saw." This showing is clearly insufficient pursuant to Palmer. See id. at 555.
 {¶ 426} The fifty-ninth assignment of error is overruled.
 {¶ 427} "60. THE TRIAL COURT AND THIS COURT ERRED BY FAILING TO CONTROL THE PROCEEDINGS AND PRESERVE AND PROVIDE AN ACCURATE RECORD OF THE PROCEEDINGS FOR REVIEW."
 {¶ 428} Under this assignment of error, Skatzes contends that he has been denied a complete and accurate record on appeal by the manner in which we have resolved a variety of record problems in this case. Some of these issues have been addressed at length in our earlier decisions in this case, and we will address them only briefly here.
 {¶ 429} First, Skatzes points out that the pleadings, transcripts, and one of the indictments from Scioto County were missing at one point but have now been found. Skatzes also points out that the transcript was incomplete and had not been certified in its entirety at an earlier point in these proceedings. Insofar as Skatzes acknowledges that these issues have been resolved, the purpose of Skatzes' discussion of these issues is unclear.
 {¶ 430} Second, Skatzes complains about two unmarked audiotapes which "disappeared from the record" and a folder of unmarked documents related to the mitigation phase of the trial. With respect to the tapes, we indicated in our March 4, 1999 Decision and Final Judgment Entry that our review of the record revealed no unmarked tapes, that there was no indication in the record that the tapes had existed, and that counsel had offered no suggestion as to the substance of these tapes. State v. Skatzes (Mar. 4, 1999), Montgomery App. No. 15848, (Decision and Final Judgment Entry). Skatzes' argument that the record is incomplete without the alleged tapes is without merit. With respect to the mitigation materials, we noted in our Decision and Final Judgment Entry that there was no dispute among the parties that these unmarked materials were documents submitted at the sentencing hearing and that the court had reviewed the materials but had not considered them in arriving at its decision. Id. Because no dispute existed, we ordered the parties to submit a stipulation pursuant to App.R. 9(E) that the folder contained the packet of information referred to at the sentencing hearing. Id. Skatzes' attorneys apparently refused to sign the stipulation prepared by the prosecutors, and efforts to involve the trial judge in the process were fruitless. Accordingly, we ordered the mitigation documents included in the record on November 9, 1999. State v. Skatzes (Nov. 9, 1999), Montgomery App. No. 15848, (Journal Entry). Skatzes has offered no basis for us to change our earlier decision, which worked to his advantage.
 {¶ 431} Third, Skatzes objects to our decision to accept a duplicate of Exhibit 311, which was missing from the record. Exhibit 311 was a videotaped copy of a news broadcast. Skatzes points out that the content of the videotape should have been transcribed as it was played for the jury, but was not, and that as a result "identification" of the duplicate tape has not been possible. He contends that there is "no justification" for the state's failure to have properly recorded and preserved this evidence.
 {¶ 432} It is apparent from the record that Exhibit 311 was a news broadcast of a statement made by inmate Stanley Cummings on the recreation yard on April 16, after which Corrections Officer Tony Demons was released. Skatzes was not involved in this exchange. We have concluded that "the contents of Exhibit 311 are * * * readily identifiable" from the record and ordered the parties to supplement the record in accordance with App.R. 9(E). State v. Skatzes (Mar. 4, 1999), Montgomery App. No. 15848, (Decision and Final Judgment Entry). Because there is little doubt about the content of the tape and Skatzes has not suggested how he was prejudiced by the duplicate, we find no error in this decision.
 {¶ 433} Fourth, Skatzes objects to our decision to allow substitute copies of Exhibits 1 through 5, 308, 314, 318, 319, and 321, which were diagrams of the prison at Lucasville, videotapes of Tess Unwin's press conference, and videotapes of various activities that occurred on the recreation yard during the course of the riot such as food drops and the surrender process. In particular, Skatzes objects to the fact that the substitute exhibits were authenticated by Sgt. Hudson, who testified at many trials and, according to Skatzes, may not have had specific recollections as to Skatzes' case. We conducted a hearing on this issue on July 12, 2000 and concluded that, as attested by Sgt. Hudson, the copies were "true and accurate copies of the exhibits used in the underlying trial." State v. Skatzes (Aug. 31, 2000), Montgomery App. No. 15848, (Decision and Entry). In so holding, we noted that Skatzes had "not challenged the accuracy of the proffered duplicate exhibits or made any persuasive argument regarding how [he] would be prejudiced by their admission." Id. Skatzes has given us no reason to reconsider this decision herein.
 {¶ 434} Fifth, Skatzes challenges our acceptance into the record of a photocopy of Exhibit 335, a photograph of three inmates-Rodger Snodgrass, Jason Robb, and Ronald Barber-each of whom had tattoos associated with white supremacist groups on his exposed arms. Skatzes claims that the copy does not "fully demonstrate the prejudice engendered by [the] photo." He further argues that the photograph was irrelevant, that it inflamed the passions and prejudices of the jury, and that it created "the implication of guilt by association" in violation of Skatzes' First Amendment rights. In our Decision and Final Judgment Entry of March 4, 1999, we allowed the substitution of a copy because Skatzes had not shown why the copy was inferior to the original. Statev. Skatzes (Mar. 4, 1999), Montgomery App. No. 15848, (Decision and Final Judgment Entry). Because Skatzes still has not made such a showing, we stand by our earlier decision. Skatzes' arguments that the photograph was prejudicial and irrelevant relate to the admission of the original exhibit and are not properly raised in opposition to the substitution of a photocopy.
 {¶ 435} Sixth, Skatzes objects to three pages of the transcript that were not certified by any court reporter. The certification at issue was filed on August 23, 1999 pursuant to a previous order of this court.
 {¶ 436} Seventh, Skatzes objects to the fact that two exhibits introduced during the testimony of the coroner who conducted the autopsy of David Sommers are missing from the record. Skatzes makes no specific argument with respect to these exhibits, but he obviously objects to the fact that they are missing. Each of the exhibits is described in the record as a "sketch * * * magnified * * * on a piece of cardboard." Exhibit 344 was a drawing of Sommers' body indicating the location of his wounds and Exhibit 345 was "a picture looking on the top of the head," also reflecting his injuries. The parties have been unable to locate these exhibits or copies of the exhibits. Thus, we must consider whether we can effectively review the record in the absence of these exhibits and whether Skatzes has been unduly prejudiced by their disappearance.
 {¶ 437} The content of Exhibits 344 and 345 is fairly clear from the record: they were sketches made by the coroner of the wounds to Sommers' head, neck, and torso. Although Skatzes made no argument with respect to the prejudicial effect of these exhibits in his brief, he suggests in other filings with the court that he must be able to determine whether the exhibits were "gory, misleading, or otherwise prejudicial to [his] case."
 {¶ 438} It is not plausible to us that the sketches in question could have been fairly characterized as "gory." Gory is defined as "bloodcurdling, sensational," Webster's Ninth New Collegiate Dictionary (1990) 528, and we see no reasonable likelihood that sketches of a body with markings for the locations of injuries could be considered gory. See DePew, 38 Ohio St.3d at 281 (the term "gruesome" in the context of photographic evidence should, in most cases, be limited to depictions of actual bodies or body parts). This is especially true where, as here, the sketches can be juxtaposed with photographic exhibits of Sommers' bloodied body with his brain exposed, to which Skatzes did not object. Moreover, we have no reason to believe that the exhibits were misleading, as there was no dispute as to the cause of Sommers' death. We further note that defense counsel did not object to the admission of these exhibits at trial and that Skatzes has not prepared a statement of the evidence pursuant to App.R. 9(C). Having thoroughly considered this matter, we are confident that Skatzes can receive a thorough and fair hearing on appeal despite the unfortunate loss of Exhibits 344 and 345.
 {¶ 439} Skatzes cites numerous cases for the proposition that the alleged incompleteness and inaccuracy of the record in this case compel granting a new trial. In our view, however, none of these cases requires such a result.
 {¶ 440} In State v. D'Ambrosio (1993), 67 Ohio St.3d 185, 199, a capital case upon which Skatzes relies extensively, mitigation evidence offered at trial was missing from the record when the case arrived at the supreme court. Ultimately, the exhibits in question were forwarded to the supreme court by the prosecutor or the clerk, and the record was complete. Id. at 200. It was unclear to the supreme court, however, whether the court of appeals had had the complete record when it had conducted its independent review of the death sentence. Id. As such, the supreme court deferred conducting its own independent review of the sentence and remanded the matter to the court of appeals for it to consider all of the mitigating evidence or to clarify that it had already done so. Id. D'Ambrosio highlights the importance of a complete record, but it provides no guidance regarding the record issues presented in Skatzes' case, namely the propriety of substituting copies of exhibits for the originals when the originals cannot be found and the inability to locate seemingly insignificant exhibits from the guilt phase of trial.
 {¶ 441} Skatzes also relies on several cases in which the record problems were much more significant than those presented here. For example, in Hammond v. Alabama (Ala.Crim.App. 1995), 665 So.2d 970, 972, six potential jurors had been questioned in chambers after indicating possible problems with serving on the jury in open court, such as objections to sitting in judgment of another on religious grounds, having read or talked with others about the case, and the like. Before excusing five of these potential jurors for cause, in chambers discussions were had with them that were not recorded. Id. The appellate court noted that it could speculate about the nature of the questioning that had occurred in chambers and recognized that the potential jurors may have been properly excluded but acknowledged that it could not be sure without a transcript of those proceedings. Id. The court concluded:
 {¶ 442} "The exclusion for cause of a juror who is not irrevocably committed to vote against the death penalty regardless of the facts and circumstances is, in a capital prosecution, reversible constitutional error and cannot be subject to harmless error review.
 {¶ 443} "* * *.
 {¶ 444} "After a careful review of the record before us, we conclude that the missing portion of the voir dire examination and the proceeding relating to challenges for cause constitutes a substantial and significant portion of the record * * * adversely affect[ing] a substantial right of the appellant." (Citations omitted.) Id. at 972-973.
 {¶ 445} Accordingly, the court ordered a new trial. Id. at 973. It did not, however, adopt a blanket rule that missing portions of a record entitle a defendant to a new trial, which is the position that Skatzes urges us to adopt. In fact, Hammond's reasoning is firmly rooted in the constitutional issues surrounding jury selection. Moreover, whereas Hammond concluded that the defendant's substantial rights had been adversely affected by the missing portion of the record, we have reached the opposite conclusion with respect to the missing items in Skatzes' case.
 {¶ 446} In State v. Sanders (N.C. 1984), 321 S.E.2d 836, 837, the defendant challenged the adequacy and accuracy of the trial court's jury instructions on appeal. Due to erroneous transcription by the court reporter, "portions of the jury instructions before [the appellate court] contain[ed] a strikingly large number of incomplete sentences, unintelligible phrases[,] and words so misspelled as to cast doubt upon their meaning." Id. Even correcting grammatical errors and possible lapses in language by the trial judge, the appellate court was "unable to make any reasonable sense of the challenged instructions" and was unable to improve upon the record. Id. Thus, the court ordered a new trial. Id. Skatzes is not presented with record problems of this magnitude.
 {¶ 447} In Perez v. Texas (Tex.Crim.App. 1992), 824 S.W.2d 565, a new trial was ordered where the court reporter had lost tapes and records of the whole trial except for voir dire. In In re Stephen B.(Cal. 1979), 598 P.2d 480, 481, the court reporter's notes regarding one day of a two-day jurisdictional hearing in juvenile court had been inadvertently destroyed. After an appellate court affirmed the trial court's judgment based on the partial record, the supreme court reversed and ordered a new hearing. Id. at 485. These problems are not analogous to the missing and substituted exhibits in Skatzes' case.
 {¶ 448} In sum, the cases cited by Skatzes do not support his conclusion that a new trial was warranted by the irregularities in the record. In fact, one of the cases upon which he relies actually supports our view. In Stephens v. Zant (C.A.5, 1980), 631 F.2d 397, reversed on other grounds, (1983) 462 U.S. 862, 103 S.Ct. 2733, the court was confronted with a capital case in which neither the voir dire nor the closing arguments had been transcribed. The petitioner contended that a death sentence could not constitutionally be affirmed on appeal when the transcript before the reviewing court did not contain the proceedings of the entire trial. Id. at 402. Like Skatzes, the petitioner did not specifically allege that anything erroneous, inflammatory, or prejudicial had occurred during the unrecorded portion of the trial. The court concluded that the record was adequate so long as the reviewing court could make the determinations required of it under Gregg,428 U.S. at 153, 96 S.Ct. at 2909, i.e., that the sentence was not imposed under the influence of passion or prejudice, that the evidence supported the jury's finding of a statutory aggravating circumstance, and that the sentence was proportionate to other sentences imposed in similar cases. The court also found it significant that the proceedings at issue had taken place in open court, that counsel had had a full opportunity to comment on and challenge those proceedings, that trial counsel had not objected to the injection of anything prejudicial, and that the petitioner had not alleged or offered any evidence that he was actually prejudiced by anything that was not on the record. Stephens, 631 F.2d at 403. In Skatzes' case, these same factors support the conclusion that the record is adequate, along with the fact that duplicates of many of the missing exhibits were produced for our review.
 {¶ 449} Finally, Skatzes advances some general arguments about the incompleteness of the record and the unconscionability of the state "seek[ing] the death penalty and then diminish[ing] the quality of the record for review." We share Skatzes' consternation about the careless manner in which exhibits were removed from the record of this case for use at other trials resulting from the riot, and we are baffled that none of the prosecutors involved in the cases saw a problem with the handling of exhibits in this manner. We do not agree, however, that Skatzes has thereby been deprived of his right to due process and to thorough appellate review. We are confident that, with the exception of the coroner's sketches, we have been able to supplement the record with true and accurate copies of the exhibits admitted at trial such that we can thoroughly review the evidence offered against Skatzes. Thus, the record is not incomplete except with respect to the coroner's sketches, and Skatzes has not advanced a credible argument as to how he was prejudiced by those sketches. Moreover, we recognize that, having been sentenced to death, Skatzes has an interest-aside from the completeness of the record-in protracting our consideration of this appeal while the parties continue to search for the original exhibits. In our view, ample time and effort have been devoted to locating original exhibits and to verifying copies of exhibits that could not be found. After five years, there was no reasonable likelihood that, given additional time, the parties would have been able to uncover the missing exhibits.
 {¶ 450} The sixtieth assignment of error is overruled.
 {¶ 451} "61. THE TRIAL COURT ERRED IN ALLOWING THE GOVERNMENT TO ARGUE NON-STATUTORY AGGRAVATING FACTORS."
 {¶ 452} The supreme court has made it clear that, in the penalty phase of a capital trial, the only aggravating circumstances that may be considered are those circumstances specifically enumerated in R.C.2929.04(A) that were charged in the indictment and found by the jury to have been proven beyond a reasonable doubt. Wogenstahl,75 Ohio St.3d at 356. The "nature and circumstances of the offense," on the other hand, may weigh against the imposition of the death penalty. Id.; R.C.2929.04(B). The aggravating circumstances and the nature and circumstances of the offense are "two very different concepts," and the supreme court has held that "it is wholly improper for the state to argue or suggest that the nature and circumstances of the offense are `aggravating circumstances.'" (Emphasis sic.) Wogenstahl,75 Ohio St.3d at 352, 355.
 {¶ 453} Skatzes argues that, during closing arguments in the sentencing phase of the trial, the prosecutor used non-statutory factors such as his role in the riot, which was a circumstance of the offense but not an aggravating circumstance pursuant to R.C. 2929.04(A), to argue in favor of the death sentence. The record reveals, however, that the prosecutor's argument was proper. The prosecutor's closing argument made the distinction between aggravating circumstances and mitigating factors very clear. He referred to Skatzes' leadership role in the riot and in the Aryan Brotherhood to refute any argument that the statutory mitigating factors were entitled to much weight. These mitigating factors included whether Skatzes had been a participant but not the principal offender in the offenses and whether he had been under duress or had been coerced. R.C. 2929.04(B)(2), (6). The state pointed to the evidence that Skatzes had been one of the leaders during the riot in support of its argument that these mitigating factors were not entitled to much weight, if any, in Skatzes' sentencing. The prosecutor did not argue that Skatzes' leadership role was an aggravating circumstance justifying imposition of the death penalty.
 {¶ 454} The sixty-first assignment of error is overruled.
 {¶ 455} "62. DEATH QUALIFICATION OF THE JURY VIOLATED DEFENDANT'S RIGHTS TO DUE PROCESS AND EQUAL PROTECTION OF THE LAWS AS GUARANTEED BY THE UNITED STATES CONSTITUTION, AMENDS. V, VIII, AND XIV, AND THE OHIO CONSTITUTION, ART. I, § 2 16."
 {¶ 456} Skatzes claims that he was prejudiced by the fact that the jurors were questioned about their abilities to impose a death sentence before his guilt had been determined. He claims that this procedure made the jury more likely to convict in the guilt phase of the trial.
 {¶ 457} The supreme court has held that death-qualifying a jury does not deny a capital defendant a trial by an impartial jury. Statev. Jones, 91 Ohio St.3d 335, 338, 2001-Ohio-57; State v. Dunlap,73 Ohio St.3d 308, 315, 1995-Ohio-243, certiorari denied (1996),516 U.S. 1096, 116 S.Ct. 822. See, also, Wainwright v. Witt (1985),469 U.S. 412, 433, 105 S.Ct. 844, 857. It is well settled that, in striving to achieve an impartial jury-one that will fairly judge the facts and apply the law as instructed-the trial court is justified in excluding those jurors who would never impose the death penalty.Jenkins, 15 Ohio St.3d at 188.
 {¶ 458} The sixty-second assignment of error is overruled.
 {¶ 459} The remaining assignments of error are raised in Skatzes' supplemental briefs.
 {¶ 460} "63. DEFENSE COUNSEL[S]' CONDUCT FELL BELOW THE ACCEPTABLE STANDARD OF PRACTICE WHEN THEY FAILED TO PROPERLY VOIR DIRE THE JURORS ON THE DEATH PENALTY AND FAILED TO MAKE EFFECTIVE USE OF JUROR QUESTIONNAIRES."
 {¶ 461} Skatzes claims that trial counsel acted ineffectively insofar as the jury questionnaire did not include "questions designed to elicit information that would reveal juror bias" toward the Aryan Brotherhood or those associated with it. Skatzes also lists the names of a number of jurors who allegedly "indicated an inclination towards [sic] use of the death penalty" in those questionnaires.
 {¶ 462} A debatable decision concerning trial strategy cannot form the basis of a finding of ineffective assistance of counsel. Cook,65 Ohio St.3d at 524-525. Although trial counsel could have put a question about the Aryan Brotherhood on the jury questionnaire, that certainly was not the only means by which counsel could have adequately evaluated the jurors' views. Indeed, the prospective jurors were questioned during voir dire about their familiarity with the Aryan Brotherhood and whether they would be able to judge Skatzes based on the evidence presented rather than on the views of that organization. Counsel's approach was a reasonable one, and Skatzes has not shown that he was prejudiced by it.
 {¶ 463} Skatzes also claims that some jurors who expressed "an inclination towards [sic] use of the death penalty" on their questionnaires were not adequately questioned during voir dire. The record does not support this claim. The jurors were questioned extensively about their understanding of the process by which the death penalty may be imposed in Ohio and about their abilities to participate in that process as jurors. We are unpersuaded that Skatzes' attorneys failed to make effective use of the jury questionnaires in this regard.
 {¶ 464} The sixty-third assignment of error is overruled.
 {¶ 465} "64. THE TRIAL COURT ERRED IN SENDING CONFLICTING INSTRUCTIONS TO THE JURY.
 {¶ 466} "65. THE TRIAL COUNSEL PROVIDED SUBSTANDARD REPRESENTATION IN PERMITTING THE JUDGE TO SEND CONFLICTING INSTRUCTIONS TO THE JURY."
 {¶ 467} Under his sixty-fourth and sixty-fifth assignments of error, Skatzes challenges the jury instruction regarding conspiracy and claims that his attorneys were ineffective in failing to object to this instruction. To the extent that this argument challenges the instruction itself, it revisits an argument already raised and addressed under the fourth assignment of error. We rely on that discussion here.
 {¶ 468} To the extent that this argument challenges counsel's effectiveness in failing to object to the instruction given from the bench, it exceeds the scope of supplemental briefing allowed by our April 25, 2002 order. The alleged ineffectiveness was apparent from the trial transcript, which was filed more than six years ago. Our decision to supplement the record with the written jury instructions did not worsen the effect of the alleged ineffectiveness. Moreover, we are unpersuaded that the result of the trial would probably have been different but for the alleged error or that the error was so serious that the defense attorneys failed to function as the "counsel" that the Sixth Amendment guarantees. Strickland, 466 U.S. at 687, 104 S.Ct. at 2064; Cook,65 Ohio St.3d at 524.
 {¶ 469} The sixty-fourth and sixty-fifth assignments of error are overruled.
 {¶ 470} "66. THE TRIAL COURT ERRED IN IMPOSING THE DEATH PENALTY ON A PERSON SUFFERING FROM A SEVERE MENTAL ILLNESS.
 {¶ 471} "67. THE TRIAL COUNSEL PROVIDED SUBSTANDARD REPRESENTATION IN PERMITTING THE JUDGE TO IMPOSE THE DEATH SENTENCE ON A PERSON SUFFERING FROM A SEVERE MENTAL ILLNESS."
 {¶ 472} Skatzes argues that it is unconstitutional to impose the death penalty on a person suffering from a severe mental illness and that his counsel were ineffective in failing to raise this argument in the trial court. This issue is not one on which we permitted supplemental briefing. However, because Skatzes relies in part on a United States Supreme Court decision that was issued after the filing of his original brief, we will address the issue.
 {¶ 473} Skatzes cites Atkins v. Virginia (2002), ___ U.S. ___,122 S.Ct. 2242, which held that execution of the mentally retarded is unconstitutional. Skatzes does not claim to be mentally retarded, but he does claim to be mentally ill, and he urges this court to extend Atkins
to prohibit the execution of the severely mentally ill.
 {¶ 474} Even if we were willing to consider the legal issue presented, we would not do so in this case because we disagree with Skatzes' assertion that "the record establishes that [he] may suffer from a serious mental illness." Skatzes relies on his own characterization of himself as "paranoid," his inability to recall certain events during the riot, his weight loss, and contradictions between his testimony and that of other inmates about whether he had possessed a weapon during the riot in support of his claim that he is severely mentally ill. He presented no medical evidence bearing on his mental health. This evidence clearly does not create a genuine issue as to whether Skatzes had a mental illness that warranted consideration as part of his sentencing. As such, we need not consider whether the holding in Atkins should be extended to the mentally ill.
 {¶ 475} The sixty-sixth and sixty-seventh assignments of error are overruled.
 {¶ 476} "68. THE TRIAL COURT ERRED IN USURPING THE JURY FUNCTION OF FINDING THAT THE AGGRAVATED CIRCUMSTANCES WERE PROVED BEYOND A REASONABLE DOUBT, DETERMINING WHAT MITIGATION WAS PRESENT, AND IN WEIGHING THE AGGRAVATED CIRCUMSTANCES AGAINST THE MITIGATING FACTORS.
 {¶ 477} "69. THE TRIAL COUNSEL PROVIDED SUBSTANDARD REPRESENTATION IN PERMITTING THE JUDGE TO USURP THE JURY FUNCTION OF DETERMINING THAT THE AGGRAVATED CIRCUMSTANCES OUTWEIGHED THE MITIGATING FACTORS."
 {¶ 478} Skatzes' final two assignments of error challenge the role of the trial judge in imposing the death penalty and reiterate the argument made under his fifty-seventh assignment of error that Ohio's sentencing procedures are inconsistent with the United States Supreme Court's recent decision in Ring v. Arizona (2002), ___ U.S. ___,122 S.Ct. 2428. As we stated, supra, Ohio's sentencing scheme clearly does not present the problem addressed in Ring. We rely on our prior discussion in disposing of these assignments of error.
 {¶ 479} The sixty-eighth and sixty-ninth assignments of error are overruled.
 {¶ 480} "70. DEFENSE COUNSEL WERE INEFFECTIVE WHEN THEY AGREED TO PERMIT ALTERNATE JURORS IN THE JURY ROOM DURING PENALTY PHASE DELIBERATIONS."
 {¶ 481} "71. THE TRIAL COURT ERRED WHEN HE [SIC] PERMITTED ALTERNATE JURORS IN THE JURY ROOM DURING PENALTY PHASE DELIBERATIONS."
 {¶ 482} Skatzes claims that the trial court erred in allowing the alternate jurors into the jury room during the penalty phase deliberations and that trial counsel acted ineffectively in failing to object to this procedure. The record demonstrates that, in fact, trial counsel expressly agreed to this procedure. Skatzes relies on the recent supreme court ruling in State v. Gross, 97 Ohio St.3d 121, 2002-Ohio 5524, in support of his argument.
 {¶ 483} In Gross, the supreme court held that allowing alternate jurors to sit in on penalty phase deliberations over the defendant's objection constitutes reversible error unless the state can show that the error was harmless or the trial court has cured the error. Skatzes' case is unlike Gross in that he did not object to the presence of the alternate jurors. Moreover, in Gross, there was specific evidence of disruption of the deliberative process by an alternate juror, and Skatzes concedes that there is no such evidence in this case. Because there is no such evidence here, we find that the error was harmless and that trial counsel were not ineffective in failing to object. See State v. Neal
(Dec. 6, 2002), Champaign App. No. 2000-CA-16 and 2000-CA-18,2002-Ohio-6786.
 {¶ 484} The seventieth and seventy-first assignments of error are overruled.
 {¶ 485} We will proceed with our independent review of the aggravating circumstances and mitigating factors about which the parties presented evidence at trial. Pursuant to R.C. 2929.05, we must conduct an independent review of the record and consider the offense and the offender "to determine whether the aggravating circumstances the offender was found guilty of committing outweigh the mitigating factors in the case, and whether the sentence of death is appropriate." Furthermore, we must determine whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. R.C. 2929.05(A).
 {¶ 486} Initially, we express our belief beyond a reasonable doubt that the evidence supports the aggravated circumstances that Skatzes was found guilty of committing. It is not disputed that Skatzes was a prisoner in a detention facility when Elder and Sommers were murdered and that he had previously been convicted of an offense involving the purposeful killing of another. See R.C. 2929.04(A)(4) and (5). We also agree with the jury and with the trial judge that Skatzes actively participated in the killing of Elder and Sommers as part of a course of conduct involving the purposeful killing of two or more persons. See R.C. 2929.04(A)(5). Furthermore, the evidence amply supports the findings that Skatzes purposely caused the death of Elder, with prior calculation and design, in the course of or immediately after committing kidnapping, and that Skatzes purposely caused the death of Sommers in the course of or immediately after committing kidnapping and was a principal offender in those offenses. See R.C. 2929.04(A)(7). Each of these factors is entitled to significant weight.
 {¶ 487} For each aggravated murder count for which the death sentence was imposed, we are now required to determine whether the aggravating circumstances accompanying that count outweigh the mitigating factors. Specifically, the aggravating circumstances must be weighed against the nature and circumstances of the offense, the history, character, and background of the offender, and the additional factors set forth in R.C. 2929.04(B), which include the following:
 {¶ 488} "(1) Whether the victim of the offense induced or facilitated it;
 {¶ 489} "(2) Whether it is unlikely that the offense would have been committed, but for the fact that the offender was under duress, coercion, or strong provocation;
 {¶ 490} "(3) Whether, at the time of committing the offense, the offender, because of a mental disease or defect, lacked substantial capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law;
 {¶ 491} "(4) The youth of the offender;
 {¶ 492} "(5) The offender's lack of a significant history of prior criminal convictions and delinquency adjudications;
 {¶ 493} "(6) If the offender was a participant in the offense but not the principal offender, the degree of the offender's participation in the offense and the degree of the offender's participation in the acts that led to the death of the victim;
 {¶ 494} "(7) Any other factors that are relevant to the issue of whether the offender should be sentenced to death."
 {¶ 495} In our view, the factors enumerated at R.C.2929.04(B)(1)-(6) are entitled to no weight in mitigation in this case. Skatzes was not pressured or provoked into committing the crimes, he did not lack the capacity to appreciate the criminality of his conduct or to conform his conduct to the law, he was not young, and he had a significant criminal history. The degree of Skatzes' participation in each of the murders is not entitled to any weight in mitigation. Thus, we will consider whether there are any other factors that are entitled to weight when compared with the aggravating circumstances.
 {¶ 496} Skatzes offered the testimonies of several Lucasville inmates and of Corrections Officer Ratcliff at the sentencing phase of the trial. The inmates, several of whom were black, testified that they had never experienced racism from Skatzes and that Skatzes had treated them with respect. They also testified that Skatzes had been helpful and likeable in prison and had served as a peacemaker among inmates. The inmates described Skatzes as a role model for younger inmates on staying out of trouble and attested that he could make a valuable contribution to the prison community in the future. The inmates also testified that Skatzes had helped some injured corrections officers to get out of L-block in the first hours of the riot. Officer Ratcliff stated that Skatzes had been a role model for younger inmates and had protected him and Officer Clark during the riot.
 {¶ 497} Skatzes also offered his own unsworn statement at the sentencing hearing. See R.C. 2929.03(D)(1). In his statement, Skatzes spoke at length about the injustice of the prison system and of the riot investigation, as a result of which lying snitches who had admitted to killing people received light sentences in exchange for testifying against him. He also spoke of the hard conditions in prison, of his efforts to do the "right things" and to help other prisoners, and of his own refusal to snitch on anyone. He maintained his innocence throughout, and, although he expressed some remorse that the riot had happened and that people had been injured and killed, he expressed no personal remorse and took no responsibility.
 {¶ 498} In our view, this mitigation evidence was entitled to very little weight. Any capacity that Skatzes may have had to serve as a good role model was severely undercut by his use of his leadership capabilities to promote destruction and violence during the riot. By the same token, his past conduct in prison, including his role in the riot and an extended period in administrative control, refutes the suggestion that Skatzes would be a valuable contributor to the prison community. Moreover, we are inclined to attribute Skatzes' willingness to help seriously injured corrections officers out of L-block in the early hours of the riot to self-interest rather than to benevolence, because Skatzes clearly recognized that the deaths of any corrections officers would escalate the authorities' response to the riot. Skatzes' lack of remorse and refusal to accept any responsibility for the riot obviously are not entitled to any weight in mitigation.
 {¶ 499} In sum, we find that the aggravating circumstances are entitled to significant weight and that the mitigating factors are entitled to very little weight. With respect to the aggravated murder of Earl Elder, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt. Likewise, with respect to the aggravated murder of David Sommers, we find that the aggravating circumstances outweigh the mitigating factors beyond a reasonable doubt.
 {¶ 500} We must also consider whether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases. R.C. 2929.05(A). The Supreme Court of Ohio has held that "[t]he proportionality review required by R.C. 2929.05(A) is satisfied by a review of those cases already decided by the reviewing court in which the death penalty has been imposed." Steffen, 31 Ohio St.3d at 111, paragraph one of the syllabus.
 {¶ 501} This court has affirmed death sentences in cases involving the killing or two or more victims in one course of conduct. Keene, Montgomery App. No. 14375, affirmed (1998), 81 Ohio St.3d 646; State v.Kinley (June 24, 1993), Clark App. No. 2826, affirmed (1995),72 Ohio St.3d 491; State v. Moreland (Sept. 16, 1988), Montgomery App. No. 9907, affirmed (1990), 50 Ohio St.3d 58; State v. Hooks (Oct. 22, 1986), Montgomery App. No. 9275, affirmed (1988), 39 Ohio St.3d 67. We have also affirmed death sentences in cases involving felony murder aggravating circumstances. State v. Myers (Feb. 12, 1999), Greene App. No. 96-CA-38; State v. Bays (Jan. 30, 1998), Greene App. No. 95-CA-118, affirmed (1999), 87 Ohio St.3d 15; Keene, supra; State v. Brewer (Aug. 26, 1988), Greene App. No. 87-CA-67, affirmed (1990), 48 Ohio St.3d 50;Hooks, supra. This court has not considered any aggravated murder cases in which the aggravating circumstances included the defendant's status as a prisoner at the time of the offense or the defendant's prior conviction for a purposeful killing. However, other courts in this state have affirmed death sentences in such cases. See State v. Sanders (May 1, 1998), Hamilton App. No. C-960253, affirmed (2001), 92 Ohio St.3d 245;Robb, Franklin App. No. 95APA08-1003, affirmed (2000), 88 Ohio St.3d 59;State v. Bradley (Sept. 22, 1987), Scioto App. No. 1583, affirmed (1989), 42 Ohio St.3d 136; State v. Zuern (June 11, 1986), Hamilton App. No. C-840803, affirmed (1987), 32 Ohio St.3d 56. Based upon our review of the cases supra and our consideration of the facts in this case, we conclude that Skatzes' sentence was not excessive or disproportionate.
 {¶ 502} As discussed under the forty-first assignment of error, Skatzes' conviction for the kidnapping of Earl Elder will be vacated, at the state's request, due to the fact that the sentence imposed was not announced in open court. In all other respects, the judgment of the trial court will be affirmed.
BROGAN, J. and GRADY, J., concur.
[1] There were two separate indictments that were merged at trial.
[2] Although Skatzes claims that the trial court posed this question "after each juror had been passed for cause and after extensive questioning by * * * both the government and Skatzes' counsel," the record does not bear this out. It appears that the judge's standard course was to call a potential juror, to briefly explain the purpose of voir dire, and then to ask this single question-and sometimes follow-up questions-before turning the questioning over to trial counsel.